**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

GINA GOE, individually and as parent and next friend of GRACE GOE; KARLA KOE, individually and as parent and next friend of KYLIE KOE; LAURA LOE, individually and as parent and next friend of LOGAN LOE; and MELISSA MOE, individually and as parent and next friend of MAYA MOE,

*Plaintiffs,*

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services; CENTERS FOR MEDICARE & MEDICAID SERVICES; and MEHMET OZ, in his official capacity as Administrator of CMS,

*Defendants.*

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Civil Action No. ____________

## INTRODUCTION

1. Since taking office, the Trump administration has waged an unrelenting campaign to eliminate legal protections for transgender people and to deny them access to essential health care. The Rule at issue in this case is the latest salvo in that campaign.

2. On August 13, 2026, the Centers for Medicare & Medicaid Services ("CMS") published a final rule categorically prohibiting Federal Financial Participation ("FFP") for evidence-based treatments for gender dysphoria—including puberty-delaying medications, hormone therapy, and surgical interventions[1]—for all youth enrolled in Medicaid (under age 18) and the Children's Health Insurance Program ("CHIP") (under age 19). 91 Fed. Reg. 52,406

[1] Plaintiffs challenge the Rule to the extent it would affect access to pharmacological interventions; they do not challenge its applicability to surgical interventions.

(Aug. 13, 2026) (the "Rule"). The Rule was motivated by discriminatory animus against transgender individuals and violates the Administrative Procedure Act, and the United States Constitution.

3. The Rule is not the product of reasoned deliberation—it is the product of a political directive. Days into office, President Trump signed Executive Order 14187, titled "Protecting Children from Chemical and Surgical Mutilation" ("Denial of Care Order") commanding the Secretary of Health and Human Services to "take all appropriate actions" to "end" transgender health care for young people, what the order branded a "stain on our Nation's history." Exec. Order No. 14187, 90 Fed. Reg. 8,771 (Jan. 28, 2025). The title alone reveals the Administration's animus: labeling evidence-based medical care as "mutilation" is not the language of neutral policymaking. The Secretary then issued a Declaration pronouncing these treatments unsafe and ineffective, a pronouncement a federal court found "so clearly unlawful" that it vacated the Declaration, permanently enjoined the United States Department of Health and Human Services ("HHS") from relying on it or any materially similar policy, and excoriated Defendants for attempting to "bully or gaslight" the court into ignoring the Declaration's "many procedural and legal flaws." *Oregon v. Kennedy*, 831 F. Supp. 3d 1048, 1078 (D. Or. 2026). Despite that ruling, CMS, acting under the same Executive Order and reaching the same conclusion, finalized the Rule.

4. Medicaid regulations identify the services that participating State plans must provide to eligible beneficiaries, including the services required under 42 C.F.R. § 440.220, and expressly prohibit a Medicaid agency from arbitrarily denying or reducing the amount, duration, or scope of a required service "solely because of the diagnosis, type of illness, or condition." 42 C.F.R. § 440.230(c). The Rule thus makes diagnosis—not the service, the beneficiary's

eligibility, or an individualized assessment of medical necessity—the dispositive basis for coverage. The Rule also does precisely what that prohibition forbids: it withdraws federal funding for pharmaceutical and surgical interventions when used to treat gender dysphoria while preserving funding for the same drugs and procedures when used to treat other diagnoses. The Rule overrides individualized medical necessity determinations made by treating physicians based on comprehensive clinical assessment. It applies, by its own terms, "even when a provider determines that a sex-rejecting procedure is medically necessary." 91 Fed. Reg. at 52,419. CMS itself acknowledged it has historically not "taken a position at the Federal level that particular services when provided to particular individuals for a particular purpose are inherently not medically necessary." *Id.* at 52,443. This reversal of decades of agency policy—imposed without adequate justification, in the face of overwhelming opposition from the medical community, and in direct conflict with the statutory mandate that Medicaid cover all medically necessary services for youth, including the Medicaid Act's Early and Periodic Screening, Diagnostic, and Treatment ("EPSDT") mandate—violates the Administrative Procedure Act ("APA"). The Rule also violates the Equal Protection guarantee of the Fifth Amendment because it was motivated by discriminatory animus against individuals with gender dysphoria.

5. The Rule takes effect on October 13, 2026. Unless this Court acts, transgender adolescents who depend on Medicaid and CHIP will lose access to treatments that their physicians have determined are medically indicated—treatments that every major medical association in the United States recognizes as safe and effective when appropriately prescribed. The consequences will be devastating: worsening gender dysphoria, psychological crisis, and in some cases, self-harm. The harm is imminent, concrete, and irreparable. Plaintiffs respectfully

request that this Court declare the Rule unlawful, vacate it in its entirety, and enjoin Defendants from implementing or enforcing it.

## JURISDICTION AND VENUE

6. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702, as well as jurisdiction over constitutional claims arising under the Fifth Amendment to the United States Constitution.

7. An actual, present, and justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a). The APA provides a waiver of sovereign immunity and a cause of action for persons adversely affected by final agency action. 5 U.S.C. § 702. This Court has authority to grant declaratory and injunctive relief under both the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and the Court's equitable powers.

8. Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1), which provides that a civil action against an officer or employee of the United States acting in an official capacity, or against an agency of the United States, may be brought in any judicial district in which (A) a defendant resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or (C) the plaintiff resides if no real property is involved. Plaintiffs Gina and Grace Goe, Karla and Kylie Koe, Logan Loe, and Maya Moe and their families all reside in the State of New Hampshire and receive medical care in the State of New Hampshire.

9. The Rule constitutes "final agency action" within the meaning of 5 U.S.C. § 704 because it marks the consummation of the agency's decision-making process and determines rights and obligations from which legal consequences flow. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Review of agency action under the APA is conducted on the administrative record and does not involve trial by jury. 5 U.S.C. § 706.

## PARTIES

**Plaintiffs**

10. Gina Goe is the parent and legal guardian of Grace Goe, a transgender adolescent under the age of 18 who is currently enrolled in Medicaid in the State of New Hampshire. Declaration of Gina Goe in Support of Plaintiffs' Motion for Stay ("Goe Decl."), ¶¶ 1–4. Gina Goe has actively participated in medical decisions regarding Grace's care, including the decision—made jointly with Grace and her treating physicians following comprehensive assessment—to pursue puberty-suppressing medication when clinically indicated to prevent the onset of irreversible masculinizing changes. *Id.* ¶¶ 8–15. Grace's family would not be able to pay privately for her treatment if Medicaid coverage were eliminated. Gina Goe and her family reside in Sullivan County, New Hampshire, in this judicial district. *Id.* at ¶ 3.

11. Karla Koe is the parent and legal guardian of Kylie Koe, a transgender adolescent under the age of 18 who is currently enrolled in Medicaid in the State of New Hampshire. Declaration of Karla Koe in Support of Plaintiffs' Motion for Stay ("Koe Decl."), ¶¶ 1–4. Kylie and her family, with the guidance of Kylie's treating physicians, have decided to pursue puberty-suppressing medication and/or receiving cross-sex hormone therapy that her treating physician has determined to be medically indicated to treat her gender dysphoria. Kylie's family lacks the financial resources to pay privately for Kylie Koe's treatment if Medicaid coverage is eliminated. *Id.* ¶¶ 11, 13, 14. Karla Koe and her family reside in Hillsborough County, New Hampshire. *Id.*at ¶ 3.

12. Laura Loe is the parent and legal guardian of Logan Loe, a transgender adolescent under the age of 18 who is currently enrolled in Medicaid in the State of New Hampshire. Declaration of Laura Loe in Support of Plaintiffs' Motion for Stay ("Loe Decl."), ¶¶ 1–4. Logan's doctors, Logan and her family agreed that puberty-suppression medication was

medically necessary to treat her gender dysphoria, and that she is imminently ready to begin hormone therapy. *Id.* at ¶ 11. Logan's family is unable to afford this treatment, as it costs more than the family's yearly household income. Medicaid coverage would make it possible for Logan to receive this necessary care. Logan and her family live in Hillsborough County, New Hampshire. *Id.* at ¶ 3.

13. Melissa Moe is the parent and legal guardian of Maya Moe, a fifteen-year-old transgender girl living in New Hampshire. She and her family are enrolled in New Hampshire Medicaid. Declaration of Melissa Moe in Support of Plaintiffs' Motion for Stay ("Moe Decl."), ¶¶ 1–4. Maya was prescribed puberty-suppression medication since 2022, and began hormone therapy in 2023, both of which were covered by New Hampshire Medicaid. *Id.* at ¶¶ 9, 11. Maya's family is unable to afford these therapies if they are not covered by Medicaid, as her puberty-suppressing medication, delivered by an implant, costs more than her mother's annual salary. *Id.*at ¶ 14.

