**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

GINA GOE, individually and as parent and next friend of GRACE GOE; KARLA KOE, individually and as parent and next friend of KYLIE KOE; LAURA LOE, individually and as parent and next friend of LOGAN LOE; and MELISSA MOE, individually and as parent and next friend of MAYA MOE,

*Plaintiffs,*

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services; CENTERS FOR MEDICARE & MEDICAID SERVICES; and MEHMET OZ, in his official capacity as Administrator of CMS,

*Defendants.*

Civil Action No.1:26-cv-803

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' EXPEDITED MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS


INTRODUCTION ........ 1

A. Medical Guidelines for Treating Minors with Gender Dysphoria ........ 3

B. The Trump Administration's Campaign Against Transgender Health Care and the Historical Background of the Rule ........ 4

C. The Rulemaking ........ 9

D. The Rule's Scope and Operation ........ 10

E. The Impact of the Rule on Children With Gender Dysphoria and the Harm to Plaintiffs 12

1. Grace Goe ........ 13

2. Kylie Koe ........ 15

3. Logan Loe ........ 18

4. Maya Moe ........ 20

LEGAL STANDARD ........ 21

ARGUMENT ........ 22

I. Plaintiffs Have a Strong Likelihood of Success on the Merits of Their Claims ........ 22

A. The Rule Violates the Administrative Procedure Act ........ 22

1. The Rule is a Final Agency Action Subject to APA Review. ........ 22

2. The Rule Violates the APA Because it Exceeds CMS's Statutory Authority and Conflicts with Statutory Requirements ........ 23

a. The Rule Violates the APA Because it Exceeds CMS's Statutory Authority. ........ 24

b. The Rule conflicts with the Medicaid Act's EPSDT Mandate. ........ 27

c. The Rule Violates the Medicaid Act's Comparability Requirement, as CMS Itself Has Long Construed It. ........ 30

3. The Rule Violates the APA Because it is Arbitrary and Capricious. ........ 34

a. CMS Failed to Consider the Reliance Interests of Adolescents Currently in Treatment or the Obvious Alternative of Protecting Them. ........ 35

b. CMS Failed to Reasonably Engage with Comments on the Proposed Rule... 37

c. CMS Offered No Reasoned Explanation for Abandoning Its Longstanding Practice of Deferring to Individualized Medical Necessity Determinations. ........ 40

d. The Rule's Safety Rationale Is Contradicted by Its Own Exceptions. ........ 40

II. The Rule Will Cause Irreparable Harm. ........ 42

III. The Public Interest Overwhelmingly Favors Relief. ........ 44

CONCLUSION ........ 45

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Local & Reg'l Mfrs. Caucus v. EPA*,
215 F.3d 61 (D.C. Cir. 2000)....39

*Beal v. Doe*,
432 U.S. 438 (1977)....29

*Bennett v. Spear*,
520 U.S. 154 (1997)....23

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988)....26

*Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*,
622 F.3d 36 (1st Cir. 2010)....45

*Brito v. Garland*,
22 F.4th 240 (1st Cir. 2021)....25

*City of Providence v. Barr*,
954 F.3d 23 (1st Cir. 2020)....25

*Coe v. Hooker*,
406 F. Supp. 1072 (D.N.H. 1976)....31

*Dep't of Com. v. New York*,
588 U.S. 752 (2019)....22, 41

*DHS v. Regents of Univ. of Cal.*,
591 U.S. 1 (2020)....35, 36

*S.D. ex rel. Dickson v. Hood*,
391 F.3d 581 (5th Cir. 2004) ....27, 28, 30

*Ellis v. Patterson*,
859 F.2d 52 (8th Cir. 1988) ....34

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016)....31, 35

*FCC v. Fox Television Stations*,
556 U.S. 556 U.S. 502, 515 (2009)....35, 40, 41

*Fideicomiso De La Tierra Del Cano Martin Pena v. Fortuno*,
582 F.3d 131 (1st Cir. 2009) ........................................ 73

*Fitzmorris v. Weaver*,
2024 WL 231883 (D.N.H. Jan. 22, 2024) ........................................ 22

*Goldstein v. Batista Contracting LLC*,
671 F. Supp. 3d 68 (D. Mass. 2023) ........................................ 3

*Gomes v. Hyde*,
804 F. Supp. 265 (D. Mass. 2025) ........................................ 28

*Harris v. McRae*,
448 U.S. 297 (1980) ........................................ 29

*Henderson v. Bodine Aluminum*,
70 F.3d 958 (8th Cir. 1995) ........................................ 42

*Home Box Off., Inc. v. F.C.C.*,
567 F.2d 9 (D.C. Cir. 1977) ........................................ 39

*Illinois et al. v. U.S. Dep't Health & Hum. Servs.*,
No. 1:26-cv-14051 (D. Mass Sept. 2, 2026) ........................................ 12

*Rosie D. ex rel. John D. v. Romney*,
410 F. Supp. 2d 18 (D. Mass. 2006) ........................................ 27, 28

*Justiniano v. Social Sec. Admin.*,
876 F.3d 14 (1st Cir. 2017) ........................................ 43

*Lanier v. City of Boston*,
95 F. Supp. 2d 17 (D. Mass. 2000) ........................................ 45

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ........................................ 24

*Katie A. ex rel. Ludin v. L.A. Cnty.*,
481 F.3d 1150 (9th Cir. 2007) ........................................ 27

*Massachusetts Ass'n of Older Americans v. Sharp*,
700 F.2d 749 (1st Cir. 1983) ........................................ 31, 42

*Massachusetts v. Oz*,
2026 WL 2192092 (D. Mass. July 29, 2026) ........................................ 12

*Moore ex rel. Moore v. Reese*,
637 F.3d 1220 (11th Cir. 2011) ........................................ 29

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)....................35, 36, 37, 41

*Nat'l Parks Conservation Ass'n v. U.S. Dep't of Interior*,
180 F.4th 348 (1st Cir. 2026)....................42

*Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*,
407 F. Supp. 2d 323 (D. Mass. 2005)....................44

*Nken v. Holder*,
556 U.S. (2009)....................22, 35, 41

*Norsworthy v. Beard*,
87 F. Supp. 3d 1164 (N.D. Cal. 2015)....................42

*Nw. Bypass Grp. v. U.S. Army Corps of Eng'rs*,
552 F. Supp. 2d 97 (D.N.H. 2008)....................37

*Ohio v. EPA*,
603 U.S. 279 (2024)....................37

*Oregon v. Kennedy*,
831 F. Supp. 3d 1048 (D. Or. 2026)....................8, 9

*Parham v. J.R.*,
442 U.S. 584 (1979)....................44

*Pediatric Specialty Care, Inc. v. Ark. Dep't of Human Servs.*,
293 F.3d 472 (8th Cir. 2002)....................27

*PFLAG, Inc. v. Trump*,
769 F.Supp. 3d 405 (D. Md. 2025)....................5

*RENEW Ne. v. United States Dep't of Interior*,
2026 WL 1078282 (D. Mass. Apr. 21, 2026)....................13

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan*,
397 F.3d 56 (1st Cir. 2005)....................42

*Russello v. United States*,
464 U.S. 16 (1983)....................25

*Schweiker v. Gray Panthers*,
453 U.S. 34 (1981)....................31

*Sindicato Puertorriqueño de Trabajadores v. Fortuño*,
699 F.3d 1 (1st Cir. 2012)....................21

*Trafalgar Cap. Assocs., Inc. v. Cuomo*,
159 F.3d 21 (1st Cir. 1998)....................23

*Troxel v. Granville*,
530 U.S. 57 (2000)....................44

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001)....................28

*United States v. Larionoff*,
431 U.S. 864 (1977)....................26

*United States v. Skrmetti*,
605 U.S. 495 (2025)....................33

*United Steelworkers v. Textron, Inc.*,
836 F.2d 6 (1st Cir. 1987)....................43

*Utility Air Regulatory Group v. EPA*,
573 U.S. 302 (2014)....................26

*Washington v. Reno*,
35 F.3d 1093 (6th Cir. 1994)....................44

*Weaver v. Reagen*,
886 F.2d 194 (8th Cir. 1989)....................33

*White v. Beal*,
555 F.2d 1146 (3d Cir. 1977)....................33

**Statutes**

5 U.S.C. § 553....................37

5 U.S.C. § 704....................22

5 U.S.C. § 706(2)(A)....................34, 37

5 U.S.C. § 706(2)(C)....................23

42 U.S.C. § 1302(a)....................26

42 U.S.C. §§ 1396 *et seq.*....................24

42 U.S.C. § 1396a(a)(10)(B)(i)....................25, 26, 30, 31

42 U.S.C. § 1396b....................25, 27, 29

42 U.S.C. § 1396d(r)(5)....................22, 23, 27, 28

42 U.S.C. § 1397aa ........................................................................................22, 26

N.H. Admin. Code § He-W 530(e) ...........................................................................32

N.H. Admin. Code § He-W 546 ...............................................................................32

Pub. L. No. 97-12 § 402...........................................................................................24

Pub. L. No. 98-619 § 204.........................................................................................24

RSA 332-N:2, III ..........................................................................................12, 22, 32

**Executive Orders**

Executive Order 14168, ..............................................................................................5

Executive Order 14187 ........................................................................................5, 6, 41

**Other Authorities**

42 C.F.R. Part 441.....................................................................................................24

42 C.F.R. § 440.230 .......................................................................................31, 32, 33, 34

90 Fed. Reg. 8,771 ..................................................................................................5, 41

90 Fed. Reg. 54,696–699 (Nov. 28, 2025)...................................................................12

90 Fed. Reg. 59,441-478 (Dec. 19, 2025).....................................................................9

91 Fed. Reg. 52,406-74.......................................................................................... Passim

## INTRODUCTION

This case challenges an unprecedented federal funding ban that singles out medically necessary treatment for gender dysphoria in transgender adolescents. On August 13, 2026, the Centers for Medicare and Medicaid Services ("CMS") published a final rule titled, "*Prohibition on Federal Medicaid and Children's Health Insurance Program Funding for Sex-Rejecting Procedures Furnished to Children*," 91 Fed. Reg. 52,406 (Aug. 13, 2026) (to be codified at 42 C.F.R. §§ 441.800–441.802 and 42 C.F.R. § 457.476) (the "Rule"). The Rule categorically prohibits Federal Financial Participation ("FFP") for evidence-based treatments—including puberty-suppressing medications and hormone therapy—when prescribed to treat gender dysphoria in transgender Medicaid beneficiaries under age 18 and the Children's Health Insurance Program ("CHIP") beneficiaries under age 19. It preserves funding for the same treatments when prescribed for other conditions. *Id.* at 52,473–74.[1] Unless enjoined before its October 13, 2026 effective date, the Rule will cause irreparable harm by disrupting ongoing treatment and forcing these families to choose between essential care they cannot afford and watching their children lose access to it and suffer serious harm as a result.

The Rule did not emerge from neutral medical or fiscal policymaking. Rather, it arises from a documented Administration campaign to suppress transgender health care; it replaces the individualized medical judgments of patients, parents, and treating providers with a categorical federal funding ban. *See*, *e.g.*, *id*. ¶¶ 33, 71. That history bears directly on whether the Rule reflects the reasoned, evidence-based decision-making the Administrative Procedure Act ("APA") requires.

[1] The Rule also prohibits FFP for surgical interventions when performed to treat gender dysphoria. 91 Fed. Reg. at 52,474. No Adolescent Plaintiff is seeking or receiving surgical treatment, and Plaintiffs do not challenge that aspect of the Rule in this motion. Plaintiffs accordingly ask the Court to enjoin the Rule as to Plaintiffs insofar as it prohibits FFP for puberty-suppressing medications and hormone therapy.