**Adolescent Plaintiffs**

14. Grace Goe is an eleven-year-old transgender girl who has lived in New Hampshire for her entire life and is enrolled in Medicaid. Goe Decl. ¶ 4. She was diagnosed with gender dysphoria in January 2021. *Id.* at. ¶¶ 4, 8. Before her diagnosis, Grace experienced severe distress when others regarded her as a boy, including intense anxiety, uncharacteristic outbursts, statements that she "should just be dead," and a school crisis intervention prompted by a statement about cutting herself. *Id.* at ¶ 6. After her family began recognizing and supporting her as a girl, those symptoms subsided, and Grace has since lived as a girl in all aspects of her life, including at home and at school. *Id.* at ¶¶ 9, 12. Grace is now approaching the onset of male puberty. *Id.* at ¶ 11. Her treating providers anticipate that puberty-suppressing medication will be medically indicated when she reaches Tanner stage 2 to prevent irreversible masculinizing

changes, including deepening of her voice, facial and body hair growth, and skeletal changes, that would predictably cause a return of severe gender dysphoria and psychological distress. *Id.* If The Rule takes effect, Medicaid will not cover that medication, and Grace's family cannot afford it without Medicaid coverage. *Id.* at 17.

15. Kylie Koe is a thirteen-year-old transgender girl enrolled in Medicaid, her only health insurance. Koe Decl. ¶¶ 3, 4. She began living as a girl around age six or seven and was diagnosed with gender dysphoria by a mental health provider five years ago. *Id.* at ¶ 4, 6. She has also been diagnosed with depression, anxiety, and ADHD. *Id.* at ¶ 6. Before treatment, Kylie regularly shut down at school—she would stop speaking, refuse her work, sit alone, and could not be reached by teachers. *Id.* With medication and treatment she is now able to get through the school day, but it is a stability that is fragile and depends on her being able to live as who she is. *Id.* Most students at her school do not know she is transgender, and even a single misused name has left her unable to attend class for a full day. *Id*. ¶¶ 7–8. Kylie's parents were recently informed by her pediatric endocrinologist that she has reached Tanner stage 2 and that beginning puberty-suppressing medication is medically indicated prevent irreversible masculinizing changes—a permanently deepened voice, facial and body hair growth, a broadened jaw and brow, and an Adam's apple—that would predictably cause severe gender dysphoria and psychological distress. *Id.* at ¶¶ 9, 11, 13. If the Rule takes effect, Medicaid will not cover that medication, and Kylie's family will be unable to afford the cost of her medication. ¶ 14.

16. Logan Loe is a fifteen-year-old transgender girl who is a lifelong resident of New Hampshire and has been enrolled in Medicaid her entire life; Medicaid is her only health insurance. Loe Decl. ¶¶ 3–4. She has lived as a girl since approximately 2021, and her family came to understand and support her as a girl after she told her mother she is transgender. *Id*. at ¶

4. Logan has a history of depression and anxiety and experienced bullying and harassment in public school, but found her only sustained, successful relationship with a mental health counselor at the gender clinic after coming out. *Id.* at ¶¶ 8–10. At age twelve, her pediatric endocrinologist prescribed puberty blockers, and she has received them for approximately three years under close monitoring, all covered by Medicaid, with the result that she has undergone no masculine pubertal changes. *Id.* at ¶ 11. Her providers have determined this medication is medically necessary; if it stops, masculine puberty will resume within months and produce irreversible changes — a deeper voice, facial hair, an Adam's apple, and changes to her face and bone structure — that she and her doctors expect would cause severe distress and expose the most private fact about herself. *Id.* at ¶¶ 12, 14, 15. If the Rule takes effect, Medicaid will no longer cover the medication, and Logan's low-income family cannot afford its cost of approximately $70,000 per year without Medicaid coverage. *Id.* at ¶¶ 16–17.

17. Maya Moe is a fifteen-year-old transgender girl who lives in New Hampshire and has been enrolled in New Hampshire Medicaid since 2016. Moe Decl. ¶¶ 3–4. She was diagnosed with gender dysphoria in April 2019 after her pediatrician referred her to a specialized gender clinic. *Id*. at ¶ 8. Maya has expressed that she is a girl since early childhood. *Id.* at ¶ 5. After her family began recognizing and supporting her as a girl at around age five, including at school, her teachers observed an immediate change from being introverted, quiet, and anxious to being more present and engaged. *Id*. at ¶¶ 5–7. After years of monitoring, Maya began receiving puberty-suppressing medication in October 2022 and estrogen therapy in 2023. *Id.* at ¶¶ 9, 11. Her doctors have advised that she must continue both treatments, and her endocrinologist has determined that her current implant must be replaced at least once before she turns eighteen. *Id*. at ¶¶ 8–13. If the blocker stops working, testosterone-driven puberty will begin within months

and cause permanent changes, including a deeper voice and facial and body hair, that Maya fears. *Id.* at ¶ 15. If the Rule takes effect, Medicaid will no longer cover the puberty-suppression medication and hormone therapy Maya needs, and her family cannot afford the care without Medicaid coverage because the hormone implant alone costs more than $40,000—more than her mother's annual income. *Id*. ¶¶ 14, 17.

**Defendants**

18. Defendant United States Department of Health and Human Services ("HHS") is a Department of the U.S. Executive Branch. HHS is an agency within the meaning of 5 U.S.C. § 551(1). HHS is responsible for overseeing implementation of provisions of the Social Security Act, of which Medicaid and CHIP are a part.

19. Defendant Robert F. Kennedy, Jr., is the HHS Secretary. He is responsible for overseeing and administering all HHS programs through the Office of the Secretary and HHS's operating divisions. He is sued in his official capacity.

20. Defendant Centers for Medicare & Medicaid Services ("CMS") is the agency within HHS with primary responsibility for overseeing federal and state implementation of Medicaid and CHIP as required by federal law. CMS drafted and promulgated the Rule.

21. Defendant Mehmet Oz, M.D., is the CMS Administrator. He is responsible for overseeing and administering all CMS programs through the Office of the Administrator and CMS's centers and offices. He approved the Rule on August 10, 2026. 91 Fed. Reg. at 52,473. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

**The Medicaid and CHIP Programs**

22. Medicaid is a cooperative federal-state program that provides medical assistance to eligible low-income individuals, including young people. Title XIX of the Social Security Act,

42 U.S.C. §§ 1396–1396w-6. Under Medicaid, the Federal Government reimburses States for a specified percentage (the Federal Medical Assistance Percentage (“FMAP”)) of the costs of covered services provided to eligible individuals. The FMAP is calculated annually based on each State’s per capita income relative to the national average, with a statutory minimum of 50% and a statutory maximum of 83%. 42 U.S.C. § 1396d(b).

23. CHIP provides federal funding to States to provide health coverage to uninsured, low-income youth. Title XXI of the Social Security Act, 42 U.S.C. §§ 1397aa–1397mm. Together, Medicaid and CHIP provide comprehensive health benefits coverage to approximately 35.5 million young people in the United States.

24. The EPSDT benefit is a mandatory component of Medicaid for individuals under age 21. Under EPSDT, States must provide all “necessary health care, diagnostic services, treatment, and other measures described in [section 1396d(a)] to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan.” 42 U.S.C. § 1396d(r)(5). Congress enacted EPSDT in 1967 and expanded it significantly in 1989 to mandate that participating States provide EPSDT-eligible youth all services within the scope of § 1396d(a) that are medically necessary to correct or ameliorate their conditions, regardless of whether the State covers such services for adults. The plain words of the statute and legislative history “make evident that Congress intended that the health care, services, treatment and other measures that must be provided under the EPSDT program be determined by reference to federal law, not state preferences.” *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 592 (5th Cir. 2004).

**Gender Dysphoria and Evidence-Based Treatment**

25. For decades, physicians have consistently followed evidence-based clinical practice and medical guidelines, developed through peer-reviewed scientific and medical

research and widely accepted by the medical community, to assess, diagnose, and treat gender dysphoria.

26. Gender dysphoria is a recognized medical condition characterized by sustained and significant difference between one's experienced gender and that assigned to them at birth. It is included in both the *American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders, Fifth Edition, Text Revision* (March 2022) (DSM-5-TR) and the *World Health Organization's International Classification of Diseases, 11th Revision* (ICD-11).

27. For transgender adolescents, as for all people, living consistently with one's gender identity is essential to health and wellbeing. Transgender health care is medically appropriate and necessary health care for transgender people to live safe and healthy lives. Untreated gender dysphoria can cause severe consequences, including heightened rates of depression, anxiety, self-harm, and suicidality.

28. Evidence-based treatments for gender dysphoria in adolescents are governed by rigorous clinical protocols developed by the world's leading medical authorities. *See* World Professional Association for Transgender Health (WPATH) Standards of Care; Endocrine Society Clinical Practice Guidelines. For adolescents, potential medical treatments may include puberty-delaying medications, hormone therapy, and, in limited circumstances, surgical interventions. These treatments have been safely administered for decades. The same medications are also used to treat other conditions in adolescents and adults. Puberty-delaying medications are used to treat central precocious puberty and may be used to treat hormone-sensitive cancers and endometriosis, while treatment for delayed puberty may include testosterone for cisgender boys and estrogen for cisgender girls—the same hormones used to treat their transgender peers.