The Rule is unlawful for multiple independent reasons. CMS lacked statutory authority to create a nationwide service-specific funding exclusion that Congress did not enact—an exclusion that Congress, which has enumerated the circumstances in which federal Medicaid funding is unavailable, has repeatedly declined to adopt. The Rule also cannot be reconciled with the Medicaid Act's Early and Periodic Screening, Diagnostic, and Treatment ("EPSDT") mandate, which requires coverage of all medically necessary care for children, or with the Act's comparability requirement, which—as CMS itself has long construed it—forbids denying covered services to eligible children solely because of their diagnosis. On top of ignoring these congressional mandates, CMS also disregarded substantial evidence supporting the targeted care, abandoned its longstanding reliance on individualized medical necessity determinations without adequate explanation, and ignored the serious reliance interests of patients and families, rendering the Rule arbitrary and capricious. The Rule ultimately substitutes a predetermined policy outcome for statutory limits, record evidence, and individualized clinical judgment.

The threatened harm is imminent and irreparable. The Rule stops medically necessary treatment and therefore risks serious physical and psychological injury, intrudes on parents' ability to direct their children's medical care, and imposes costs these families cannot bear. A preliminary injunction would preserve the existing treatment and coverage status of these Plaintiffs while the Court reviews the Rule's legality. Plaintiffs therefore request an order barring Defendants from applying the Rule's pharmaceutical provisions to the named Adolescent Plaintiffs' Medicaid-covered care pending final judgment.

If this Court is unable to issue a preliminary injunction decision by October 13, 2026, Plaintiffs respectfully request that this Court issue a temporary restraining order enjoining enforcement of the Rule as to Plaintiffs while Plaintiffs' Motion for Preliminary Injunction remains

pending. *See Fideicomiso De La Tierra Del Cano Martin Pena v. Fortuno*, 582 F.3d 131, 133 (1st Cir. 2009) ("Preliminary injunctions and TROs are often requested together."); *Goldstein v. Batista Contracting LLC*, 671 F. Supp. 3d 68, 72 (D. Mass. 2023) ("The Court applies the same standard in assessing requests for temporary restraining orders and preliminary injunctions.").

## STATEMENT OF FACTS

### A. Medical Guidelines for Treating Minors with Gender Dysphoria

The available research overwhelmingly shows that when prescribed to adolescents based on an individualized assessment and in accordance with applicable standards of care, transgender medical care reduces depression, anxiety, suicidality, and self-harm and improves psychosocial functioning and overall well-being. Declaration of Kate Millington, M.D. ("Millington Decl.") ¶¶ 43, 44, 54. Denying access to this care leads to negative health outcomes for transgender patients with gender dysphoria. *Id.* ¶ 25. By prohibiting FFP for evidence-based treatment of gender dysphoria, the Rule will deprive transgender youth nationwide of critical, often lifesaving health care.

Gender dysphoria is a sustained and significant difference between one's experienced gender and that identified at birth. Millington Decl. at ¶ 18. Compl. at ¶ 26. The condition is recognized in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision*. Millington Decl. at ¶ 18; Compl. at ¶ 26. Without treatment, gender dysphoria can lead to serious consequences, including increased rates of depression, anxiety, self-harm, and suicidality. Millington Decl. at ¶¶ 25, 43; Compl. at ¶ 27.

By one estimate, there are about 130,000 young transgender Medicaid or CHIP beneficiaries who live in states without laws restricting their access to care.[2] These beneficiaries

[2] *See* Lindsey Dawson, *New Regulation Prohibits Federal Medicaid Funds from Covering Gender-Affirming Medical Care for Young People*, Kaiser Family Found. (Aug. 13, 2026), https://tinyurl.com/2myff39k.

seek treatment from providers who follow evidence-based medical guidelines to treat adolescents with gender dysphoria. For decades, physicians have relied on clinical practice guidelines grounded in peer-reviewed scientific and medical research when evaluating, diagnosing, and caring for youth with gender dysphoria. Millington Decl. at ¶¶ 19, 20, 32; Compl. at ¶ 25.

Major U.S. medical organizations—including the American Medical Association, American Academy of Pediatrics, American Psychological Association, and Endocrine Society—recognize evidence-based treatment for adolescents with gender dysphoria as medically necessary and appropriate and support access to that care. Declaration of Chris Erchull ("Erchull Decl.") at Exs. A–D; Compl. ¶ 29. Clinical protocols for treating adolescents with gender dysphoria include the World Professional Association for Transgender Health's ("WPATH") *Standards of Care Version 8* and the Endocrine Society's *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*. Millington Decl. ¶ 19; Compl. ¶ 28. Depending on the individual patient, treatment may include puberty-blocking medication and hormone therapy. Millington Decl. ¶¶ 28–30, 41, 56; Compl. ¶ 28.

The treatments for gender dysphoria available to adolescents and young adults are not novel, experimental, or untested. The scientific literature overwhelmingly shows that transgender medical care is effective at alleviating the distress caused by gender dysphoria in adolescents and young adults. Millington Decl. at ¶¶ 39, 40.

### B. The Trump Administration's Campaign Against Transgender Health Care and the Historical Background of the Rule

The Rule is the latest component of a coordinated federal campaign to suppress transgender health care. Compl. ¶ 32. On December 22, 2024, then-President-elect Trump threatened that "with the stroke of [his] pen on day one, we are going to stop the transgender lunacy." Compl. ¶ 33.

President Trump began implementing that threat immediately after taking office. Hours after he was inaugurated, he issued Executive Order 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." 90 Fed. Reg. 8,615 (Jan. 20, 2025). The Order defined "gender ideology" as "the false claim that males can identify as and thus become women and vice versa." *Id.* It claimed to protect women from men who "self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers," and directed federal agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology." *Id*. at 8,615–16.

Eight days later, President Trump issued Executive Order 14187, which characterized transgender health care as "mutilation" and a "stain on our Nation's history." 90 Fed. Reg. 8,771 (Jan. 28, 2025). That Order, which has since been enjoined by a federal court, directed the Secretary of Health and Human Services ("HHS") to take "all appropriate actions" to "end" such care for young people, and to withdraw federal funding from institutions that provide it to individuals under age nineteen. *Id.* at 8,772.[3] It also ordered the Secretary of HHS—in response to what President Trump termed "reliance on junk science"—to publish a review of existing literature on "best practices for promoting the health of children" with gender dysphoria. *Id.* at 8,771.

The Administration also pursued that objective through federal law-enforcement mechanisms, including a Department of Justice ("DOJ") directive to prosecute providers of transgender health care, administrative and grand jury subpoenas to physicians and clinics for

[3] Executive Order 14187 was enjoined prior to the instant litigation. *See PFLAG, Inc. v. Trump*, 769 F.Supp. 3d 405, (D. Md. 2025). The district court stated, "The challenged provisions of the Executive Orders place significant conditions on federal funding that Congress did not prescribe. This, the Constitution simply does not allow." *Id.* at 416.

patients' medical records, and public solicitation of reports about hospitals providing such care. Compl. ¶¶ 35–39. In the months after the Executive Orders issued, hospitals nationwide canceled or restricted gender-affirming care for minors. *See* Erchull Decl. Ex. E (Jo Yurcaba, *At Least 21 Hospitals Have Ended or Restricted Trans Care for Minors Since January,* NBC News (Aug. 24, 2025, 7:00 AM), https://tinyurl.com/34bzz89z).

On April 11, 2025—eight months before CMS published its notice of proposed rulemaking prohibiting FFP for evidence-based treatments for gender dysphoria, CMS Deputy Administrator and Director Drew Snyder sent a letter to every state Medicaid Director warning that Medicaid funds should not be used for transgender medical care. *See* Erchull Decl. Ex. F. He claimed, without citation to any source, that such interventions were "[i]nitiated with an underdeveloped body of evidence" and "lack reliable evidence of long-term benefits for minors, and for some children, these interventions are now known to cause long-term and irreparable harm." *Id.* And he reminded state Medicaid Directors that "longstanding federal Medicaid regulations prohibit federal funding for coverage of services whose purpose is to permanently render an individual incapable of reproducing."[4] *Id.*

On November 19, 2025, HHS's Office of Population Affairs published a report titled, "Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices" (the "HHS Review"), commissioned by Executive Order 14187.[5] The HHS Review reached the same conclusion that President Trump and Administrator Oz had announced months earlier: that the

---

[4] In fact, the "primary goal of medical treatment for gender dysphoria is to treat the patient's gender dysphoria by bringing the person's body into alignment with their identity and as a result, reduce the significant distress and anxiety that such misalignment causes that person." Millington Decl. ¶ 37.

[5] The HHS Review was initially released on May 1, 2025, but was re-released in November 2025 with minor revisions and peer review comments. *See* Erchull Decl. Ex. G (HHS, "HHS Releases Comprehensive Review of Medical Interventions for Children and Adolescents with Gender Dysphoria" (May 1, 2025), https://www.hhs.gov/press-room/gender-dysphoria-report-release.html)). The HHS Review is available at https://tinyurl.com/38r2der2.

evidence of the benefit of gender-affirming care was of "low certainty" and that such interventions risk significant irreversible harm. *Id.* at 114. It recognized the WPATH and Endocrine Society guidelines, together with guidance from the American Academy of Pediatrics, as the most influential sources of clinical guidance for treating pediatric gender dysphoria in the United States. *Id.* at 148. However, it disputed that the positions of U.S. medical associations establish a uniform professional consensus, stating that it is unclear whether the associations' official views are shared by the wider medical community or most of their members. *Id.* at 17. Contrary to HHS's claim that it took great care in considering the "gold standard of science,"[6] the HHS Review included in its evaluation only 17 out of 286 systematic reviews that were considered for inclusion. *Id.* at 87-88. The remaining 269 reviews, representing a combined several thousand studies, were discarded. *Id.*

The HHS Review concluded that the overall quality of evidence concerning the effects of the reviewed interventions on psychological outcomes, quality of life, regret, and long-term health was very low. *Id.* at 15. At the same time, it stated that evidence of harms associated with gender affirming care was "sparse." *Id.* The HHS Review also acknowledged that low or very low certainty evidence supporting hormonal and surgical interventions "does not prove that the interventions are ineffective." *Id.* at 230.

After publication of the HHS Review, the American Academy of Pediatrics ("AAP") announced it was "deeply alarmed" by the report, which it said "bypass[ed] medical expertise and scientific evidence." Erchull Decl. Ex. I (Susan J. Kressly, AAP Statement on HHS Report Treatment for Pediatric Gender Dysphoria (May 1, 2025), https://tinyurl.com/bdhcuz8x).

---

[6] Erchull Decl. Ex. G (HHS, "HHS Releases Comprehensive Review of Medical Interventions for Children and Adolescents with Gender Dysphoria" (May 1, 2025), https://www.hhs.gov/press-room/gender-dysphoria-report-release.html.)

According to the AAP, the HHS Report "prioritize[d] opinions over dispassionate reviews of evidence," and cited AAP recommendations in "inaccurate and misleading ways." *Id.* The American Psychological Association likewise stated that the HHS Review's lack of transparency concerning its "authorship, expertise, and methodology" undermined scientific rigor and prevented proper evaluation of potential bias. Erchull Decl. Ex. J (APA Statement on Access to Treatment for Transgender, Gender Diverse, and Nonbinary People (May 1, 2025), https://tinyurl.com/y642tsf4).

The Administration's campaign against health care for transgender adolescents and young adults expanded in December 2025, when Secretary Kennedy, Administrator Oz, and other HHS officials held a press conference to announce several agency actions to suppress gender affirming care for youth. Secretary Kennedy signed a "declaration" titled "Safety, Effectiveness, and Professional Standards of Care for Sex-Rejecting Procedures on Children and Adolescents" (the "Kennedy Declaration"). Erchull Decl. Ex. K. The Kennedy Declaration asserted that "[s]ex-rejecting procedures for children and adolescents are neither safe nor effective as a treatment modality for gender dysphoria, gender incongruence, or other related disorders in minors" — notwithstanding the HHS Review's own acknowledgment that low-certainty evidence "does not prove that the interventions are ineffective" and that evidence of harm was "sparse"—and threatened providers of gender affirming care with exclusion from Medicare, Medicaid, and other federal health care programs. Compl. ¶¶ 41, 42. A federal court later vacated the Kennedy Declaration, finding it "so clearly unlawful" that the court permanently enjoined HHS from relying on it or any materially similar policy, and criticized Secretary Kennedy and the Administration for attempting to "bully or gaslight" the court into ignoring the Kennedy Declaration's "many procedural and legal flaws." *Oregon v. Kennedy*, 831 F. Supp. 3d 1048, 1078 (D. Or. 2026);

Compl. ¶ 3. HHS released the proposed rule concerning the Medicaid and CHIP funding prohibition challenged here the day after the Kennedy Declaration.[7]

HHS also referred at least 17 providers, including children's hospitals and federally qualified health centers, to its Office of Inspector General for exclusion proceedings on the basis of the Kennedy Declaration, and did not withdraw those referrals after the Declaration was enjoined. *Oregon*, 831 F. Supp. 3d at 1059–65; Compl. ¶ 45.