29. The overwhelming consensus of the nation's leading medical organizations, including the American Medical Association, the American Academy of Pediatrics, the American Psychological Association, and the Endocrine Society, is that it is medically necessary and appropriate for adolescents to have access to evidence-based treatments for gender dysphoria.

30. The Rule acknowledges that approximately 17 State Medicaid programs cover some forms of these treatments. 91 Fed. Reg. at 52,409.

31. As the agency acknowledged in The Rule, CMS has never before taken the position at the federal level "that particular services when provided to particular individuals for a particular purpose are inherently not medically necessary." 91 Fed. Reg. at 52,443. Yet it makes this unprecedented departure now. As set forth below, this reversal was not the product of reasoned deliberation but of a coordinated campaign to target transgender individuals.

**The Administration's Campaign Against Transgender Health Care**

32. The Rule is part of a coordinated federal campaign to target and suppress transgender health care that began even prior to the first day of the current administration.

33. Throughout his campaign for the presidency and since taking office, President Trump repeatedly characterized transgender Americans in dehumanizing terms, referring to them as "deranged" and victims of "madness" and "insanity." He falsely claimed transgender identity was "never heard of in all of human history" and described transgender health care as "mutilation." On December 22, 2024, then President-Elect Trump announced, "with the stroke of my pen on day one, we are going to stop the transgender lunacy."

34. President Trump lived up to that threat. On January 20, 2025, hours after his inauguration, President Trump issued Executive Order 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," which

defined "gender ideology" as "the false claim that males can identify as and thus become women and vice versa." 90 Fed. Reg. 8,615 (Jan. 20, 2025). This Executive Order directed federal agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology."

35. Just eight days later, on January 28, 2025, President Trump issued the Denial of Care Order, which directed the Secretary of HHS to "take all appropriate actions" to "end" transgender health care for young people. 90 Fed. Reg. 8,771. The Executive Order characterized evidence-based medical care as a "stain on our Nation's history" and directed the Secretary to withdraw federal funding from any institution providing such care to individuals under age 19. The title—labeling established medical treatments as "mutilation"—reveals discriminatory animus toward transgender individuals rather than any neutral concern for child welfare. HHS promptly complied by publishing a webpage titled "Protecting Women and Children," which links to the Executive Orders.

36. On April 11, 2025, CMS Deputy Administrator and Director Drew Snyder sent a letter to every state Medicaid Director warning that Medicaid funds should not be used for transgender medical care. He claimed, without citation to any source, that such interventions were "[i]nitiated with an underdeveloped body of evidence" and "lack reliable evidence of long-term benefits for minors, and for some children, these interventions are now known to cause long-term and irreparable harm." And he reminded state Medicaid Directors that "longstanding Medicaid regulations prohibit federal funding for coverage of services whose purpose is to permanently render an individual incapable of reproducing."

37. On April 22, 2025, then-Attorney General Pamela Bondi issued a memorandum to DOJ components describing the increase in the number of adolescents identifying as

transgender as “tragic” and “absurd,” characterizing “transgenderism” as a “sociological disease,” and directing United States Attorneys to investigate and prosecute what the memorandum called “female genital mutilation” performed “under the banner of gender-affirming care.” The memorandum further demonstrates that the federal enforcement campaign was directed at suppressing transgender health care based on hostility toward transgender people rather than neutral application of generally applicable health or criminal laws.

38. The administration’s campaign against transgender health care continued. On June 2, 2025, the FBI posted a message on “X” soliciting FBI tip line reports of hospitals and practitioners providing transgender health care for minors.

39. In July 2025, DOJ issued more than 20 administrative subpoenas to doctors and clinics providing transgender health care to youth. *See* Press Release, U.S. Dep’t of Justice, *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children* (July 9, 2025). After several lawsuits quashed those subpoenas as overbroad, DOJ pursued grand jury subpoenas demanding the private medical records and identifying information of transgender minors who had received transgender health care.

40. Pursuant to Executive Order 14187, HHS’s Office of Population Affairs initially released a report titled, “Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices” (the “HHS Review”), on May 1, 2025. When the HHS Review was initially released, the American Academy of Pediatrics (“AAP”) immediately issued a statement criticizing it for “bypassing medical expertise and scientific evidence,” prioritizing opinion over dispassionate review, and describing the AAP’s recommendations in inaccurate and misleading ways. The American Psychological Association likewise stated that the HHS Review’s lack of

transparency concerning its "authorship, expertise, and methodology" undermined scientific rigor and prevented proper evaluation of potential bias.

41. After the criticism, HHS Review republished it with minor revisions and minimal peer-review comments on November 19, 2025. The HHS Review identified the WPATH, Endocrine Society, and American Academy of Pediatrics guidelines as the most influential clinical guidance for treating pediatric gender dysphoria in the United States, but questioned whether those guidelines reflected a uniform professional consensus. However, the HHS Review included in its evaluation only 17 out of 286 systematic reviews considered for inclusion, excluding 269 reviews representing thousands of studies. It nevertheless concluded that evidence concerning psychological outcomes, quality of life, regret, and long-term health was of very low certainty, while acknowledging both that evidence of harms was "sparse" and that low- or very-low-certainty evidence "does not prove that the interventions are ineffective."

42. On December 18, 2025, HHS announced a coordinated series of actions targeting transgender health care. Secretary Kennedy, CMS Administrator Mehmet Oz, FDA Commissioner Marty Makary, Deputy Secretary Jim O'Neill, and Assistant Secretary for Health Admiral Brian Christine all participated in an in-person press event to announce these actions. Secretary Kennedy signed a "declaration" titled "Safety, Effectiveness, and Professional Standards of Care for Sex-Rejecting Procedures on Children and Adolescents" (the "Kennedy Declaration"), which pronounced that medical treatments for gender dysphoria in children and adolescents "are neither safe nor effective as a treatment modality for gender dysphoria, gender incongruence, or other related disorders in minors." According to the Kennedy Declaration, HHS "may" exclude health care providers and entities from participating in federal health care programs, including Medicare and Medicaid, if they provide such care to children or adolescents.

On April 18, 2026, the United States District Court for the District of Oregon determined that the Secretary lacked statutory authority to "unilaterally establish standards of care that supersede professionally recognized standards of care for provision of gender-affirming care" and permanently enjoined HHS from "enforcing, implementing, giving intent to, or relying, in whole or in part, on the Kennedy Declaration—or any materially similar policy which supersedes or purports to supersede the professionally recognized standards of care for gender-affirming care that exist in the Plaintiff States." *Oregon*, 831 F. Supp. 3d at 1080–83.

43. As part of the same December 18 announcement, HHS and CMS published three Notices of Proposed Rulemaking the following day as part of what HHS described as an "all-government effort" led by President Trump and spearheaded by Secretary Kennedy: (1) "Prohibition on Federal Medicaid and Children's Health Insurance Program Funding for Sex-Rejecting Procedures Furnished to Children," which culminated in the rule at issue in this case, 90 Fed. Reg. 59,441 (Dec. 19, 2025); (2) "Hospital Condition of Participation: Prohibiting Sex-Rejecting Procedures for Children," which would bar hospitals that provide pediatric transgender health care from participating in Medicare and Medicaid programs, 90 Fed. Reg. 59,463 (Dec. 19, 2025); and (3) "Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance," which would amend the Section 504 regulations to allow federally funded entities to discriminate against transgender people with gender dysphoria, 90 Fed. Reg. 59,478 (Dec. 19, 2025). In its press release, HHS characterized transgender health care as "inflict[ing] permanent harm on children" and described the proposed rules as "answering President Trump's call to action." CMS, Press Release, *HHS Acts to Bar Hospitals from Performing Sex-Rejecting Procedures on Children* (Dec. 18, 2025).

44. Also on December 18, 2025, the FDA issued warning letters to 12 manufacturers and retailers for allegedly marketing breast binders to children for the purpose of treating gender dysphoria. And Assistant Secretary for Health Admiral Brian Christine signed a "public health message" asserting that "current evidence does not support claims that puberty blockers, cross-sex hormones, and surgeries are safe and effective treatments for pediatric gender dysphoria." CMS, Press Release, *HHS Acts to Bar Hospitals from Performing Sex-Rejecting Procedures on Children* (Dec. 18, 2025).

45. Between December 26, 2025, and February 11, 2026, HHS referred at least seventeen healthcare providers—including children's hospitals and federally qualified health centers—to the HHS Office of Inspector General for exclusion proceedings, citing the Kennedy Declaration as the basis for concluding that these providers failed to "meet professionally recognized standards of health care." *Oregon*, 831 F. Supp. 3d at 1059–65. HHS General Counsel Mike Stuart announced each referral on social media, stating with respect to the final batch of referrals that "sex rejecting procedures for children are not acceptable standards of healthcare. In just the past few weeks, more than 40 hospital systems across the country have made the right decision to stop these heinous procedures. But there is far more work to do to protect our children." Mike Stuart (@HHSGCMikeStuart), X (Feb. 11, 2026), https://x.com/HHSGCMikeStuart/status/2021649628630240524.