### C. The Rulemaking

Against that backdrop, CMS published its proposed rule, "Prohibition on Federal Medicaid and Children's Health Insurance Program Funding for Sex-Rejecting Procedures Furnished to Children." 90 Fed. Reg. 59,441 (Dec. 19, 2025). In response to the proposed rule, the agency stated that it received approximately 11,000 timely submissions, more than 90 percent of which opposed the proposal. 91 Fed. Reg. 52,421. Major medical associations, state agencies, health care providers, academic researchers, patients, and advocacy organizations submitted extensive evidence demonstrating the safety and efficacy of the targeted treatments. Commenters also criticized the agency's primary evidentiary basis, the HHS Review, as scientifically flawed, predetermined, and misapplied. Compl. ¶¶ 48–49; 91 Fed. Reg. at 52,453.

Moreover, commenters objected to the Rule on the legal bases asserted by Plaintiffs in this action, including that it constitutes arbitrary and capricious agency action, discrimination on the

[7] HHS simultaneously released two additional proposed rules as "part of an all-government effort, led by President Trump and spearheaded by Secretary Kennedy. PBS NewsHour, *WATCH: Trump Administration Seeks to Cut Off Access to Transgender Health Care for U.S. Children*, at 0:17:37. The first would have barred hospitals providing pediatric transgender health care from participating in Medicare and Medicaid entirely. *See* "Hospital Condition of Participation: Prohibiting Sex-Rejecting Procedures for Children," 90 Fed. Reg. 59,464 (Dec. 19, 2025). The second would amend HHS's Section 504 regulations to permit federally funded entities to discriminate against transgender people with gender dysphoria. *See* Nondiscrimination on the Basis of Disability in Programs or Activities Receiving Federal Financial Assistance, 90 Fed. Reg. 59,478 (Dec. 19, 2025). Announcing these rules, HHS described transgender health care as "inflict[ing] permanent harm on children" and the rulemaking package as "answering President Trump's call to action." Erchull Decl. Ex. L (Press Release, HHS, HHS Acts to Bar Hospitals from Performing Sex-Rejecting Procedures on Children (Dec. 18, 2025)).

basis of diagnosis in violation of Medicaid's comparability requirement, agency action in excess of statutory authority in conflict with Medicaid's Early and Periodic Screening, Diagnostic and Treatment ("EPSDT") requirements, and discrimination on the basis of sex, gender identity, and disability, in violation of the Constitution's Equal Protection guarantees and the Affordable Care Act. *See generally* 91 Fed. Reg. at 52,421–73. Commenters also explained that an absence of high-certainty evidence of effectiveness does not constitute evidence of harm (as the HHS Review recognized) and pointed to studies and decades of clinical experience supporting the medical necessity of treatment for appropriately assessed patients. Compl. ¶ 49.

On August 12, 2026, the day before CMS finalized the Rule, Secretary Kennedy referred more than 200 health care organizations and providers to the HHS-OIG and DOJ for investigation, and on the day of the Rule's issuance HHS released a commissioned report describing providers of this care as "wolves in white coats" and the care itself as "child mutilation." Compl. ¶¶ 61. The Rule thus was issued as one component of a coordinated Administration effort to end this care, not as an isolated Medicaid coverage determination. Compl. ¶¶ 32–46, 60–62.

### D. The Rule's Scope and Operation

CMS published the Rule on August 13, 2026, with an effective date of October 13, 2026. It prohibits federal Medicaid and CHIP funding from being used by states for puberty-suppressing medications, hormone therapy, and surgical interventions when used to align a patient's body with a gender identity different from the patient's sex. Compl. ¶ 51. However, it permits funding for the same pharmaceuticals and procedures when used for other purposes. *Id.* at ¶ 52. The Rule applies even when a treating provider determines that the care is medically necessary for an individual patient. Compl. ¶ 54. Although CMS disclaimed reliance on the enjoined Kennedy Declaration, the Rule was developed by the same officials pursuant to the same Executive Order as the Kennedy Declaration, and it reached the same substantive conclusion. Compl. ¶ 56.

The Rule adopted the term "sex-rejecting procedures" to describe the treatment category at issue—language that had not previously appeared in the agency's clinical or regulatory vocabulary. The term is not an independent clinical classification, but rather a mirror of the terminology of the preceding executive orders.

It defines "sex-rejecting procedure" as a "pharmaceutical or surgical intervention that attempts to align an individual's physical appearance or body with an asserted identity that differs from the individual's sex by either of the following: (1) Intentionally disrupting or suppressing the normal development of natural biological functions, including primary or secondary sex-based traits; or (2) Intentionally altering an individual's physical appearance or body, including amputating, minimizing or destroying primary or secondary sex-based traits such as the sexual and reproductive organs." 91 Fed. Reg. at 52,474. This definition seemingly attempts to encompass the components of transgender health care: puberty-suppressing medications, hormone therapy, and surgical interventions.

The Rule contains three exceptions to its broad prohibition: (1) procedures for medically verifiable disorders of sexual development; (2) procedures for purposes other than gender identity alignment; and (3) treatment of complications from prior transgender health care. *Id.* at 52,474. It provides a tapering period of up to six months for beneficiaries currently receiving cross-sex hormone therapy as of the effective date. *Id.* at 52,416. However, the tapering period does not extend to puberty-suppressing medication. *Id*.

CMS claims authority under Sections 1902(a)(19) (best interests of recipients), 1902(a)(30)(A) (quality of care and efficiency), and 2101(a) (effective and efficient provision of CHIP) of the Social Security Act ("the Act"). The Rule does not prohibit states from covering

these services with state-only funds, nor does it prohibit mental health services, psychotherapy, or counseling. 91 Fed. Reg. at 52,414.

### E. The Impact of the Rule on Children With Gender Dysphoria and the Harm to Plaintiffs

Because the Federal Government provides between 50% and approximately 83% of State Medicaid expenditures through the Federal Medical Assistance Percentage ("FMAP"), the Rule's prohibition on FFP will foreseeably cause States to cease coverage of the affected treatments. States that currently cover these services have relied on federal matching funds and face severe fiscal pressure.[8] The withdrawal of FFP will effectively deny care to Medicaid- and CHIP-enrolled youth because States and providers will predictably cease offering treatments they can no longer afford to provide.

Each Adolescent Plaintiff is receiving medical treatment for gender dysphoria, with Medicaid coverage, since before January 1, 2026. Goe Decl. at ¶¶ 4, 10; Koe Decl. at ¶ 9; Loe Decl. at ¶ 11; Moe Decl. at ¶ 9. New Hampshire law expressly authorizes health care providers to continue that treatment for minors who, like the Adolescent Plaintiffs, began it before that date. RSA 332-N:2, III. The federal share of New Hampshire's Medicaid expenditures is 50 percent. *See* 90 Fed. Reg. at 54,696 (Nov. 28, 2025). Once the Rule takes effect, the State would have to bear the entire cost of continuing that care with state-only funds, and the State has given no indication that it will do so. *Massachusetts v. Oz*, No. CV 26-12962-RGS, 2026 WL 2192092, at *2 (D. Mass. July 29, 2026), *citing RENEW Ne. v. United States Dep't of Interior*, 2026 WL

[8] Twenty-one states and the District of Columbia have separately sued to block implementation of the Rule due to its "immediate, significant, and harmful effects on Plaintiff States, including fiscal harms resulting from the loss of federal funding for necessary healthcare many Plaintiff States are required to cover and will continue to fund from their own already strained budgets, as well as significant operational costs state Medicaid agencies will incur to comply with the Rule." *See Illinois et al. v. U.S. Dep't Health & Hum. Servs.*, No. 1:26-cv-14051 (D. Mass Sept. 2, 2026) (ECF No. 1).

1078282, at *30 (D. Mass. Apr. 21, 2026) (holding that "Courts within this district have recognized that unrecoverable 'money damages resulting from agency action' are 'sufficient to establish irreparable harm in an APA suit.'")

The Rule will directly affect thousands of adolescents currently receiving transgender health care through Medicaid and CHIP that their physicians have determined is medically necessary. The Rule acknowledges that, between 2017 and 2021, more than 120,000 young people ages 6 to 17 were diagnosed with gender dysphoria, with more than 4,700 starting puberty-suppressing medications and more than 14,000 starting hormonal therapy. 91 Fed. Reg. at 52,408–09.

Abrupt discontinuation of hormone therapy and puberty-suppressing medications poses grave medical risks, including severe psychological distress, return of gender dysphoria symptoms, and dangerous physiological consequences from sudden hormonal changes. The Rule's six-month tapering period, which applies only to cross-sex hormones, is medically inadequate, and the Rule includes no tapering period for puberty-blocking medications. The Rule will result in the loss of essential, necessary, and physician-prescribed health care, causing concrete and imminent harm to each Adolescent Plaintiff.

The impacts on Adolescent Plaintiffs are cases in point.

**1. Grace Goe**

Goe has been treated for gender dysphoria since December 2021. Goe Decl. ¶¶ 4, 8. Grace's pediatric endocrinologist is monitoring her physical development and expects she will soon reach Tanner stage 2 of puberty, meaning that outward physical changes of male puberty will begin. *Id.* at ¶ 11. Goe attends public school in New Hampshire and has been known as a girl at school since her diagnosis. *Id.* at ¶¶ 4, 12.

After she was diagnosed with gender dysphoria by her primary care provider, her family began to regard her as a girl, and the symptoms of distress subsided. *Id.* at ¶ 9. The change was immediate. *Id.* Since the time of her diagnosis, Goe has lived as a girl in all aspects of her life. *See id.* at ¶ 4. She is treated as a girl at home and at school. *Id.* at ¶¶ 4, 12. Her family and peers have known her as a girl for many years. *Id.* at ¶¶ 4, 12. Because her gender dysphoria is properly treated, she no longer exhibits symptoms of distress associated with gender dysphoria. *Id*.

Without puberty-suppressing medication, Goe is at an age where she will begin to undergo changes associated with male puberty, including body hair growth and a deepening voice, in addition to the development of other secondary sex characteristics associated with adolescent boys. *Id.* at ¶¶ 11, 13. Many of these changes are irreversible. *Id.* at ¶ 13. She and her peers will be aware of these changes. *Id.* at ¶ 12. If her body masculinizes, she would predictably experience severe distress associated with gender dysphoria. *Id*.

If the Rule goes into effect, Goe will no longer be able to receive coverage for the puberty suppressing medication that she will soon need. *Id.* at ¶ 16. That change in coverage will occur immediately upon the effective date of the Rule. *Id.* at ¶ 17. Her family is unable to afford the medication without Medicaid coverage and has no alternative means by which to fund the medical care she needs.[9] *Id*.