46. This coordinated enforcement campaign—combining subpoenas, criminal investigations, and HHS-OIG referrals—reflects deliberate governmental hostility toward transgender individuals and constitutes a calculated effort to intimidate and coerce health care providers into abandoning medically necessary care for their patients. Although HHS had relied on the Kennedy Declaration to justify referrals and threatened exclusions, the Administration did

not reverse those actions after a federal court permanently enjoined reliance on the Declaration or any materially similar policy. *See Oregon*, 831 F. Supp. 3d at 1078

**The Proposed and Final Rule**

47. On December 19, 2025, CMS published the proposed rule at issue in this case: "Prohibition on Federal Medicaid and Children's Health Insurance Program Funding for Sex-Rejecting Procedures Furnished to Children." 90 Fed. Reg. 59,441 (Dec. 19, 2025).

48. According to the Regulations.gov docket for the Proposed Rule, the agency received 34,960 comments, yet CMS publicly posted only 11,005 comments. *See* Regulations.gov, Docket ID CMS-2025-1823, https://www.regulations.gov/docket/CMS-2025-1823 (last visited Sept. 26, 2026). In The Rule, the agency stated it received "approximately 11,000 timely pieces of correspondence," more than 90 percent of which opposed the proposed rule. 91 Fed. Reg. at 52,421. Commenters included major medical professional associations, State government agencies, health care providers, academic researchers, patients, and advocacy organizations who submitted extensive evidence demonstrating the safety and efficacy of the targeted treatments.

49. Multiple commenters criticized the agency's primary evidentiary basis—the HHS Review—as scientifically flawed, predetermined, and misapplied.[2] 91 Fed. Reg. at 52,453. As characterized by the Rule, the HHS Review was an umbrella review of existing systematic reviews conducted by the HHS Office of Population Affairs, and The Rule acknowledges that the evidence base "does not support conclusions about the effectiveness of medical and surgical

[2] *See*, *e.g.*, Endocrine Society, Comment Letter on Prohibition on Federal Medicaid and Children's Health Insurance Program Funding for Sex-Rejecting Procedures Furnished to Children (Feb. 17, 2026); https://tinyurl.com/4ypm2xpe; American Academy of Pediatrics, Comment Letter on Prohibition on Federal Medicaid and Children's Health Insurance Program Funding for Sex-Rejecting Procedures Furnished to Children (Feb. 19, 2026), https://tinyurl.com/3c79jntx; American Public Health Association, Comment Letter on Prohibition on Federal Medicaid and Children's Health Insurance Program Funding for Sex-Rejecting Procedures Furnished to Children (Feb. 17, 2026), https://tinyurl.com/mtnjzr9.

interventions in improving mental health or reducing gender dysphoria symptoms." 91 Fed. Reg. at 52,409. Commenters pointed out that absence of evidence of effectiveness is not evidence of harm, and that numerous studies and decades of clinical experience supported the medical necessity of these treatments for appropriately assessed patients.

50. On August 13, 2026, CMS published The Rule. 91 Fed. Reg. 52,406. The Rule adds new Subpart N to 42 C.F.R. Part 441 (§§ 441.800–441.802) and new § 457.476 to Part 457. The effective date is October 13, 2026.

51. The Rule defines "sex-rejecting procedure" as a"pharmaceutical or surgical intervention that attempts to align an individual's physical appearance or body with an asserted identity that differs from the individual's sex by either of the following: (1) Intentionally disrupting or suppressing the normal development of natural biological functions, including primary or secondary sex-based traits; or (2) Intentionally altering an individual's physical appearance or body, including amputating, minimizing or destroying primary or secondary sex-based traits such as the sexual and reproductive organs." 91 Fed. Reg. at 52,474. This definition encompasses puberty-delaying medications, cross-sex hormones, and surgical interventions. Applying the definition requires CMS and State Medicaid agencies to identify an individual's sex, determine whether the individual's gender identity differs from that sex, and determine whether the treatment would align the individual's body with that identity. The Rule thus makes the relationship between an individual's sex and gender identity an express criterion for federal funding.

52. The Rule contains three narrow exceptions: (1) treatment of a medically verifiable disorder of sexual development; (2) use of the same pharmaceuticals or procedures for purposes other than aligning physical appearance with a person's gender identity; and (3) treatment of

complications arising from prior "sex-rejecting procedures." *Id.* Accordingly, the same puberty-delaying medications remain eligible for federal funding when prescribed to treat precocious puberty, and the same hormones remain eligible for federal funding when prescribed for delayed puberty or other endocrine conditions. The Rule also limits its prohibition to Medicaid beneficiaries under age 18 and CHIP beneficiaries under age 19; it does not impose the same prohibition on the use of those treatments for beneficiaries with gender dysphoria after they pass the applicable age cutoff, including beneficiaries age 20 or older.

53. The Rule provides a limited tapering period of up to six months exclusively for patients currently receiving cross-sex hormone therapy medications as of the effective date. 91 Fed. Reg. at 52,474. This tapering provision does not extend to puberty-delaying medications or surgical procedures, for which FFP ceases entirely on October 13, 2026.

54. The Rule explicitly applies "even when a provider determines that a sex-rejecting procedure is medically necessary" for an individual patient. 91 Fed. Reg. at 52,419. It overrides individualized medical necessity determinations made by treating physicians based on a comprehensive assessment of the patient's clinical needs. The Rule provides no exception or other mechanism to account for an individual patient's diagnosis, clinical history, response to treatment, risk of treatment interruption, or treating provider's determination that the care is medically necessary except for a six month tapering provision that does not account for these issues. It instead treats the affected care as categorically ineligible for federal funding for every covered patient within the Rule's age limits.

55. CMS claims statutory authority under Sections 1902(a)(19), 1902(a)(30)(A), and 2101(a) of the Social Security Act, 42 U.S.C. §§ 1396a(a)(19), 1396a(a)(30)(A), 1397aa(a). These provisions require that Medicaid-covered services in the State Plan be provided in a

manner consistent with the "best interests" of recipients and "quality of care," and that CHIP provide services in an "effective and efficient manner." They do not authorize a categorical nationwide clinical exclusion that overrides the EPSDT mandate.

56. The Rule relies primarily on the HHS Review and cherry-picking from the United Kingdom's Cass Review (published in April 2024), as well as policy changes in Sweden, Finland, and Norway. 91 Fed. Reg. at 52,410–52,411. Although the Rule claims it "does not rely on the Kennedy Declaration, in whole or in part," 91 Fed. Reg. at 52,407, The Rule was developed by the same officials, pursuant to the same Executive Order, and reaches the same substantive conclusion as the judicially vacated Declaration. The Rule also adopts the term "sex-rejecting procedure," which had not previously appeared in CMS's clinical or regulatory vocabulary and mirrors the terminology used in the Administration's preceding directives and actions targeting transgender health care.

**Harms to Plaintiffs and the Affected Population**

57. Because the Federal Government provides between 50% and approximately 83% of State Medicaid expenditures through the FMAP, the Rule's prohibition on FFP operates as a self-executing prohibition that will foreseeably cause States to cease coverage of the affected treatments.[3] States that currently cover these services have relied on federal matching funds and face severe fiscal pressure. The withdrawal of FFP will effectively deny care to Medicaid- and CHIP-enrolled youth because States and providers will predictably cease offering treatments they can no longer afford to provide.

[3] On its face, new Section 441.802(a) attempts to prohibit States from using even their own funding through the Medicaid program, as to just the FFP share. 91 Fed. Reg. at 52,474 ("Except as provided in paragraph (c) of this section [the six-month tapering period for patients on cross-sex hormone therapy], a State plan must provide that the Medicaid agency will not make payment under the plan for sex-rejecting procedures for children under the age of 18.").The Rule does not appear to prohibit States from using other funds to pay for continuing care.

58. The Rule will directly affect thousands of adolescents currently receiving transgender health care through Medicaid and CHIP that their physicians have determined is medically necessary. The Rule acknowledges that, between 2017 and 2021, more than 120,000 young people ages 6 to 17 were diagnosed with gender dysphoria, with more than 4,700 starting puberty blockers and more than 14,000 starting hormonal therapy. 91 Fed. Reg. at 52,408–09.