The use of puberty-suppressing medication, as determined medically necessary by her treating endocrinologist and mental health provider, prevents the masculinizing changes of male puberty from occurring and allows Goe to continue living as, and being recognized as, the girl

[9] Low-income children in New Hampshire are covered either by traditional Medicaid or through the expansion of Medicaid through CHIP funding, depending on their families' modified adjusted gross income. *See* New Hampshire Dep't Health & Hum. Servs, Medicaid Assistance Manual a§ 223, https://tinyurl.com/yr3cf6v9. For all intents and purposes, the programs are operationally identical.

she is. If that medication is interrupted, those changes will begin within months and cannot be reversed: a deepened voice, facial and body hair, and skeletal changes will be permanent, and will mark her for the rest of her life as visibly different from other girls and women. *Id*. at ¶¶ 13, 14; Millington Decl. ¶¶ 25. The clinical consequences of that loss are not speculative in Goe's case. Before her diagnosis, the distress of being regarded as a boy produced severe anxiety, statements that she "should just be dead," and a school crisis intervention over self-harm. Goe Decl. ¶ 6. Her treating providers have determined that continued suppression is necessary to prevent the return of that distress, and the medical literature confirms that untreated gender dysphoria in adolescents carries markedly elevated risks of depression, self-harm, and suicidality. Millington Decl. ¶ 25. The Rule would force Goe to undergo, without any tapering period, precisely the bodily changes her treatment exists to prevent, at the moment in her life when they would do the most lasting harm.

**2. Kylie Koe**

Kylie Koe is a thirteen-year-old transgender girl who lives in Hillsborough County, New Hampshire. Koe Decl. ¶¶ 3–4. She has lived as a girl since she was six or seven years old—roughly half her life. *Id.* ¶ 4. She and her family are Medicaid beneficiaries, and Medicaid is her only health insurance. *Id.*

Kylie was drawn to femininity from early childhood, and in first grade she told her family she is a girl—the point at which the rest of the family caught up to what she already knew about herself. *Id*. at ¶ 5. She began seeing a mental health provider in 2021, who diagnosed her with gender dysphoria; she has also been diagnosed with depression, anxiety, and ADHD. *Id*. at ¶ 6. Before beginning treatment, she regularly shut down at school—she would stop speaking, refuse her work, sit alone, and could not be reached by her teachers—but with medication and treatment

she is now able to manage those symptoms and get through the school day, a stability that is hard-won and fragile and depends on her being able to live as who she is. *Id*.

Kylie attends school in New Hampshire, where most students do not know she is transgender and have only ever known her as a girl; being seen simply as a girl is essential to her sense of safety and belonging. *Id*. at ¶ 7. But that safety is fragile: when others at school have used her given name, she has been left despondent, unable to function at school, angry, and fearful. *Id*. at ¶ 8.

Since approximately 2024, Kylie has been treated at a New Hampshire gender clinic, where her care has been overseen by a pediatric endocrinologist. *Id*. at ¶ 9. Her endocrinologist is tracking her development closely and has advised that she recently reached Tanner stage 2—the point at which the outward physical changes of male puberty begin and she will need puberty blockers imminently. *Id*. Under her endocrinologist's care, Kylie has a treatment plan in place: her doctor plans to prescribe puberty blockers as soon as she reaches Tanner stage 2, so that she does not develop the permanent physical characteristics of an adult male while she continues to grow. *Id*. at ¶ 13. Her doctors, her father, and her mother all agree this is the right treatment, and Kylie herself wants it. *Id*.

Without puberty-suppressing medication, Kylie is at an age where she will begin to undergo the changes of male puberty. *Id.* at ¶ 9. Her endocrinologist has explained that she will soon undergo irreversible masculine changes that cannot be reversed by any medication. *Id*. at ¶ 11. The doctor has also explained that puberty-suppressing medications are effective only if started at the beginning of puberty, before these changes take hold, which is why the timing matters so much: the window in which the medication can protect Kylie is about to open, and once it closes it will not reopen. *Id*. Kylie knows these changes are coming and is terrified that

others will begin to see her as a boy; if her body changes, everyone she knows will find out at once. *Id*. at ¶ 10.

The clinical consequences of that loss are not speculative in Kylie's case. She is already living with depression and anxiety, at an age when a child's sense of self is especially vulnerable, and her mother—who has already watched a single misused name keep Kylie out of the classroom for a day—attests that if Kylie begins to develop the outward characteristics of a boy she will refuse to go to school or out in public at all. *Id*. at ¶ 12. Her mother is deeply afraid of what forced masculinization would do to Kylie's mental health, education, and safety. *Id.*

If the Rule goes into effect, Kylie will no longer be able to receive Medicaid coverage for the puberty-suppressing medication she needs. *Id*. at ¶¶ 14–15. The family is a low-income family of four; the medication costs up to $50,000 as an implant, which is more than the family earns in nine months, and they have no other insurance, savings, or resources to pay out of pocket. *Id*. at ¶ 14. Without Medicaid coverage, Kylie will not receive the medication—not a choice the family is making, but the reality of its finances. *Id*.

The Rule is scheduled to take effect on October 13, 2026—weeks away and at almost exactly the moment Kylie's doctor expects her to need the medication—and provides no transition period for children who need puberty-suppressing medication. *Id*. at ¶ 15. If the Rule takes effect, the family knows of no way for Kylie to receive puberty blockers as her puberty continues; her body will start to change, and those changes will be permanent, while this case is being decided. *Id*. The Rule would take the treatment decision away from the family, not because the medication is medically unnecessary, but because they cannot pay for it themselves. *Id*. at ¶ 16. The harm is already occurring: since learning of the Rule, Kylie's parents have lived

with constant fear, and her mother does not know how to tell her daughter that the treatment she has been counting on may be taken away at the very moment she needs it. *Id*. at ¶ 17.

**3. Logan Loe**

Logan Loe is a fifteen-year-old transgender girl living in Hillsborough County, New Hampshire, with her mother and her mother's fiancé. Loe Decl. ¶¶ 3–4. She has lived as a girl since approximately 2021 and has had Medicaid as her only insurance throughout her life. *Id.*

From early childhood, Logan consistently understood and expressed herself as a girl. *Id*. at ¶ 5. In 2021, she asked to use feminine pronouns, and soon after told her mother that she is transgender, confirming what her family had already understood. *Id*. at ¶¶ 6–7.

Logan has a history of depression and anxiety and takes medication that helps treat these conditions. *Id*. at ¶ 8. After coming out as transgender, she benefited from group therapy with LGBTQ young people and began seeing a therapist at the gender clinic to which her pediatrician referred the family. *Id*. at ¶ 9. After experiencing bullying at school during seventh and eighth grade, she began studying at home under her mother's supervision. *Id*. at ¶ 10.

At age twelve after extensive evaluation by her therapist and the gender clinic's medical team and counseling about the medication's risks, benefits, and alternatives, Logan's pediatric endocrinologist prescribed puberty-suppressing medication. *Id*. at ¶ 11. For approximately three years, she has received injections every three months with close monitoring, including regular blood work and bone density scans, all covered by New Hampshire Medicaid. *Id*. The treatment has prevented masculine pubertal changes, including facial hair, and deepening of her voice, and her appearance is very feminine. *Id*. She has an appointment at the gender clinic on October 5, 2026, to assess whether she is ready to begin estrogen therapy, which she strongly desires. Id. at ¶ 13.

Logan's doctors have explained that puberty-suppressing medication pauses, rather than stops, puberty permanently, and that masculine puberty will resume within a few months if she stopped treatment. *Id*. at ¶ 12. The resulting changes—a deeper voice, facial hair, an Adam's apple, and changes to her face and bone structure—would be irreversible. *Id*. Logan is terrified that others will begin to see her as a boy and disclose the most private fact about her. *Id*. at ¶ 15.

If the Rule takes effect, Logan will lose Medicaid coverage for her puberty-suppressing medication. *Id*. at ¶¶ 14. The family is low-income and cannot afford the medication, which the clinic states would cost approximately $70,000 per year without insurance—more than the family's household income. *Id*. at ¶ 16. The family has no other health insurance for Logan, no savings or other resources to pay out of pocket, and her mother's fiancé cannot add her to his employer's plan because he is not her legal parent; no state program has been identified that would cover the care. *Id*. Without Medicaid coverage, Logan will not receive the medication. *Id*.

The Rule is scheduled to take effect on October 13, 2026—less than three weeks away and only eleven days after Logan's clinic appointment—and provides no transition period for children receiving puberty blockers, although it permits a tapering period for adolescents already receiving hormone therapy. *Id*. at ¶ 17. Her doctors have told the family that once Logan stops treatment, masculine puberty will begin and those changes will be permanent, occurring while this case is being decided, with no ability later to undo them. *Id*.

For three years, Logan's doctors have recommended, prescribed, and monitored this treatment, and Medicaid has covered it as medically necessary. *Id*. at ¶ 18. The Rule would override that judgment because her family cannot pay for treatment. *Id*. The harm has already begun: since learning of the Rule, Logan's mother has been in a constant state of panic and has spent hours unsuccessfully searching for another way to fund her daughter's care. *Id*. at ¶ 19.

**4. Maya Moe**

Maya Moe is a fifteen-year-old transgender girl and a resident of New Hampshire, where she lives with her mother, Melissa Moe. Moe Decl. ¶¶ 3, 4. She was diagnosed with gender dysphoria at a specialized gender clinic in April 2019, following a referral from her pediatrician, and has attended the clinic every six months since. *Id.* at ¶ 8. Maya and her family are Medicaid beneficiaries; she has been enrolled in New Hampshire Medicaid since 2016, and it is her only health insurance. *Id.* at ¶ 4. She has been taking puberty-suppressing medication since it was prescribed by her treating pediatric endocrinologist in October 2022—before New Hampshire's law restricting this care for minors took effect on January 1, 2026. *Id.* at ¶ 9.

Maya has expressed that she is a girl since she was very young; at around age four she became extremely distressed shopping in the boys' clothing section, and at age five she told her mother she is a girl. *Id.* at ¶ 5. From around age five, her family allowed her to live as a girl in all aspects of her life, including at school, with no medical treatment at that age; her identity has been consistent since. *Id*. at ¶ 6. The change in her demeanor was immediate. *Id.* at ¶7. Her teachers observed that before living as a girl she was introverted, quiet, and anxious, and that afterward she became more present and engaged. *Id*. Her family and peers have known her as a girl for most of her life. *See id.* at ¶ 6.

The ongoing use of puberty-suppressing medication, together with estrogen therapy, began in 2023, and prevents the masculinizing changes of male puberty and allows Maya to continue living as, and being recognized as, the girl she is. *Id*. at ¶ 11. Her endocrinologist has determined that her implant needs to be replaced at least once before her eighteenth birthday; once the implant stops working, the medication wears off quickly and testosterone-driven puberty will begin within a few months. *Id*. at ¶ 10. If that medication is interrupted, those

changes cannot be reversed: Maya knows that a deeper voice and facial and body hair are permanent, and she is afraid of those changes. *Id*. at ¶ 15.

The clinical consequences of that loss are not speculative in Maya's case. When the blocker has worn off for only a week or two, she has become withdrawn, irritable, and depressed; going through a full masculine puberty would be far worse and its physical changes permanent. *Id*. at ¶ 16. Her mother fears she would experience severe and lasting depression and could become suicidal. *Id.* The decision to pursue this treatment was made together with Maya's pediatrician, the clinic, and her endocrinologist, who all determined it was medically necessary after years of monitoring. *Id*. at ¶ 13.

If the Rule goes into effect, Maya will no longer be able to receive Medicaid coverage for the puberty-suppressing medication and estrogen she needs; her mother understands that New Hampshire Medicaid will no longer cover her care after October 13, 2026. *Id*. at ¶ 14. Her family cannot afford this care without Medicaid coverage: the implanted version of puberty suppression medication costs more than $40,000—more than her mother's annual income—and estrogen costs approximately $100 per month, in addition to monitoring visits and bloodwork. *Id*. The Rule is already harming the family; since learning of it, Maya and her mother have lived with dread, and her mother has asked her doctor whether the implant can be replaced sooner out of fear of losing coverage. *Id*. at ¶ 17.

## LEGAL STANDARD

A preliminary injunction is an extraordinary remedy assessed under four factors: "(1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing the injunction will burden the defendants less than denying an injunction would burden the plaintiffs; and (4) the effect, if any, on the public interest." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (cleaned up).