59. Abrupt discontinuation of hormone therapy and puberty-suppressing medication, or denial of medically indicated treatment at the time it is needed, poses grave risks, including severe psychological distress, return of gender dysphoria symptoms, and irreversible physiological changes. The Rule's six-month tapering period applies only to cross-sex hormones, is medically inadequate, and provides no tapering period for puberty-suppressing medication. The resulting harm is concrete and imminent for each of the Adolescent Plaintiffs. Without puberty suppression, Grace will undergo masculinizing changes—including a permanently deepened voice, facial and body hair growth, and skeletal changes—that her treatment is intended to prevent. Those changes would be apparent to Grace and her peers and would predictably cause severe distress. Before her diagnosis and social transition, Grace experienced intense anxiety, statements that she "should just be dead," and a school crisis intervention concerning self-harm. Her family cannot afford puberty-suppressing medication without Medicaid coverage. The Rule therefore threatens to force Adolescent Plaintiff Grace Goe to undergo permanent bodily changes at the point in her development when they would cause the greatest and most lasting harm. The Rule likewise threatens Adolescent Plaintiff Kylie Koe with the loss of ongoing hormone therapy that has produced sustained clinical improvement and that her family cannot afford privately. Adolescent Plaintiff Logan Loe will lose access to the puberty-suppressing medication her physicians have determined are medically necessary, and

which she has been taking for three years. And the Rule threatens to force Adolescent Plaintiff Maya Moe to discontinue puberty-suppressing medication, and eventually, hormone therapy, because the medications are too expensive for her family to afford, and she understands that the changes caused by masculine puberty will be permanent.

**Escalation Following the Rule**

60. On August 12, 2026—one day before CMS published The Rule—HHS referred more than 200 health care organizations and providers to the HHS Office of Inspector General and DOJ for investigation. *See* Letter from Robert F. Kennedy, Jr., Sec'y, U.S. Dep't of Health & Human Servs., to T. March Bell, Inspector Gen., U.S. Dep't of Health & Human Servs. Office of Inspector Gen., Re: Referral Concerning Potential Violations of Federal Law by Hospitals and Clinics (Aug. 12, 2026).

61. On August 13, 2026—the same day that CMS issued The Rule—HHS released a commissioned report titled *Wolves in White Coats: How Doctors and Hospitals Pushed and Profited from the Fraud of Gender Medicine*,[4] targeting physicians who provide transgender health care. The report was authored by ten contributors drawn not from any major medical association, but from right-wing advocacy organizations and media. Only three of the ten authors are medical doctors—just two in relevant fields—and all have been outspoken critics of transgender health care. The lead author, Aaron Baer, is the president of the Center for Christian Virtue, an organization that the Southern Poverty Law Center has designated an anti-LGBTQ+ hate group. Other authors include contributors from the Independent Women's Forum and the Ethics and Public Policy Center. One author, Dr. Eithan Haim, is a general surgeon who previously faced federal charges for allegedly obtaining and leaking private patient information

[4] HHS, "Wolves in White Coats: How Doctors and Hospitals Pushed and Profited from the Fraud of Gender Medicine" (Aug. 13, 2026), https://www.hhs.gov/sites/default/files/hhs-wolves-in-white-coats.pdf

from Texas Children's Hospital; those charges were dropped after President Trump took office. The report's title likens physicians who provide transgender health care to predatory animals. The report accuses them of perpetrating "fraud," labels established medical treatments as "child mutilation," and describes evidence-based care as designed to "stunt and maim" children's bodies. The report's release, coordinated with The Rule, reflects a deliberate government campaign to intimidate healthcare providers, chill the provision of medically necessary care, and vilify transgender youth and those who treat them.

62. The pattern of this Administration—from campaign rhetoric to Day One executive orders to enforcement subpoenas to the Kennedy Declaration to The Rule to the "Wolves in White Coats" report—demonstrates that The Rule was not the product of neutral policymaking but of discriminatory animus.

**STANDING**

63. Plaintiffs satisfy Article III standing requirements because each has suffered (or imminently will suffer) a concrete and particularized injury-in-fact that is fairly traceable to The Rule and would be redressed by a favorable decision from this Court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Plaintiffs also satisfy the zone-of-interests requirement applicable to claims under the APA, which requires that a plaintiff's interests "arguably fall within the zone of interests to be protected or regulated by the statute" that the plaintiff claims was violated. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)). This test "is not meant to be especially demanding," and "there need be no indication of congressional purpose to benefit the would-be plaintiff." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399–400 (1987). The test forecloses suit only when a "plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be

assumed that Congress intended to permit the suit." *Id.* at 399. As set forth below, all Plaintiffs satisfy both requirements.

**Adolescent Plaintiffs**

64. The Adolescent Plaintiffs enrolled in Medicaid face a direct, concrete, and imminent deprivation of their statutory entitlement to medically indicated health care services under the EPSDT provisions of the Medicaid Act. Each Adolescent Plaintiff enrolled in Medicaid has been diagnosed with gender dysphoria and is currently receiving treatment that The Rule categorically prohibits from federal funding effective October 13, 2026. This injury involves the deprivation of a statutory entitlement created by Congress—the EPSDT mandate's guarantee of coverage for all medically necessary services to "correct or ameliorate defects and physical and mental illnesses and conditions" for Medicaid-eligible youth, 42 U.S.C. § 1396d(r)(5)—and is therefore concrete within the meaning of Article III. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021). Some Adolescent Plaintiffs enrolled in Medicaid are also beneficiaries of CHIP funds through expanded Medicaid programs that have elected EPSDT-equivalent coverage have equivalent statutory entitlements. The injury is imminent because the Rule takes effect on a date certain. *Dep't of Commerce v. New York*, 588 U.S. 752, 766–67 (2019) (future injuries satisfy imminence requirement where "certainly impending," or presenting "a substantial risk that the harm will occur") (*citing Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

65. The Adolescent Plaintiffs' injuries are directly traceable to the Rule. The Rule operates as a self-executing prohibition on FFP that will foreseeably cause States to cease coverage. As the Supreme Court recognized in *Department of Commerce*, 588 U.S. at 768, causation is satisfied where third-party conduct is the "predictable effect" of government action; "[w]hen third party behavior is predictable, commonsense inferences may be drawn." *Diamond*

*Alternative Energy, LLC v. EPA*, 606 U.S. 100, 116 (2025). Because States depend on federal matching funds for between 50% and 83% of Medicaid costs, the withdrawal of FFP will predictably result in the termination of coverage for the affected treatments.

66. Vacatur of the Rule under 5 U.S.C. § 706(2) would restore the prior regulatory regime under which the Adolescent Plaintiffs' care was covered through Medicaid and CHIP. *See Oregon*, 831 F. Supp. 3d at 1048 (*citing All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018)) ("Vacatur is the presumptive remedy for unlawful agency action."); *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) (same).

67. The Adolescent Plaintiffs also satisfy the zone-of-interests requirement. The Adolescent Plaintiffs enrolled in Medicaid are the direct and intended beneficiaries of the Medicaid Act's EPSDT provisions, which were enacted specifically to ensure that individuals under 21 enrolled in Medicaid receive "all medically necessary" services to "correct or ameliorate defects and physical and mental illnesses and conditions." 42 U.S.C. § 1396d(r)(5). These Adolescent Plaintiffs—adolescents enrolled in Medicaid who have been diagnosed with gender dysphoria and are currently receiving treatment that The Rule prohibits—are paradigmatic members of the class Congress intended to protect. Their interests in receiving medically indicated care are at the core of the Medicaid EPSDT statutory scheme. The Adolescent Plaintiffs enrolled in separate CHIP programs likewise fall within the zone of interests of Title XXI of the Social Security Act (State Children's Health Insurance Program). Congress established CHIP to provide "child health assistance to uninsured, low-income children in an effective and efficient manner." 42 U.S.C. § 1397aa(a). The Adolescent Plaintiffs enrolled in CHIP are the precise population—low-income children in need of health care services—that Congress intended to benefit when it created the program. *See Mendoza v. Perez*, 754 F.3d 1002,

1017–18 (D.C. Cir. 2014) (individuals displaced by unlawful agency action from benefits they otherwise would receive fall within the zone of interests of the statute Congress enacted to protect them).

**Parent Plaintiffs**

68. The Parent Plaintiffs have standing on three independent bases. First, they have a constitutionally protected liberty interest in directing the medical care of their adolescents. *Troxel*, 530 U.S. at 65 ("the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court"). The Rule directly infringes this interest by categorically prohibiting federal funding for treatments that Parent Plaintiffs, in consultation with their adolescents' medical providers, have determined are medically indicated for their children. *See Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000) (the right to family association includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state). Second, they suffer a direct financial injury because the loss of Medicaid or CHIP coverage may require them to search for alternative sources of care and will require them to pay out-of-pocket for their adolescents' medically indicated treatment—costs that constitute a cognizable economic harm. Third, they suffer concrete emotional and dignitary harm from being forced either to watch their adolescents suffer the consequences of abrupt treatment termination or to divert family resources they cannot afford. These are not injuries derivative of their children's harms; they are direct injuries to the parents' own legally protected interests. Causation and redressability are established on the same bases as for the Adolescent Plaintiffs.

69. The Parent Plaintiffs also satisfy the zone-of-interests requirement. The Parent Plaintiffs' interests fall within the zone of interests protected by the Medicaid Act and CHIP.