Likelihood of success and irreparable harm are "the most critical" factors. *Fitzmorris v. Weaver*, No. 21-CV-25-PB, 2024 WL 231883, at *2 (D.N.H. Jan. 22, 2024) (cleaned up). The balance of equities and public interest merge when the Government is the opposing party. *Nken v. Holder*, 556 U.S. at 418, 435–36 (2009). The Court should grant a preliminary injunction to the extent necessary to prevent the threatened injury to the named Plaintiffs. The requested order would bind Defendants and the persons specified in Fed. R. Civ. Rule 65(d)(2) as to the named Plaintiffs.

## ARGUMENT

The four preliminary injunction factors favor the relief requested. Plaintiffs are likely to succeed on their claims that the Rule's pharmaceutical provisions exceed CMS's statutory authority, conflict with Medicaid requirements, and are arbitrary and capricious. Each Adolescent Plaintiff faces a concrete risk of losing Medicaid coverage for prescribed or medically necessary treatment when the Rule takes effect on October 13, 2026. Their families attest that they cannot afford the treatment without coverage, and the record describes the serious, potentially irreversible physical and psychological harms that could follow interruption.

The requested injunction is narrowly drawn to the injuries established by these Plaintiffs. It would prohibit Defendants from applying the Rule's pharmaceutical provisions to the Medicaid-covered treatment of Grace, Kylie, Logan, and Maya while this action is pending.

### I. Plaintiffs Have a Strong Likelihood of Success on the Merits of Their Claims[10]

#### A. The Rule Violates the Administrative Procedure Act.

##### 1. The Rule is a Final Agency Action Subject to APA Review.

Under the APA, courts may review "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. A final agency action is a "definitive statement of

[10] As a threshold matter, Plaintiffs readily satisfy the requirements for standing. The Adolescent Plaintiffs are Medicaid/CHIP beneficiaries currently receiving puberty-suppressing medication or hormone therapy that the Rule

the agency's position with direct and immediate consequences." *Trafalgar Cap. Assocs., Inc. v. Cuomo*, 159 F.3d 21, 35 (1st Cir. 1998) (cleaned up). "The core question [for finality] is whether the agency has completed its decision-making process, and whether the result of that process is one that will directly affect the parties." *Id*. The Rule—a final rule published in the Federal Register, with a fixed effective date and binding legal consequences for States, providers, and beneficiaries—plainly meets these requirements. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

### 2. The Rule Violates the APA Because it Exceeds CMS's Statutory Authority and Conflicts with Statutory Requirements

The APA requires courts to "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). The Rule fails that standard in three independent ways. First, no provision of the Medicaid Act or CHIP authorizes CMS to impose a nationwide, service-specific funding prohibition that Congress did not enact. Second, the Rule directly conflicts with the EPSDT mandate, which requires coverage of all medically necessary care for beneficiaries under age 21. *See* 42 U.S.C. § 1396d(r)(5). Finally, the Rule conflicts with Medicaid's comparability requirement, which forbids

---

will render ineligible for FFP. Because their families cannot afford that care without Medicaid/CHIP coverage, the Rule imminently threatens loss of medically necessary treatment and serious physical and psychological harm. Each Adolescent Plaintiff began treatment before January 1, 2026, and New Hampshire law expressly authorizes providers to continue treating minors who did so. *See* RSA 332-N:2, III; *supra,* Statement of Facts Part E. The Rule—not state law—is thus the sole obstacle to the Adolescent Plaintiffs' continued care. The Parent Plaintiffs likewise face financial injury and the prospect of watching their children lose essential care, and they may assert their children's injuries as next friends under Federal Rule of Civil Procedure 17(c). These injuries are fairly traceable to the Rule because withdrawing FFP, which covers a substantial share of state Medicaid and CHIP expenditures, will predictably cause States and providers to discontinue the affected care. New Hampshire has given no indication that it will assume the full cost of continuing this care for existing patients once federal funding is withdrawn. *See supra*, Statement of Facts Part E. They are redressable because postponing the Rule's effective date would preserve the funding necessary for continued treatment. *See Dep't of Com. v. New York,* 588 U.S. 752, 767–68 (2019). Plaintiffs also fall squarely within the zone of interests protected by Medicaid and CHIP: the Adolescent Plaintiffs are the intended beneficiaries of programs Congress created to provide medically necessary care to low-income children, including Medicaid's mandatory Early and Periodic Screening, Diagnostic and Treatment ("EPSDT") benefit. *See* 42 U.S.C. §§ 1396d(r)(5), 1397aa(a).

denying covered services to eligible beneficiaries solely because of their diagnosis or condition. *Id*. at § 1396a(a)(10)(B).

**a. The Rule Violates the APA Because it Exceeds CMS's Statutory Authority.**

The Rule exceeds the authority Congress delegated to CMS. Congress created Medicaid and CHIP as cooperative federal-state programs governed by specified statutory conditions. 42 U.S.C. §§ 1396 *et seq*. It assigned States substantial responsibility to define and administer covered services through approved plans and prescribed how CMS may address noncompliance with EPSDT and CHIP requirements. None of the general provisions CMS invokes in the preamble to the Rule authorizes a nationwide, service-specific funding prohibition that Congress did not enact. Whether they do is a question of statutory interpretation that this Court decides for itself, without deference to CMS's reading of its own authority. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024).

The Rule upends Medicaid and CHIP's framework by adding a new substantive funding condition of CMS's own making. But a federal service-specific funding prohibition requires congressional authorization. For example, an analogous subpart of 42 C.F.R. Part 441 prohibits federal funding for most abortions. 42 C.F.R. pt. 441, subpt. E. That prohibition implements express statutory restrictions commonly known as the Hyde Amendment. *See* 42 C.F.R. § 441.200 (citing § 402 of Pub. L. No. 97-12 and § 204 of Pub. L. No. 98-619). The Rule here, in contrast, implements no comparable congressional command. The difference is telling: although Congress could exclude a category of services from federal Medicaid funding, it has enacted no such exclusion for transgender health care. In fact, Congress has considered, and declined to enact, legislation that would impose precisely the exclusion CMS has now adopted. *See*, *e.g.*, H.R. 10075, 118th Cong. (2024); H.R. 742, 119th Cong. (2025).

Similarly, in Section 1903(i) of the Medicaid Act, Congress, in more than two dozen paragraphs enumerated additional circumstances in which federal payment "shall not be made." *See*, *e.g.*, 42 U.S.C. § 1396b(i). And the definition of "medical assistance" in § 1396d(a) itself carves particular categories of care—for example, services furnished to patients under age 65 in institutions for mental diseases—out of the scope of federal participation. *See id.* § 1396d(a). When Congress wishes to withhold federal funding for a category of otherwise-covered services, it says so in the text of the Act. Its detailed enumeration of funding exclusions—and the absence of any express delegation to CMS—forecloses any inference that it silently delegated to CMS the power to add new ones by regulation. *See Brito v. Garland*, 22 F.4th 240, 252 (1st Cir. 2021) ("we reach the unremarkable conclusion that Congress meant only what it said – and not what it did not say"); *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotation omitted); *City of Providence v. Barr*, 954 F.3d 23, 35 (1st Cir. 2020) (reasoning that Congress's "express authorization for specific deviations" from a statutory funding formula strongly implied that Congress did not authorize the agency to impose additional grant conditions to "advance its own priorities").

In those circumstances where it did not explicitly authorize nationwide funding limitations, Congress left it to the States – not CMS – to dictate what is in the best interest of recipients. CMS relies on §§ 1902(a)(19) and 1902(a)(30)(A) of the Social Security Act to justify the Rule. But, in that very authority, the Medicaid statute makes plain: "A State plan for medical assistance" – not CMS – must Provide safeguards assuring that care and services are furnished "in a manner consistent with simplicity of administration and the best interests of the recipients." 42 U.S.C. §

1396a(a)(19) (emphasis added). Similarly, it is for the States, not CMS, to ensure that payments are made consistent with "efficiency, economy, and quality of care." 42 U.S.C. § 1396a(a)(30)(A). *See also* 91 Fed. Reg. at 52,442, 52,444. These broad standards applicable to States and the development of their Medicaid plans, cannot reasonably be read as authorizing CMS to exclude a specific service from federal funding nationwide.

CMS's rationale for removing CHIP funding fails for the same reason. Section 2101(a) directs states to provide child health assistance in an "effective and efficient manner" coordinated with other sources of coverage. *See* 42 U.S.C. § 1397aa. But that general programmatic standard neither identifies any particular service nor prohibits FFP for any specific treatment. Nor does a directive to coordinate CHIP with other coverage authorize CMS to write a new substantive exclusion into both programs.

The Secretary's general rulemaking authority cannot expand those provisions. *See Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014) (agency's interpretation of statute was unreasonable "because it would bring about an enormous and transformative expansion in EPA's regulatory authority without clear congressional authorization"); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress"); *United States v. Larionoff*, 431 U.S. 864, 873 (1977) ("regulations, in order to be valid, must be consistent with the statute under which they are promulgated."). Authority to issue rules "not inconsistent with" the Social Security Act and necessary to its efficient administration remains bounded by the Act itself. *See* 42 U.S.C. § 1302(a). It does not permit CMS to reallocate authority between the federal government and the States or attach a new condition to FFP that Congress did not impose. Authority to implement statutory requirements is not authority to create them.

**b. The Rule conflicts with the Medicaid Act's EPSDT Mandate.**

The EPSDT benefit is a mandatory component of Medicaid for individuals under age 21. The goal of EPSDT, as explained by CMS itself, "is to ensure that children get the health care they need when they need it – the right care to the right child at the right time in the right setting." CMS, Coverage Guide, *EPSDT–Guide for States: Coverage in the Medicaid Benefit for Children and Adolescents* 1 (May, 2026), available at https://tinyurl.com/ye4efyk3.

Under the EPSDT benefit, States must provide all "necessary health care, diagnostic services, treatment, and other measures described in [§ 1396d(a)] to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan." 42 U.S.C. § 1396d(r)(5). Congress enacted EPSDT in 1967 and expanded it significantly in 1989 to mandate that participating States provide EPSDT-eligible youth all services within the scope of § 1396d(a) that are medically necessary to correct or ameliorate their conditions, regardless of whether the State covers such services for adults. Section 1396d(a), in turn, includes, among other things, "outpatient hospital services . . . physicians' services furnished by a physician . . . clinic services furnished by or under the direction of a physician . . . [and] prescribed drugs, dentures, and prosthetic devices." 42 U.S.C. § 1396d(a)(2)(A), (5)(A), (9), (12). Courts have consistently enforced EPSDT as written: the obligation is mandatory, and the only limit Congress placed on it is medical necessity. *See*, *e.g.*, *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 589–90 (5th Cir. 2004); *Pediatric Specialty Care, Inc. v. Ark. Dep't of Human Servs.*, 293 F.3d 472, 480–81 (8th Cir. 2002); *Katie A. ex rel. Ludin v. L.A. Cnty.*, 481 F.3d 1150, 1154–55 (9th Cir. 2007); *Rosie D. ex rel. John D. v. Romney*, 410 F. Supp. 2d 18, 25–26 (D. Mass. 2006).

The Rule is in direct conflict with the statutory requirement that Medicaid cover services for "necessary healthcare." The Rule's preamble acknowledges that its prohibition applies "'even

in circumstances in which a provider may determine that a sex rejecting procedure is medically necessary for a child diagnosed with gender dysphoria.'" 91 Fed. Reg. at 52,443. That position cannot be squared with EPSDT's text. The Rule withdraws federal funding for nearly every treatment recognized as medically necessary for minors with gender dysphoria. It replaces the individualized medical necessity determination that Section 1396d(r)(5) requires with a categorical national exclusion, and it applies even when the treating clinician and a multidisciplinary team determine that a service is necessary to correct or ameliorate the young person's condition. Courts have repeatedly held that a State may not adopt categorical exclusions that override individualized EPSDT medical necessity determinations. *See*, *e.g.*, *Hood*, 391 F.3d at 594–95 (State could not exclude medically necessary incontinence supplies from EPSDT coverage); *Rosie D.*, 410 F. Supp. 2d at 26–27. CMS, whose statutory role is to enforce the EPSDT mandate against noncompliant States, cannot itself impose the categorical exclusion the statute forbids the States to adopt.