Congress designed Medicaid to "furnish ... medical assistance on behalf of families with dependent children." 42 U.S.C. § 1396-1. CHIP similarly provides "child health assistance to uninsured, low-income children." 42 U.S.C. § 1397aa(a). Parents' interests in securing medically necessary care for their minor children are directly implicated by agency action that categorically prohibits coverage for such care. EPSDT's mandate that states provide all medically necessary services to "correct or ameliorate defects and physical and mental illnesses and conditions" for children under 21, 42 U.S.C. § 1396d(r)(5), reflects Congress's intent that families be able to rely on Medicaid for their children's health care needs. The Parent Plaintiffs are therefore well within the zone of interests Congress intended to protect.

## CLAIMS FOR RELIEF

### COUNT I

Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
Arbitrary and Capricious Agency Action

70. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

71. The Rule is arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A) because CMS failed to provide a reasoned explanation for its unprecedented departure from decades of agency policy. The agency acknowledged that it has "not historically taken a position at the Federal level that particular services when provided to particular individuals for a particular purpose are inherently not medically necessary," 91 Fed. Reg. at 52,443, and justified its reversal solely by reference to "the prevailing evidentiary landscape," *id.* But an agency changing course must "show that there are good reasons for the new policy.'" *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). This vague appeal to "the prevailing evidentiary landscape" does not satisfy that standard. CMS failed to explain why the same evidence that previously

supported—or at minimum did not preclude—coverage now compels a categorical nationwide ban on federal funding.

72. The Rule is arbitrary and capricious because CMS failed to adequately consider the serious reliance interests engendered by its prior policy. Thousands of young people and their families have relied on the availability of Medicaid coverage for transgender health care. When an agency changes course, it must "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016). "It would be arbitrary and capricious to ignore such matters." *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *Fox Television*, 556 U.S. at 515). The agency's six-month tapering provision—limited exclusively to cross-sex hormones—is manifestly inadequate to address the reliance interests of patients currently receiving puberty-delaying medications or who have structured their care around continuing access to these treatments. Indeed, CMS acknowledged that beneficiaries "who are unable to find alternative means to pay for these services may either have to rely on other methods of treatment such as psychotherapy or mental health counseling or elect to not receive these services because of the rule." 91 Fed. Reg. at 52,414. CMS frames this outcome as a voluntary choice that beneficiaries would "elect," when in reality low-income children and families who depend on Medicaid or CHIP will be forced to forgo medically indicated care because they cannot afford to pay out-of-pocket. This failure to grapple with the predictable consequences of stripping coverage from the most vulnerable beneficiaries underscores the agency's disregard of the reliance interests at stake.

73. The Rule is arbitrary and capricious because CMS's asserted evidentiary basis does not rationally support its categorical prohibition. Although CMS invokes "the prevailing

evidentiary landscape" and cites the HHS Review's conclusion that evidence is of "low certainty," low-certainty evidence is not evidence of harm or ineffectiveness—it is simply evidence that does not meet the highest methodological standards. CMS conflated the absence of high-certainty evidence with proof that the treatments are unsafe or ineffective, a logical fallacy that pervades the Final Rule. Moreover, CMS applied asymmetric evidentiary standards: it dismissed decades of clinical experience and peer-reviewed studies supporting these treatments while crediting speculative concerns about long-term effects that lack empirical support. This selective and irrational weighing of evidence does not satisfy the requirement that agency action reflect "a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43.

74. The Rule is internally contradictory: it simultaneously claims the prohibited treatments are not medically necessary while permitting the identical pharmaceuticals and procedures when used for purposes other than treating gender dysphoria—conceding that the drugs and procedures themselves do not pose unacceptable risks. The Rule permits these same drugs to treat precocious puberty, endometriosis, and other conditions, fatally undermining its asserted rationale that the treatments are categorically unsafe for young people.

75. The Rule expressly overrides individualized medical necessity determinations by treating physicians, applying "even when a provider determines that a sex-rejecting procedure is medically necessary." 91 Fed. Reg. at 52,419, 52,443. This categorical override of medical judgment—without any mechanism for individual patient assessments—is contrary to the structure of the Medicaid program, which has always relied on individualized determinations of medical necessity. The Rule must be set aside as arbitrary and capricious.

76. The Parent Plaintiffs have a constitutionally protected liberty interest in making medical decisions for their minor adolescents, including the fundamental right to direct their adolescents' medical care. *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000) ("[T]he interest of parents in the care, custody, and control of their children[] is perhaps the oldest of the fundamental liberty interests recognized by this Court."). The Rule strips Parent Plaintiffs of the ability to effectuate treatment decisions made in consultation with their adolescents' physicians because no affordable alternative to Medicaid-funded care exists for their families.

**COUNT II**
Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
Violation of 42 C.F.R. § 440.230(c)

77. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

78. CMS's own regulation at 42 C.F.R. § 440.230(c) provides that "[t]he Medicaid agency may not arbitrarily deny or reduce the amount, duration, or scope of a required service . . . to an otherwise eligible beneficiary solely because of the diagnosis, type of illness, or condition." The Rule violates this provision because it categorically denies Medicaid coverage for pharmaceutical and surgical interventions when furnished to treat gender dysphoria, even though the same drugs and procedures that remain covered for other diagnoses—solely because of the patient's diagnosis of gender dysphoria.

79. The same puberty-delaying medications remain covered when prescribed for precocious puberty. The same hormones remain covered when prescribed for other endocrine conditions. The same surgical procedures remain covered when performed for other purposes. The only basis for denying coverage is the patient's diagnosis. The distinction also conflicts with Medicaid's comparability requirement, 42 U.S.C. § 1396a(a)(10)(B), as implemented by §

440.230(c), and with the requirement that limits on services be based on criteria such as medical necessity or utilization control rather than a categorical exclusion tied to diagnosis. *See* 42 C.F.R. § 440.230(d). Sections 440.210 and 440.220 identify services that participating Medicaid plans must provide, and New Hampshire's Medicaid framework relies on provider determinations of medical necessity for covered services. The Rule displaces those individualized determinations for one diagnosis while preserving them for others. This is precisely the type of diagnosis-based exclusion that § 440.230(c) prohibits.

80. Because States depend on FFP to administer their Medicaid programs, even assuming the Rule does not have a broader categorical ban, the Rule requires or will predictably induce State Medicaid agencies to deny or reduce otherwise required services on the very diagnosis-based ground that section 440.230(c) forbids.

81. Although The Rule purports to be "consistent" with § 440.230(c), 91 Fed. Reg. at 52,418, this conclusory assertion is belied by the Rule's operative text. Because The Rule is inconsistent with the agency's own binding regulation, it is arbitrary and capricious and not in accordance with law. *Allina Health Servs.*, 746 F.3d at 1108–09 (agency action inconsistent with its own regulations is unlawful).

**COUNT III**
Administrative Procedure Act, 5 U.S.C. § 706(2)(C)
Agency Action in Excess of Statutory Authority

82. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

83. The Rule exceeds CMS's statutory authority and is "not in accordance with law" in violation of 5 U.S.C. § 706(2)(C) because it conflicts with the mandatory EPSDT provisions of the Medicaid Act. The EPSDT mandate requires States to provide all "necessary health care,

diagnostic services, treatment, and other measures described in [section 1396d(a)] to correct or ameliorate defects and physical and mental illnesses and conditions." 42 U.S.C. § 1396d(r)(5). Although States generally have discretion to set Medicaid benefit levels, EPSDT is different: "Congress did not grant or allow states the discretion to define what types of health care and services would be provided to EPSDT children, and participating states must provide all services within the scope of § 1396d(a) which are necessary to correct or ameliorate defects, illnesses, and conditions in children discovered by the screening services." *S.D. ex rel. Dickson*, 391 F.3d at 593. Where Congress has expressly withheld discretion from the States under EPSDT, CMS cannot claim authority to impose the very categorical exclusion that Congress denied the States the power to make. An agency "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

84. The statutory provisions upon which CMS purports to rely—Sections 1902(a)(19), 1902(a)(30)(A), and 2101(a)—do not authorize the agency to override the EPSDT mandate. These provisions require States to provide services consistent with "the best interests of the recipients" and "quality of care"—they do not authorize CMS to impose a categorical nationwide clinical exclusion. To the contrary, these provisions reinforce the requirement that coverage decisions be made in the best interests of individual patients based on their medical needs, not through blanket prohibitions imposed by the agency.