CMS's response in the Rule was to assert, without analysis, that the Rule is "consistent" with EPSDT because EPSDT requires coverage only of medically necessary services and CMS has now determined that the targeted medications never are. 91 Fed. Reg. at 52,419. That reasoning is circular. EPSDT commits the medical necessity determination to the individualized clinical judgment of the treating provider, subject to the State's reasonable oversight; it does not authorize CMS to declare by nationwide fiat that a diagnosed condition may never be treated with medications that remain covered for every other indication. If the general plan administration provisions CMS invokes permitted that result, they would permit CMS to override EPSDT for any condition it disfavored, and the mandate Congress enacted would mean nothing. *See Gomes v. Hyde*, 804 F. Supp. 265, 274 (D. Mass. 2025) (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31

(2001)) ("[S]tatutes should be construed so that 'no clause, sentence, or word shall be superfluous, void, or insignificant'").

That the Rule "does not prohibit" States from paying the full cost with state-only funds, 91 Fed. Reg. at 52,414, does not cure the conflict. Section 1903(a)(1) provides that the Secretary "shall pay" to each State with an approved plan the federal share of amounts "expended . . . as medical assistance under the State plan." 42 U.S.C. § 1396b(a)(1). EPSDT services are "medical assistance" that a participating State must furnish. *Id.* §§ 1396a(a)(43), 1396d(a)(4)(B), 1396d(r)(5). The Rule thus refuses federal payment for services the Act requires the State to provide and requires the Secretary to fund.

In the Rule, CMS also invokes *Harris v. McRae*, 448 U.S. 297 (1980), and *Beal v. Doe*, 432 U.S. 438 (1977), but these cases do not solve this statutory problem. *Harris* held that a State need not fund services for which federal reimbursement is unavailable because Congress itself, in the Hyde Amendment, withdrew federal funding, 448 U.S. at 308–11; it rested on Congress's power to define the scope of federal participation, not on any authority of the agency to do so. And *Beal*, while recognizing State discretion to set reasonable standards for the extent of coverage, cautioned that "serious statutory questions might be presented if a state Medicaid plan excluded necessary medical treatment from its coverage." 432 U.S. at 444. Neither decision supports an agency-created exclusion of medically necessary care from a mandatory benefit.

Nor can CMS defend the exclusion by characterizing the targeted medications as experimental or unproven. The experimental treatment doctrine has two limits, and the Rule fails both. *First*, the review must be individualized: a State may scrutinize a treating physician's medical necessity determination, but it may not displace that judgment with a categorical rule that forecloses consideration of the individual patient. *Moore ex rel. Moore v. Reese*, 637 F.3d 1220,

1255–60 (11th Cir. 2011); *Hood*, 391 F.3d at 594–95. The Rule is precisely such a categorical rule; by its terms it applies "'even when a provider determines that a sex-rejecting procedure is medically necessary.'" 91 Fed. Reg. at 52,443.

*Second*, the medications at issue are not experimental in any accepted sense. They are FDA-approved drugs with decades of clinical that are prescribed for gender dysphoria—off-label, as a large share of pediatric medications are prescribed—under published clinical guidelines endorsed by every major American medical association. Millington Decl. ¶¶ 21, 32–36, 57. And the HHS Review on which CMS relies expressly disclaimed any finding that they are ineffective: low-certainty evidence, the Review acknowledged, "does not prove that the interventions are ineffective." *See* Erchull Decl. Ex. H (HHS Review) at 230; *see supra*, Statement of Facts Part B. An agency that has not found a treatment ineffective, and that continues to fund the same medications for other children, cannot invoke the experimental-treatment doctrine to override EPSDT's medical necessity mandate.

At bottom, the Rule is incompatible with EPSDT's requirement for States to cover "necessary healthcare," and for the federal government to "pay" its share of the services. CMS's various arguments otherwise fall flat.

**c. The Rule Violates the Medicaid Act's Comparability Requirement, as CMS Itself Has Long Construed It.**

The Rule is contrary to law for a further, independent reason: it conflicts with the Medicaid Act's comparability requirement, which mandates that the medical assistance made available to any eligible individual "shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual." 42 U.S.C. § 1396a(a)(10)(B)(i). For more than four decades, CMS has construed that requirement to mean that a Medicaid agency "may not arbitrarily deny or reduce the amount, duration, or scope of a required service under §§ 440.210 and 440.220

to an otherwise eligible beneficiary solely because of the diagnosis, type of illness, or condition." 42 C.F.R. § 440.230(c). Section 440.230(c) is addressed to State Medicaid agencies, but it embodies CMS's longstanding and authoritative understanding of what the statute forbids. A rule that requires every State plan to adopt the very diagnosis-based exclusion the statute forbids—by withdrawing the federal funding on which State coverage depends—is "not in accordance with law" regardless of which sovereign draws the line. Comparability is a condition Congress imposed on the State plans that the Secretary approves and funds, 42 U.S.C. § 1396a(a)(10)(B), (b), and the Secretary's statutory role is to withhold funding from plans that violate it, *id.*—not to require, by withdrawing FFP, the very diagnosis-based exclusion the statute forbids. *See Massachusetts Ass'n of Older Americans v. Sharp*, 700 F.2d 749, 753 (1st Cir. 1983) (opining that the categorically needy "are to receive assistance first and in no less comprehensive a form because they are 'persons whom Congress considered especially deserving of public assistance'") (quoting *Schweiker v. Gray Panthers*, 453 U.S. 34, 37 (1981)); *Coe v. Hooker*, 406 F. Supp. 1072, 1083 (D.N.H. 1976) (holding that through the comparability requirement, "Congress has statutorily guaranteed Medicaid recipients equal treatment by state Medicaid administrators").[11]

The Rule does exactly what the comparability requirement forbids: it categorically eliminates federal support for medications that remain covered for other diagnoses, solely because of the patient's diagnosis of gender dysphoria and the purpose for which treatment is sought. Sections 440.210 and 440.220 identify the services that participating state Medicaid plans must cover for eligible beneficiaries and defer to state plans. New Hampshire's Medicaid State Plan provides for a provider determination of medically necessary services for the covered categories

[11] To the extent CMS now reads the comparability requirement to permit what it has forbidden the States to do since 1978, that unacknowledged reversal is independently arbitrary and capricious. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016) (agency must "display awareness that it is changing position" and offer "good reasons for the new policy") (cleaned up); *see infra* Part I.A.2.c.

under the federal rule. *Id.*; *see also* N.H. Admin. Code §§ He-W 530(e), He-W 546. Because the services at issue are physicians' services and prescribed drugs that are medically necessary to treat gender dysphoria, and because New Hampshire law permits their continued provision to minors who began treatment before January 1, 2026, RSA 332-N:2, III, they are required services within the meaning of § 440.230(c).

Contrary to 42 C.F.R. § 440.230(c), the Rule denies and limits a required service because of a beneficiary's diagnosis, illness or condition. It leaves the same medications eligible for FFP when prescribed to treat other conditions but prohibits FFP when they are prescribed to treat gender dysphoria. The coverage decision therefore turns not on the drug, procedure, provider, beneficiary, or treatment setting, but on the diagnosis and clinical indication for which the intervention is prescribed.

CMS responded to comments raising this comparability requirement problem by contending that the Rule "turns on the purpose for which a procedure is performed, not on the identity or diagnosis of the beneficiary." 91 Fed. Reg. at 52,442. But that is semantic relabeling, not a substantive distinction. The relevant "purpose" is treatment of gender dysphoria which necessarily follows from the patient's diagnosis. Section 440.230(c) forbids a Medicaid agency to deny a required service based on diagnosis, and § 440.230(d) permits only limits based on medical necessity or utilization control. The Rule's definition of a "sex-rejecting procedure" turns on whether the patient's "asserted identity . . . differs from the individual's sex," 91 Fed. Reg. at 52,474—that is, on the presence of gender incongruence, the very condition and diagnosis the medication is prescribed to treat. Its exceptions confirm the point: the Rule preserves funding for "medically verifiable disorders of sexual development" and for "purposes other than gender identity alignment," thereby continuing coverage for the same medications when prescribed for

conditions other than a diagnosis of gender dysphoria. In other words, funding is available for every diagnosis but one. *See id.* A rule that covers and funds a medication for precocious puberty, endometriosis, and disorders of sexual development, but withdraws coverage and funding when the same medication is prescribed for gender dysphoria, denies a service "solely because of the diagnosis, type of illness, or condition" within the ordinary meaning of those words. CMS cannot escape the limitations of § 440.230(c) by describing the excluded condition as a "purpose."[12]

CMS also argues that § 440.230(c) prohibits only *arbitrary* diagnosis-based distinctions and that its evidentiary assessment supplies a rational basis for this one. 91 Fed. Reg. at 52,448. But "arbitrary" in § 440.230(c) has never been read to permit what CMS has done. The regulation has always accommodated limits on the amount, duration, and scope of a service that rest on individualized medical necessity or utilization control, 42 C.F.R. § 440.230(d), while forbidding a Medicaid agency to single out a diagnosis and exclude treatment of it outright for which is otherwise a covered service. *See*, *e.g.*, *White v. Beal*, 555 F.2d 1146, 1151–52 (3d Cir. 1977) (State could not furnish eyeglasses to beneficiaries whose vision loss resulted from one cause while denying them to beneficiaries whose vision loss resulted from another); *Weaver v. Reagen*, 886 F.2d 194, 198–200 (8th Cir. 1989) (State could not categorically exclude AZT for Medicaid beneficiaries with AIDS whose physicians deemed it medically necessary, notwithstanding the

[12] *United States v. Skrmetti*, 605 U.S. 495 (2025), does not hold otherwise, nor does it support CMS's effort to recast a diagnosis-based exclusion as a distinction based only on treatment "purpose." *Skrmetti* addressed whether a state law classified on the basis of sex under the Equal Protection Clause; it did not interpret the Medicaid Act or 42 C.F.R. § 440.230(c), which expressly prohibits distinctions based on a beneficiary's "diagnosis, type of illness, or condition." More fundamentally, the Court's own description of Tennessee's law confirms the substance of the distinction CMS seeks to obscure: the law "remov[ed] one set of diagnoses—gender dysphoria, gender identity disorder, and gender incongruence—from the range of treatable conditions," and therefore established "diagnosis-based classifications." *Id.* at 519, 523. The Rule operates in precisely that manner. It preserves federal funding for the medications at issue across other diagnoses but withdraws funding when the patient has gender dysphoria and the medication is prescribed to treat that condition. Whatever constitutional significance *Skrmetti* assigned to the label "medical purpose," CMS cannot use that label to erase the diagnosis-based line the Rule actually draws or to circumvent a Medicaid regulation that expressly prohibits distinctions based on diagnosis and condition.

drug's then-limited FDA labeling); *cf. Ellis v. Patterson*, 859 F.2d 52, 55 (8th Cir. 1988) (upholding exclusion of liver transplants where the State's decision rested on the experimental nature of the procedure rather than the beneficiary's diagnosis). The Rule falls squarely on the forbidden side of that line. It does not limit the amount or duration of a service based on individual need; it eliminates the service entirely for one diagnosis while preserving it for the same treatment across other diagnoses and conditions.

Nor can CMS convert the categorical exclusion into a permissible one merely by asserting that the HHS Review's assessment of the evidence was "rigorous." That CMS now disputes the evidence supporting the excluded use does not make the distinction any less diagnosis-based. Section 440.230(d) already supplies the mechanism for acting on evidentiary concerns: "appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures." 42 C.F.R. § 440.230(d). An agency that believed the evidence warranted closer scrutiny of these prescriptions could have required individualized review; it instead chose the one tool the regulation withholds.

The Rule removes FFP for required services on the precise diagnosis-based ground that the comparability requirement, as CMS has construed it since 1978, prohibits. The Rule is therefore "not in accordance with law," 5 U.S.C. § 706(2)(A), and should be enjoined before it disrupts the lawful operation of New Hampshire's approved Medicaid State Plan and Plaintiffs' access to medically necessary care.