85. CMS itself acknowledged in The Rule that it has "not historically taken a position at the Federal level that particular services when provided to particular individuals for a particular purpose are inherently not medically necessary." 91 Fed. Reg. at 52,443. The only prior instance in which CMS relied on Sections 1902(a)(19) to restrict FFP for a specific category of services—the provider-preventable conditions rule, 76 Fed. Reg. 32,816 (June 6,

2011) (codified at 42 C.F.R. § 447.26)—is factually distinct in two critical respects. First, that prohibition emanated from a specific statutory requirement: Congress instructed HHS to prohibit federal Medicaid payments for certain provider-preventable conditions. 42 U.S.C. § 1396b-1. Here, there is no comparable statutory directive. Second, the provider-preventable conditions rule did not prohibit beneficiaries from receiving services—it merely created a financial incentive to encourage providers to avoid serious clinical errors by withholding payment for the portion of any treatment attributable to the provider's error. The regulation expressly requires that the State plan ensure that payment reductions "not prevent access to services for Medicaid beneficiaries." 42 C.F.R. § 447.26(c)(5). In contrast, The Rule institutes a categorical prohibition on payment for broad categories of services any time they are used to treat a particular condition, while simultaneously acknowledging that the prohibition will cause beneficiaries to lose access to those services. CMS cannot repurpose general "best interests" and "quality of care" language into authority to override the specific EPSDT mandate that Congress enacted.

86. Multiple circuit courts have confirmed that EPSDT creates a mandatory right to all medically necessary services for Medicaid-eligible youth. *Katie A., ex rel. Ludin v. L.A. Cnty.*, 481 F.3d 1150, 1154 (9th Cir. 2007) ("The EPSDT obligation is "extremely broad."); *S.D. ex rel. Dickson*, 391 F.3d at 593 ("participating states must provide all services within the scope of § 1396d(a) which are necessary to correct or ameliorate defects, illnesses, and conditions in children discovered by the screening services"); *Westside Mothers v. Olszewski*, 454 F.3d 532, 537 (6th Cir. 2006) (EPSDT services "*must* be provided" and "*shall* be furnished" to eligible children) (emphasis in original) (citing 42 U.S.C. §§ 1396a(a)(8), 1396a(a)(10)(A)); *Collins v. Hamilton*, 349 F.3d 371, 376 (7th Cir. 2003) ("a state's discretion to exclude services deemed 'medically necessary' by an EPSDT provider has been circumscribed by the express mandate of

the statute"); *Pediatric Specialty Care, Inc. v. Ark. Dep't of Human Servs.*, 293 F.3d 472, 479 (8th Cir. 2002) (EPSDT provides a "binding obligation" on States to create a state plan that "includes the provision of EPSDT services as they are defined in § 1396(r)."); *Pittman ex rel. Pope v. Sec'y, Fla. Dep't of Health & Rehab. Servs.*, 998 F.2d 887, 891–92 (11th Cir. 1993) (EPSDT "took . . . away" any state discretion to deny coverage of necessary treatment "for individuals under the age of twenty-one"); *Pereira v. Kozlowski*, 996 F.2d 723, 725–26 (4th Cir. 1993) (Congress "imposed upon the states ... the obligation to provide to children under the age of twenty-one all necessary services").

87. CMS cannot, by administrative rule, create a categorical exception to a congressional mandate. The EPSDT statute contains no delegation of authority to the Secretary to declare entire categories of otherwise-available services "inherently not medically necessary." 91 Fed. Reg. at 52,443. The Rule is in excess of statutory authority and must be set aside.

## COUNT IV
Administrative Procedure Act, 5 U.S.C. §§ 553, 706(2)(D)
Procedural Violation

88. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

89. The APA requires that, in notice-and-comment rulemaking, an agency must genuinely consider the comments submitted, respond to significant objections, and articulate a rational basis for its decision that reflects engagement with the record. 5 U.S.C. § 553; *see State Farm*, 463 U.S. at 43. CMS violated these requirements in promulgating The Rule.

90. More than 90 percent of the approximately 11,000 comments that CMS acknowledged receiving opposed the proposed rule. Commenters, including major medical professional associations, academic researchers, clinical providers, and patients, submitted

extensive scientific evidence demonstrating the safety and efficacy of the targeted treatments. CMS failed to meaningfully engage with this evidence, instead dismissing it with conclusory assertions that it had "carefully considered" all comments.

91. For example, the Endocrine Society explained that the standard methodology for assessing certainty in a body of evidence (called "GRADE") integrates research evidence with clinical knowledge and patient circumstances, that observational studies generally begin with "low" or "very low" ratings, and that guideline panels may make strong recommendations based on low- or very-low-quality evidence after considering additional criteria, including patients' values and preferences.[5] CMS did not address the Endocrine Society's guidelines developed pursuant to that methodology; it instead repeated the HHS Review's assessments that the guidelines received low methodological-quality scores and that evidence of benefit was of "very low certainty," while evidence of certain physiological harms rested on established biological mechanisms. 91 Fed. Reg. 52,427, 52,453–54. The American Academy of Pediatrics commented that a "very low" GRADE rating reflects limited and uncertain evidence—not affirmative evidence that an intervention is ineffective or harmful—and that the relevant care is individualized and multidisciplinary, with surgery contemplated only "in very rare cases."[6] It also explained that the gender-affirmative care model is individualized and multidisciplinary, may include surgery only "in very rare cases," and requires careful evaluation by qualified professionals. CMS responded by repeating the HHS Review's general criticisms of the AAP guidance and its conclusion that the evidence of benefit was of very low certainty, without

[5] Endocrine Society Comment on Proposed Rule to Prohibit Federal Medicaid and Children's Health Insurance Program Funding for Sex-Rejecting Procedures Furnished to Children (Feb. 17, 2026), available at https://tinyurl.com/4ypm2xpe.

[6] American Academy of Pediatrics, Comment on Proposed Rule to Prohibit Federal Medicaid and Children's Health Insurance Program Funding for Sex-Rejecting Procedures Furnished to Children (Feb. 19, 2026), https://tinyurl.com/3c79jntx ("AAP Comment").

addressing the AAP's description of its recommendations or its explanation of what a GRADE rating means. 91 Fed. Reg. 52,427, 52,453–54.

92. The American Public Health Association and 123 public health and health policy deans, chairs, and scholars cited a published critique concluding that the HHS Review "misrepresents and improperly appraises studies, often ignoring their primary conclusion," offers no evidence that puberty-pausing medications and hormone therapy are harmful, and itself describes evidence of harms as "sparse." CMS answered these objections by reiterating the HHS Review's methodological-quality and certainty assessments and asserting that certain physiological harms were grounded in established biological mechanisms, without addressing the commenters' specific explanations and critiques. 91 Fed. Reg. 52,427, 52,453–54. Nor did CMS meaningfully address the AAP's continuity-of-care evidence that abrupt withdrawal could cause psychological and physiological harm and that no professionally recognized standards—and little, if any, high-quality evidence—exist for tapering these treatments. Instead, CMS authorized federal funding only for a six-month taper of cross-sex hormones, excluded puberty blockers and surgery, and justified those limitations by invoking the same HHS-Review-based risk-benefit determination while asserting that the taper addressed the "most acute continuity-of-care concerns." 91 Fed. Reg. 52,421–22.[7]

[7] For example, the American Public Health Association ("APHA") commented, "CMS cherry-picked the evidence it relied on while failing to contend with the evidence that runs counter to its position." APHA and Public Health Deans and Scholars' Comments on the Centers for Medicare and Medicaid Services' "Hospital Condition of Participation: Prohibiting Sex-Rejecting Procedures for Children" (Feb. 17, 2026), available at https://tinyurl.com/5xjbtpfv. It noted that the two reports relied upon by CMS—the "HHS Review and the Cass Review—have both been heavily criticized by medical experts for misrepresenting scientific evidence and data." *Id.* And it stated that authors cited in the HHS Review claim that the report misrepresented their studies, ignored their primary conclusions, and provided "no evidence for its assertion that puberty-pausing medications and hormone therapy are harmful to [transgender] youth, and it even states that evidence of harms is 'sparse.'" *Id.* at 8 (quoting Dowshen, N. et al., *A Critical Scientific Appraisal of the Health and Human Services Report on Pediatric Gender Dysphoria*, J. ADOLESCENT HEALTH, 77(3), 342-345 (2025)).

93. CMS asserted that it "carefully considered" all comments but dismissed widely accepted clinical guidance as resting on "legal and political considerations rather than clinical ones." *Id*. at 52,427. But "the opportunity to comment is meaningless unless the agency responds to significant points raised by the public." *Home Box Off., Inc. v. FCC*, 567 F.2d 9, 35-36 (D.C. Cir. 1977). "For an agency's decisionmaking to be rational, the agency 'must respond to significant points raised during the public comment period.'" *Nat'l Coal. For Marine Conservation v. Evans*, 231 F. Supp. 2d 119, 127–28 (D.D.C. 2002) (quoting *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000)). Conclusory assertions of "careful consideration" do not satisfy this standard.

94. With respect to this procedural claim, Plaintiffs need not demonstrate that the outcome of the rulemaking would have been different absent the procedural violations. Under the relaxed redressability standard applicable to procedural claims, it is sufficient that the procedures, had they been followed, could have led to a different result. *See Lujan*, 504 U.S. at 572 n.7; *Mendoza*, 754 F.3d at 1012–13. The Rule was promulgated "without observance of procedure required by law" and must be set aside. 5 U.S.C. § 706(2)(D).