### 3. The Rule Violates the APA Because it is Arbitrary and Capricious.

A reviewing court "shall" set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency acts arbitrarily and capriciously when it "entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so

implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

In addition to the various statutory problems identified above, the Rule is arbitrary and capricious in at least four, independent respects: (1) CMS failed to consider the reliance interests of children currently in treatment or the obvious alternative of protecting them; (2) CMS failed to respond meaningfully to significant comments; (3) CMS offered no reasoned explanation for abandoning its longstanding practice of leaving medical necessity determinations to individualized clinical judgment; and (4) CMS adopted a safety rationale that its own exceptions contradict. The history of the rulemaking— a documented Administration campaign to suppress transgender health care—explains those failures; it does not excuse them.

**a. CMS Failed to Consider the Reliance Interests of Adolescents Currently in Treatment or the Obvious Alternative of Protecting Them.**

The Rule failed to adequately consider the serious reliance interests engendered by CMS's prior policy. Thousands of young people and their families have relied on the availability of Medicaid and CHIP coverage for transgender health care.[13] CMS is free to change its policies in accordance with the established law, but when doing so, it must explain its changed position and "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Encino Motorcars*, 579 U.S. at 221–22 (quoting *FCC v. Fox Television Stations*, 556 U.S. 556 U.S. 502, 515 (2009)). "It would be arbitrary and capricious to ignore such matters." *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *Fox Television Stations*, 556 U.S. at 515).

[13] Lindsey Dawson, "New Regulation Prohibits Federal Medicaid Funds From Covering Gender-Affirming Medical Care for Young People," KFF (Aug. 13, 2026), available at https://tinyurl.com/36s9wmrw (estimating that "about 130,000 young trans people with Medicaid or CHIP coverage . . . live in states without restrictions" on access to transgender health care).

The agency's six-month tapering provision (which is limited to hormone therapy) is manifestly inadequate to address the reliance interests of patients currently receiving puberty-suppressing medications or who have structured their care around continued access to these treatments. CMS acknowledges that beneficiaries "who are unable to find alternative means to pay for these services may either have to rely on other methods of treatment such as psychotherapy or mental health counseling or elect to not receive these services because of the rule." 91 Fed. Reg. 52,414. CMS thus frames the loss of treatment as a voluntary choice that beneficiaries might "elect," when, in reality, low-income children and families who depend on Medicaid or CHIP will be forced to forgo medically indicated care because they cannot afford to pay for it. This failure to grapple with the predictable consequences of eliminating coverage for financially vulnerable beneficiaries underscores the agency's disregard of the reliance interests at stake.

The reliance failure is compounded by CMS's failure to consider obvious, less drastic alternatives that commenters placed squarely before it. An agency acts arbitrarily when it fails to consider "alternatives within the ambit of the existing policy," *Regents*, 591 U.S. at 30 (cleaned up); *State Farm*, 463 U.S. at 51, and in *Regents* the Supreme Court set aside a rescission precisely because the agency ended benefits without considering whether narrower measures would address its stated concerns. 591 U.S. at 30–33. Commenters here proposed, among other things, exempting beneficiaries already in treatment; requiring individualized prior authorization or multidisciplinary assessment; and leaving the determination, as the Medicaid Act contemplates, to States and treating providers. CMS did not explain why none of those alternatives would address its asserted concerns; it adopted the most sweeping option available and did not acknowledge that any other existed.

**b. CMS Failed to Reasonably Engage with Comments on the Proposed Rule.**

The APA requires that, in notice-and-comment rulemaking, an agency must genuinely consider submitted comments, respond to significant objections, and articulate a rational basis for its decision that reflects reasonable engagement with the comment record. *See* 5 U.S.C. § 553; *State Farm*, 463 U.S. at 43 (an "agency must examine the relevant data and articulate a satisfactory explanation for its action"); *Ohio v. EPA*, 603 U.S. 279, 292 (2024) ("An agency action qualifies as arbitrary or capricious if it is not reasonable and reasonably explained.") (internal quotations removed); *Nw. Bypass Grp. v. U.S. Army Corps of Eng'rs*, 552 F. Supp. 2d 97, 106 (D.N.H. 2008). An agency's failure to respond to significant comments renders its action arbitrary and capricious under 5 U.S.C. § 706(2)(A).

CMS acknowledged receiving approximately 11,000 "timely" comments—including submissions from state agencies, treating providers and medical associations—and conceded that "more than 90 percent" opposed the proposed provisions. 91 Fed. Reg. 52,421. The Rule's preamble confirmed that commentators including medical associations, researchers, providers, and patients submitted scientific evidence supporting the safety and efficacy of the targeted treatments and challenging the materials on which CMS relied. *Id*. Those comments included research and professional guidance asserting that the targeted treatments were medically necessary and safe and were associated with reductions in depression, anxiety, self-harm, and suicide. 91 Fed. Reg. 52,455. Yet CMS did not meaningfully engage several specific objections.

For example, the Endocrine Society explained that the standard methodology for assessing certainty in a body of evidence (called "GRADE") integrates research evidence with clinical knowledge and patient circumstances, that observational studies generally begin with "low" or "very low" ratings, and that guideline panels may make strong recommendations based on low- or

very-low-quality evidence after considering additional criteria, including patients' values and preferences.[14] CMS did not address the Endocrine Society's guidelines developed pursuant to that methodology; it instead repeated the HHS Review's assessments that the guidelines received low methodological-quality scores and that evidence of benefit was of "very low certainty," while evidence of certain physiological harms rested on established biological mechanisms. 91 Fed. Reg. 52,427, 52,453–54.

The American Academy of Pediatrics commented that a "very low" GRADE rating reflects limited and uncertain evidence—not affirmative evidence that an intervention is ineffective or harmful—and that the relevant care is individualized and multidisciplinary, with surgery contemplated only "in very rare cases."[15] It also explained that the gender-affirmative care model is individualized and multidisciplinary, may include surgery only "in very rare cases," and requires careful evaluation by qualified professionals. CMS responded by repeating the HHS Review's general criticisms of the AAP guidance and its conclusion that the evidence of benefit was of very low certainty, without addressing the AAP's description of its recommendations or its explanation of what a GRADE rating means. 91 Fed. Reg. 52,427, 52,453–54.

The American Public Health Association and 123 public health and health policy deans, chairs, and scholars cited a published critique concluding that the HHS Review "misrepresents and improperly appraises studies, often ignoring their primary conclusion," offers no evidence that puberty-pausing medications and hormone therapy are harmful, and itself describes evidence of

---

[14] Endocrine Society Comment on Proposed Rule to Prohibit Federal Medicaid and Children's Health Insurance Program Funding for Sex-Rejecting Procedures Furnished to Children (Feb. 17, 2026), available at https://tinyurl.com/4ypm2xpe.

[15] American Academy of Pediatrics, Comment on Proposed Rule to Prohibit Federal Medicaid and Children's Health Insurance Program Funding for Sex-Rejecting Procedures Furnished to Children (Feb. 19, 2026), https://tinyurl.com/3c79jntx ("AAP Comment").

harms as "sparse."[16] CMS answered these objections by reiterating the HHS Review's methodological-quality and certainty assessments and asserting that certain physiological harms were grounded in established biological mechanisms, without addressing the commenters' specific explanations and critiques. 91 Fed. Reg. 52,427, 52,453–54. Nor did CMS meaningfully address the AAP's continuity-of-care evidence that abrupt withdrawal could cause psychological and physiological harm and that no professionally recognized standards—and little, if any, high-quality evidence—exist for tapering these treatments.[17] Instead, CMS authorized federal funding only for a six-month taper of cross-sex hormones, excluded puberty blockers and surgery, and justified those limitations by invoking the same HHS-Review-based risk-benefit determination while asserting that the taper addressed the "most acute continuity-of-care concerns." 91 Fed. Reg. 52,421–22.[18]

CMS asserted that it "carefully considered" all comments but dismissed widely accepted clinical guidance as resting on "legal and political considerations rather than clinical ones." *Id*. at 52,427. Yet "the opportunity to comment is meaningless unless the agency responds to significant points raised by the public." *Home Box Off., Inc. v. F.C.C.*, 567 F.2d 9, 35–36 (D.C. Cir. 1977); *see also Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000) (an agency

---

[16] American Public Health Association, Comment on Proposed Rule to Prohibit Federal Medicaid and Children's Health Insurance Program Funding for Sex-Rejecting Procedures Furnished to Children (Feb. 17, 2026), https://tinyurl.com/mtnjzr9.

[17] AAP Comment at 9.

[18] For example, the American Public Health Association ("APHA") commented, "CMS cherry-picked the evidence it relied on while failing to contend with the evidence that runs counter to its position." APHA and Public Health Deans and Scholars' Comments on the Centers for Medicare and Medicaid Services' "Hospital Condition of Participation: Prohibiting Sex-Rejecting Procedures for Children" (Feb. 17, 2026), available at https://tinyurl.com/5xjbtpfv. It noted that the two reports relied upon by CMS—the "HHS Review and the Cass Review—have both been heavily criticized by medical experts for misrepresenting scientific evidence and data." *Id.* And it stated that authors cited in the HHS Review claim that the report misrepresented their studies, ignored their primary conclusions, and provided "no evidence for its assertion that puberty-pausing medications and hormone therapy are harmful to [transgender] youth, and it even states that evidence of harms is 'sparse.'" *Id.* at 8 (quoting Nadia Dowshen, et al., *A Critical Scientific Appraisal of the Health and Human Services Report on Pediatric Gender Dysphoria*, 77 J. ADOLESCENT HEALTH, 77(3), 342 (2025)).

must respond to significant comments and consider significant alternatives). CMS's conclusory assertion of "careful consideration" does not satisfy that obligation.

**c. CMS Offered No Reasoned Explanation for Abandoning Its Longstanding Practice of Deferring to Individualized Medical Necessity Determinations.**

The Rule is also arbitrary and capricious because CMS failed to provide a reasoned explanation for its unprecedented departure from decades of agency policy not to take a position on whether specific treatments are medically necessary. CMS affirmatively acknowledged that it has "not historically taken a position at the Federal level that particular services when provided to particular individuals for a particular purpose are inherently not medically necessary," but justified its reversal solely by a general and vague reference to "the prevailing evidentiary landscape." 91 Fed. Reg. 52,443. This is insufficient to "show that there are good reasons for the new policy" as any agency changing course must do. *Fox*, 556 U.S. at. A vague reference to "the prevailing evidentiary landscape" does not satisfy that standard, particularly given the extensive contrary evidence submitted to CMS during the comment period. CMS failed to explain why evidence that previously supported—or, at a minimum, did not preclude—coverage now compels a categorical nationwide ban on federal funding.

**d. The Rule's Safety Rationale Is Contradicted by Its Own Exceptions.**

The Rule's stated safety rationale is undermined on its own terms. CMS justified the exclusion in part by pointing to the risks of the medications themselves—including effects on bone density and fertility—but those risks do not depend on the diagnosis for which the medication is prescribed. 91 Fed. Reg. at 52,409. Puberty-suppressing medication produces the same physiological effect, suspension of pubertal development, whether the diagnosis is central precocious puberty or gender dysphoria, and children treated for precocious puberty are commonly

suppressed for periods as long as or longer than adolescents with gender dysphoria. Millington Decl. ¶¶ 28, 29. Yet the Rule preserves FFP for the former and eliminates it for the latter without explaining why the same effects are acceptable in one group of children and intolerable in the other. 91 Fed. Reg. at 52,416. An agency must "articulate a satisfactory explanation" for indication-specific lines, *State Farm*, 463 U.S. at 43, and it may not rest a categorical exclusion on asserted harms that its own exceptions treat as tolerable. CMS did not confront that inconsistency; it did not even acknowledge it.