**COUNT V**

Violation of the Equal Protection Guarantee of the Fifth Amendment to the United States Constitution

95. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

96. The Due Process Clause of the Fifth Amendment incorporates the equal protection principles that apply to the States through the Fourteenth Amendment. *Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954). The federal government may not "deny to any person within its jurisdiction the equal protection of the laws" by intentionally discriminating on the

basis of sex or by enacting laws or regulations motivated by discriminatory animus. A policy that expressly turns on sex is subject to heightened scrutiny. And even a facially neutral classification violates equal protection when the government adopts it at least in part because of its adverse effects on a protected group. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–68 (1977).

97. The Supreme Court has repeatedly held that a "bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Romer v. Evans*, 517 U.S. 620, 634–35 (1996) (quoting *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)). In *Romer*, the Court struck down Colorado's Amendment 2, which prohibited any governmental action designed to protect gay and lesbian individuals from discrimination, because it was "born of animosity toward the class of persons affected" and "lacks a rational relationship to legitimate state interests." *Id.* at 634. The Court held that laws motivated by animus fail even rational basis review. Likewise, in *United States v. Windsor*, the Court examined the challenged law's history, breadth, and practical operation and concluded that its asserted justifications could not overcome its purpose and effect of imposing disadvantage, separate status, and stigma on same-sex couples. 570 U.S. 744, 770, 774–75 (2013). *Romer* and *Windsor* thus require more than accepting a stated justification at face value. A substantial mismatch between the government's asserted interests and the scope of the challenged classification—including a classification that is simultaneously sweeping in the burdens it imposes and selective in the conduct it reaches—supports the inference that the asserted rationale is not the law's actual purpose.

98. The Rule was motivated by discriminatory animus against transgender individuals and intentionally classifies on the basis of sex and transgender status. Its operative definition

requires CMS and State Medicaid agencies to determine an individual's sex, identify whether the individual's gender identity differs from that sex, and deny federal funding when treatment would align the individual's body with that gender identity. 91 Fed. Reg. at 52,474. The same medications remain eligible for federal funding when they are prescribed to patients whose treatment does not involve such an asserted difference between gender identity and sex. The Rule does not merely have a disparate effect on transgender individuals; it deliberately uses the defining characteristic of transgender status as the criterion for disfavored treatment. The historical background, sequence of events, departures from ordinary agency practice, discriminatory impact, and contemporaneous statements further demonstrate discriminatory purpose under *Arlington Heights*. That evidence includes: (a) the inflammatory language of Executive Order 14187, which characterized evidence-based medical care as "mutilation" and a "stain on our Nation's history"; (b) President Trump's repeated dehumanizing characterizations of transgender Americans as "deranged," "insane," and practitioners of "lunacy"; (c) Executive Order 14168's definition of transgender identity as a "false claim"; (d) the coerced settlements with Texas Children's Hospital and Cleveland Clinic requiring those institutions to cease providing gender-affirming care; (e) the release of the "Wolves in White Coats" report targeting physicians; (f) the referral of physicians who provide transgender health care to HHS-OIG and DOJ for investigation; (g) the issuance of civil and criminal subpoenas to healthcare providers; and (h) the coordinated pattern of executive and regulatory actions targeting transgender individuals across multiple federal agencies. Taken together, these facts establish that sex and transgender status were motivating factors in the Rule's adoption.

99. The Rule fails even rational basis review because its asserted justifications do not rationally fit the classification it creates. CMS invokes concerns about safety, efficacy, and

uncertainty, but the Rule is simultaneously overinclusive and underinclusive in relation to those concerns. It is overinclusive because it categorically withdraws federal funding without regard to an individual patient's diagnosis, clinical history, response to treatment, or treating provider's determination of medical necessity. Indeed, the Rule applies "even when a provider determines that a sex-rejecting procedure is medically necessary." 91 Fed. Reg. at 52,419. Evidentiary uncertainty cannot rationally support an irrebuttable nationwide determination that the affected care is never medically necessary for any covered patient, particularly where CMS acknowledged that evidence of harm was sparse and that low-certainty evidence does not establish ineffectiveness. The Rule is also underinclusive because it preserves federal funding for the same medications when used for other purposes, including treatment of precocious puberty and other endocrine conditions, and does not impose the same prohibition once patients exceed the Rule's age cutoffs. If the medications themselves present the safety risks CMS invokes, those exceptions leave the same asserted risks untouched. If, instead, CMS's concern turns on the diagnosis for which the medications are prescribed, then the Rule singles out treatment associated with transgender status rather than regulating the medications according to their inherent risks. That mismatch between the asserted rationales and the Rule's actual operation, together with the Rule's unprecedented override of individualized medical judgment and the extensive evidence of discriminatory purpose, demonstrates that the proffered justifications do not explain the classification. As in *Romer* and *Windsor*, the Rule's breadth, selectivity, history, and practical effect reveal a purpose to impose disadvantage and stigma on the targeted group. A classification designed to carry out that purpose cannot survive even rational basis review, much less the heightened scrutiny applicable to intentional sex discrimination.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and grant the following relief:

1. A declaratory judgment, pursuant to 28 U.S.C. §§ 2201–2202, declaring that the Rule, "Medicaid Program; Prohibition on Federal Medicaid and Children's Health Insurance Program Funding for Sex-Rejecting Procedures Furnished to Children," 91 Fed. Reg. 52,406 (Aug. 13, 2026), including 42 C.F.R. §§ 441.800–441.802 and 42 C.F.R. § 457.476, is unlawful, arbitrary and capricious, in excess of statutory authority, and promulgated in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C), and (D), and violates the equal protection guarantee of the Fifth Amendment to the United States Constitution,;

2. A preliminary injunction enjoining Defendants and the persons described in Rule 65(d)(2) from implementing, enforcing, or applying the Rule, 91 Fed. Reg. 52,406 (to be codified at 42 including 42 C.F.R. §§ 441.800–441.802), insofar as those provisions prohibit FFP for puberty-suppressing medications or hormone therapy prescribed to Plaintiffs Grace Goe, Kylie Koe, Logan Loe, or Maya Moe to treat gender dysphoria.

3. An order vacating and setting aside the Rule in its entirety pursuant to 5 U.S.C. § 706(2);

4. A permanent injunction enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them from implementing, enforcing, or giving any effect to the Rule;

5. A declaratory judgment that the Rule was motivated by discriminatory animus against transgender individuals in violation of the equal protection guarantee of the Fifth Amendment;

6. An award of reasonable attorneys' fees and litigation costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412;

7. Such other and further relief as this Court deems just, equitable, and proper, including any relief necessary to remedy the violations alleged herein and to prevent their recurrence.

/ / /

Dated: October 1, 2026

Respectfully submitted,

*/s/ Chris Erchull*
Chris Erchull

**GLBTQ LEGAL ADVOCATES & DEFENDERS (GLAD LAW)**

Joshua D. Rovenger (pro hac vice pending)
Chris Erchull NH Bar No. 266733
Lisa Rodriguez-Ross (pro hac vice pending)
18 Tremont Street, Suite 950
Boston, MA 02108
Telephone: (617) 426-1350
jrovenger@gladlaw.org
cerchull@gladlaw.org
erodriguezross@gladlaw.org

**AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE**

Gilles R. Bissonnette NH Bar No. 265393
Henry R. Klementowicz NH Bar No. 21177
Maria D. Savarese NH Bar No. 273285
Concord, NH 03301
Telephone: (603) 224-5591
gilles@aclu-nh.org
henry@aclu-nh.org
maria@aclu-nh.org

**NATIONAL CENTER FOR LGBTQ RIGHTS**

Rachel Berg (pro hac vice pending)
1401 21st Street #11548
Sacramento, California 95811
Telephone: (415) 365-1338
rberg@nclrights.org

**ROBINSON & COLE LLP**

Seth B. Orkand (pro hac vice pending)
Kendra L. Berardi (pro hac vice pending)
53 State Street, 32nd Floor
Boston, MA 02109
Telephone: (617) 557-6900
sorkand@rc.com
kberardi@rc.com

Danielle H. Tangorre (pro hac vice pending)
111 Washington Avenue, Third Floor
Albany, NY 12210
Telephone: (518) 432-7841
dtangorre@rc.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 1, 2026*,* a true copy of the above document was filed via the Court's CM/ECF system and that a copy will be sent via email to Kasey Weiland, Acting Civil Division Chief, U.S. Attorney's Office for the District of New Hampshire and via U.S. Postal Service, certified mail to:

General Counsel
U.S. Department of Health and Human Services
200 Independence Avenue, S.W.
Washington, D.C. 20201

Erin Creegan
U.S. Attorney
District of New Hampshire
53 Pleasant Street, 4th Floor
Concord, NH 03301

Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

/s/ *Chris Erchull*
Chris Erchull