The history recounted above explains why CMS's explanation is so thin. Executive Order 14187 directed HHS to "end" this care before any evidence had been reviewed; the HHS Review that supplies the Rule's evidentiary foundation was commissioned by that Order to support a conclusion the President had already announced; and HHS described the rulemaking package as "answering President Trump's call to action." *See supra* Statement of Facts Part B; 90 Fed. Reg. 8,771; Erchull Decl. Ex. L. An agency may, of course, change policy at the direction of a new administration. But when it does, the APA still requires "good reasons for the new policy," *Fox*, 556 U.S. at 515, grounded in the record and responsive to the evidence before it. The sequence here—directive first, evidence review second, rulemaking third—is what one would expect to produce a preamble that dismisses the consensus of the medical profession as "political," invokes a "prevailing evidentiary landscape" without identifying what in that landscape changed, preserves the same medications for every other indication without explaining why, and leaves the comments described above unanswered. That is not reasoned decision-making; it is the record of an agency that reached its conclusion before it began. *See State Farm*, 463 U.S. at 43 (agency may not offer an explanation that "runs counter to the evidence before the agency"); *Dep't of Commerce v. New*

*York*, 588 U.S. 752, 785 (2019) (reviewing courts are "not required to exhibit a naiveté from which ordinary citizens are free").

Had CMS genuinely engaged with the comment record and the evidence submitted—rather than merely referencing its "careful consideration" of the record—it would have confronted substantial evidence contrary to its decision and the less drastic alternatives discussed above, which it was obligated to consider and did not.

## II. The Rule Will Cause Irreparable Harm.

"Irreparable injury" means "an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). Plaintiffs bear the burden of demonstrating that irreparable injury is likely in the absence of interim relief. *Nat'l Parks Conservation Ass'n v. U.S. Dep't of Interior*, 180 F.4th 348, 352 (1st Cir. 2026). Here, there are at least two irreparable injuries.

***First,*** under First Circuit precedent, the loss of Medicaid benefits that results in individuals becoming "financially unable to obtain necessary medical care . . . is clearly irreparable injury." *See Mass. Ass'n of Older Americans v. Sharp*, 700 F.2d 749, 753 (1st Cir. 1983). Similarly, other federal courts have also recognized that loss of necessary medical treatment can constitute irreparable harm. *See*, *e.g.*, *Henderson v. Bodine Aluminum*, 70 F.3d 958, 961–62 (8th Cir. 1995) ("It is hard to imagine a greater harm than losing a chance for potentially life-saving medical treatment. . . . Urgent medical treatment is the kind of equitable relief that cannot abide trial."); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1192 (N.D. Cal. 2015) ("Emotional distress, anxiety, depression, and other psychological problems can constitute irreparable injury.").

Here, if the Rule goes into effect, Plaintiffs would immediately lose access to essential and urgent healthcare, which could lead to serious psychological harm, including depression, anxiety,

and suicidality. *See* Millington Decl. ¶ 25.[19] For example, without puberty-suppressing medication, Plaintiff Goe and Koe are both at ages where they will begin to undergo changes associated with male puberty and, if their bodies masculinize, they will predictably experience severe distress associated with gender dysphoria. Goe Decl. ¶ 11; Koe Decl. ¶ 9. As detailed above, each adolescent's family is unable to afford the medication without Medicaid coverage and has no alternative means by which to fund the medical care she needs. Goe Decl. ¶ 16; Koe Decl. ¶ 14; Loe Decl. ¶ 16; Moe Decl. ¶ 14.

The Rule's six-month tapering provision for hormone therapy does not make the requested injunctive relief unnecessary. The taper does not preserve treatment; it funds its withdrawal. From the effective date, federal funding is available only to reduce Plaintiff Loe and Moe's prescribed dose to zero, contrary to their treating physicians' judgment, and the physiological and psychological harms of withdrawal begin with the first reduction, not at the end of six months. Millington Decl. ¶ 25; Loe Decl. ¶ 17; Moe Decl. ¶¶ 9, 10, 16. Relief is therefore necessary now, not in April 2027.[20]

***Second,*** and in addition to the medical harm to the Adolescent Plaintiffs, which is sufficient on its own, the Rule overrides the Parent Plaintiffs' considered decisions about their children's

[19] Because transgender healthcare is urgent and time-sensitive, *see* Millington Decl. ¶ 25, some Medicaid recipients may be compelled to pay for this care with money that would otherwise be used for necessities like food, housing, and utilities. The First Circuit has recognized that this type of significant economic harm constitutes irreparable injury. *See United Steelworkers v. Textron, Inc*., 836 F.2d 6, 8 (1st Cir. 1987) (irreparable-injury factor satisfied where most of the plaintiffs lived on fixed incomes and where increases in the cost of accessing medical care would cause "concern about financial disaster" and "possibly deprivation of life's necessities"); *Justiniano v. Social Sec. Admin*., 876 F.3d 14, 28 (1st Cir. 2017) (determining that "retroactive payment would not be a sufficient remedy" for the harms of "forgoing access to essential medical, water, and electric services" caused by the termination of federal benefits). The Rule forces Plaintiffs and others into making these impossible, and irreparable choices.

[20] The pending challenge to the Rule by twenty-one States and the District of Columbia in the District of Massachusetts, *see supra* n.8, does not diminish the need for relief here. New Hampshire is not a plaintiff in that action, and, to date, no request for immediate relief has been filed. Moreover, any relief entered there may be limited to the plaintiff States, and no order has yet issued. Plaintiffs will promptly advise the Court of any ruling in that case bearing on this motion.

medical care. Parents, together with their children's physicians, have primary responsibility for judgments concerning a child's "need for medical care or treatment." *Parham v. J.R.*, 442 U.S. 584, 604 (1979); *see also Troxel v. Granville*, 530 U.S. 57, 65–66 (2000). The Parent Plaintiffs, together with their children's physicians, have made a considered medical decision, in accordance with the applicable standards of care, that the Rule forecloses in practice by withdrawing the only means of paying for it. The loss of that decision—and of the developmental window in which it must be carried out—during the pendency of this case cannot be remedied afterward by any judgment on the merits. Goe Decl. ¶ 18; Koe Decl. ¶ 16; Loe Decl. ¶ 18; Moe Decl. ¶ 17; Millington Decl. ¶ 25.

## III. The Public Interest Overwhelmingly Favors Relief.

The balance of harms and public interest favor Plaintiffs because they are likely to succeed on the merits, will suffer irreparable harm without relief, and seek to preserve the coverage Congress guaranteed to low-income children through the Medicaid Act. *See supra*, Part I. "[T]he public has an important interest in making sure government agencies follow the law." *Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323, 343 (D. Mass. 2005); *see also Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994) (recognizing the public interest "in having governmental agencies abide by the federal laws that govern their existence and operations").

Issuing the injunction will burden Defendants less than denying an injunction would burden the Plaintiffs. Denying relief would put the four named adolescents at risk of losing coverage for treatment their families cannot afford. *See* Goe Decl. ¶ 16; Koe Decl. ¶ 14; Loe Decl. ¶ 16; Moe Decl. ¶ 14. The consequences of denying relief are not merely financial. The record describes the risk of irreversible pubertal changes for Grace, Kylie, and Logan, as well as serious psychological distress associated with interrupted or unavailable treatment. For Maya, the record

describes worsening withdrawal, irritability, and depression when her puberty blocker wore off. *See* Goe Decl. ¶ 14; Koe Decl. ¶ 12; Loe Decl. ¶ 18; Moe Decl. ¶ 16. The practical burden of denying relief would fall on these families and the children facing interruption of treatment. In contrast, the burden of granting it would be limited to maintaining the status quo of continued federal participation for the named Plaintiffs. On this record, that limited burden is outweighed by the concrete and potentially irreversible harms Plaintiffs face absent an injunction.

By contrast, any harm to Defendants is minimal. Relief would merely preserve the longstanding federal policy that preceded the Rule as to the named Plaintiffs. *See Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 41 n.5 (1st Cir. 2010) ("The status quo [is] the last uncontested status which preceded the pending controversy." (cleaned up)). Defendants cannot claim cognizable harm from an order prohibiting unlawful conduct. *See Lanier v. City of Boston*, 95 F. Supp. 2d 17, 21 (D. Mass. 2000). Nor does the public interest favor enforcing an unlawful policy that inflicts grave harm without legitimate justification.

Any harm to Defendants is minimal, and there is no public interest in withdrawing physician-prescribed care from children who are thriving on it. The status quo that would be preserved as to Plaintiffs has been in place for years; CMS's own evidentiary foundation, the HHS Review, describes the evidence of harm from these medications as "sparse," *see supra* Statement of Facts Part B; and the medications remain federally funded for other children in whom they produce the same physiological effects, *see supra* Part I.A.3.d. On this record, the asserted governmental interest cannot outweigh the concrete and imminent harm to Plaintiffs.

## CONCLUSION

For the foregoing reasons, the Court should grant the motion and, under Federal Rule of Civil Procedure 65(a), preliminarily enjoin Defendants and the persons described in Rule 65(d)(2) from implementing, enforcing, or applying the Rule, 91 Fed. Reg. 52,406, including 42 C.F.R. §§

441.800–441.802, insofar as those provisions prohibit FFP for puberty-suppressing medications and hormone therapy prescribed for gender dysphoria to Plaintiffs, pending final judgment in this action. Alternatively, if this Court is unable to issue a preliminary injunction decision by October 13, 2026, Plaintiffs respectfully request that this Court issue a temporary restraining order enjoining enforcement of the Rule as to Plaintiffs while this Motion remains pending.

Dated: October 1, 2026

Respectfully submitted,

*/s/ Chris Erchull*
Chris Erchull

**GLBTQ LEGAL ADVOCATES & DEFENDERS (GLAD LAW)**

Joshua D. Rovenger (pro hac vice pending)
Chris Erchull NH Bar No. 266733
Lisa Rodriguez-Ross (pro hac vice pending)
18 Tremont Street, Suite 950
Boston, MA 02108
Telephone: (617) 426-1350
jrovenger@gladlaw.org
cerchull@gladlaw.org
erodriguezross@gladlaw.org

**NATIONAL CENTER FOR LGBTQ RIGHTS**

Rachel Berg (pro hac vice pending)
1401 21st Street #11548
Sacramento, California 95811
Telephone: (415) 365-1338
rberg@nclrights.org

**AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE**

Gilles R. Bissonnette NH Bar No. 265393
Henry R. Klementowicz NH Bar No. 21177
Maria D. Savarese NH Bar No. 273285
Concord, NH 03301
Telephone: (603) 224-5591
gilles@aclu-nh.org
henry@aclu-nh.org
maria@aclu-nh.org

**ROBINSON & COLE LLP**

Seth B. Orkand (pro hac vice pending)
Kendra L. Berardi (pro hac vice pending)
53 State Street, 32nd Floor
Boston, MA 02109
Telephone: (617) 557-6900
sorkand@rc.com
kberardi@rc.com

Danielle H. Tangorre (pro hac vice pending)
111 Washington Avenue, Third Floor
Albany, NY 12210
Telephone: (518) 432-7841
dtangorre@rc.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that this motion, the attached memorandum of law, attached exhibits, and proposed order will be served concurrently with the service of the Summonses and Complaint in this matter upon the following defendants and, as required by Fed. R. Civ. P. 4(i)(1), upon the United States Attorney for the District of New Hampshire and the Attorney General of the United States, by certified mail, return receipt requested. To facilitate expedited consideration, courtesy copies will also be transmitted by electronic mail to the Civil Division of the United States Attorney's Office for the District of New Hampshire and the Federal Programs Branch of the Department of Justice.

U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES
200 Independence Ave. SW
Washington, DC 20201

ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the U.S. Department of Health and Human Services
200 Independence Ave. SW
Washington, DC 20201

CENTERS FOR MEDICARE AND MEDICAID SERVICES
7500 Security Boulevard
Baltimore, MD 21244-1850

MEHMET OZ, in his official capacity as Administrator of the Centers for Medicare and Medicaid Services
7500 Security Boulevard
Baltimore, MD 21244-1850

UNITED STATES ATTORNEY FOR THE DISTRICT OF NEW HAMPSHIRE
53 Pleasant Street, 4th Floor
Concord, NH 03301]

ATTORNEY GENERAL OF THE UNITED STATES
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

Dated: October 1, 2026

*<u>/s/ Chris Erchull</u>*
Chris Erchull