**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

GINA GOE, individually and as parent and next friend of GRACE GOE; KARLA KOE, individually and as parent and next friend of KYLIE KOE; LAURA LOE, individually and as parent and next friend of LOGAN LOE; and MELISSA MOE, individually and as parent and next friend of MAYA MOE,

*Plaintiffs,*

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services; CENTERS FOR MEDICARE & MEDICAID SERVICES; and MEHMET OZ, in his official capacity as Administrator of CMS,

*Defendants.*

No. 1:26-cv-803-SM-TSM

# PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

I. New Hampshire Law Does Not Prohibit Medicaid Coverage of Plaintiffs' Treatment .......... 1

A. New Hampshire's Continuing Treatment Clause Protects the Course of Treatment That Began Before January 1, 2026 .......... 3

1. The text of the clause plainly protects continued treatment, not only continued medication .......... 3

2. The use of "treatment" throughout the chapter confirms that "treatment" means course of care .......... 5

II. Plaintiffs Are Likely to Succeed on the Merits .......... 5

A. CMS's General Plan-Administration Provisions Do Not Authorize a New Categorical Federal Exclusion .......... 5

B. The Rule Conflicts with EPSDT .......... 8

C. The Rule Conflicts With Medicaid's Comparability Requirement and Prohibition Against Diagnosis-Based Denials .......... 11

1. The Rule arbitrarily conditions FFP on the beneficiary's diagnosis .......... 11

2. The federal government cannot require a State to violate the comparability requirement .......... 12

D. The Rule Is Arbitrary and Capricious .......... 14

1. Defendants did not reasonably address reliance interests or obvious alternatives .......... 15

2. CMS did not meaningfully engage with significant comments .......... 16

3. CMS cherry-picked and misrepresented the evidence and imposed a categorical ban without explaining why contrary evidence and significant comments did not matter .......... 17

4. The Rule's safety rationale is contradicted by its exceptions .......... 18

E. The Remaining Factors Support Relief .......... 19

1. The threatened harm is imminent and irreparable .......... 19

2. The balance of hardships and public interest favor a narrow injunction .......... 19

CONCLUSION .......... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ..... 6, 7

*Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*,
622 F.3d 36 (1st Cir. 2010) ..... 20

*Petition of Carrier*,
165 N.H. 719 (2013) ..... 3

*City of Concord v. State*,
164 N.H. 130 (2012) ..... 4

*Concord Hosp., Inc. v. N.H. Dep't of Health & Hum. Servs.*,
743 F. Supp. 3d 325 (D.N.H. 2024) ..... 8

*Dantzler, Inc. v. Empresas Berríos Inventory & Ops., Inc.*,
958 F.3d 38 (1st Cir. 2020) ..... 2

*Dekker v. Weida*,
679 F. Supp. 3d 1271 (N.D. Fla. 2023) appeal docketed, No. 23-12155 (11th Cir. June 27, 2023) ..... 17

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ..... 15, 19

*Flack v. Wis. Dep't of Health Servs.*,
395 F. Supp. 3d. 1001 (W.D. Wis. 2019) ..... 10, 11, 12, 13, 14

*Garran v. SMS Fin. V, LLC (In re Garran)*,
338 F.3d 1 (1st Cir. 2003) ..... 3

*Heckler v. Campbell*,
461 U.S. 458 (1983) ..... 9

*Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc.*,
925 F.2d 6 (1st Cir. 1991) ..... 20

*John A. Cookson Co. v. N.H. Ball Bearings, Inc.*,
147 N.H. 352 (2001) ..... 4

*Kingdom v. Trump*,
No. 1:25-cv-691-RCL, slip op. (D.D.C. June 17, 2026) ..... 11, 18

*Kingdom v. Trump*,
No. 26-5236, 2026 WL 2997915 (D.C. Cir. Sept. 18, 2026)....11

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986)....7

*Lankford v. Sherman*,
451 F.3d 496 (8th Cir. 2006)....13

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)....6, 7

*Medina v. Planned Parenthood S. Atl.*,
606 U.S. 357 (2025)....8, 12

*Miller by Miller v. Whitburn*,
10 F.3d 1315 (7th Cir. 1993)....11

*Moore v. Reese*,
637 F.3d 1220 (11th Cir. 2011)....5

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)....14, 16

*Pinneke v. Preisser*,
623 F.2d 546 (8th Cir. 1980)....13

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012)....6

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan*,
397 F.3d 56 (1st Cir. 2005)....19

*Rush v.* Parham, 625 F.2d 1150, 1154–58 (5th Cir. 1980)....10, 14

*In re Town of Seabrook*,
163 N.H. 635 (2012)....3

*Trump v. Kingdom*,
No. 26A416 (U.S. Oct. 21, 2026)....11

*United States v. Skrmetti*,
605 U.S. 495 (2025)....10

*Weaver v. Reagen*, 886 F.2d 194, 199–200 (8th Cir. 1989)....14

*White v. Beal*,
555 F.2d 1146 (3d Cir. 1977)....12, 13, 14

**Statutes**

42 U.S.C. § 1302(a) .......... 5, 6, 11

42 U.S.C. § 1396a *et seq* .......... 5, 6, 8

42 U.S.C. § 1396c .......... 7, 8

42 U.S.C. § 1396d *et seq* .......... 6, 7, 9, 10

42 U.S.C. § 1397aa(a) .......... 5, 6

42 U.S.C. § 1397bb(a)(7)(A) .......... 5, 6

42 U.S.C. § 1983 .......... 12

RSA 332-N:2 .......... 2, 3, 4, 5

RSA 332-N:3, IV .......... 4

RSA 507-E:1, III .......... 4

Fed. R. Civ. P. 65(a) .......... 20

**Other Authorities**

42 C.F.R. § 430.12(c)(1) .......... 8

42 C.F.R. § 440.230 *et seq* .......... 12, 13, 14

42 C.F.R. § 441.801 .......... 11, 12

42 C.F.R. § 441.802 *et seq* .......... 2, 9, 12, 15, 16

90 Fed. Reg. 8,771 .......... 18

91 Fed. Reg. 52,406 (Aug. 13, 2026) .......... 12

91 Fed. Reg. 52,407 .......... 9, 16

91 Fed. Reg. 52,434 .......... 16

91 Fed. Reg. 52,409 .......... 18

91 Fed. Reg. 52,411–12 .......... 17

91 Fed. Reg. 52,416, .......... 15, 18

91 Fed. Reg. 52,421-22 .......... 17

91 Fed. Reg. 52,426 ....................18

91 Fed. Reg. 52,427 ....................15

91 Fed. Reg. 52,431, ....................18

91 Fed. Reg. 52,451 ....................7

91 Fed. Reg. 52,453–54 ....................17

91 Fed. Reg. 52,473 ....................15

Administration, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/administration (last visited Oct. 20, 2026) ....................4

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision* ....................12

Treatment, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/treatment (last visited Oct. 20, 2026) ....................3

Defendants' Opposition fails to address the central question of this litigation: whether they may use general provisions governing a State's Medicaid plan administration and quality of care to impose a categorical federal funding exclusion that conflicts with Medicaid's specific treatment requirements for and with the agency's own longstanding rule against diagnosis-based denials. They may not. The relevant statutes' plain text does not authorize Defendants' efforts. The Rule withdraws federal funding from the treatment at issue and requires every State Medicaid agency to deny payment for it. Defendants' actions are politically-motivated and driven by disapproval of treatment for gender dysphoria; not because of a sincere engagement with the evidence and available alternatives.

As to the scope of any injunction, Defendants claim that under New Hampshire law, "it is not clear that New Hampshire's plan still covers these treatments." Defendants' Memorandum of Law Opposing Plaintiffs' Expedited Motion for Preliminary Injunction ("Opp.") at 28. But State law limitations, beneficiary-specific Medicaid coverage, and the availability of federal financial participation ("FFP") are distinct. The October 1 letter to which Defendants cite identifies no Plaintiff, denies no claim, and says nothing about ending the State's coverage of this treatment, which New Hampshire Medicaid has continued throughout 2026. ECF No. 27-1, Ex. A at 2; Loe Supp. Aff. ¶ 6.

Plaintiffs seek a narrow injunction against applying the Rule's pharmaceutical provisions to the adolescent Plaintiffs, to the extent their treatment is otherwise covered by New Hampshire Medicaid. They seek no relief concerning surgery and no universal injunction. Defendants do not contest any of the facts contained in Plaintiffs' declarations or the expert declaration of Kate Millington, M.D. The Court should grant that limited preliminary relief.

## I. New Hampshire Law Does Not Prohibit Medicaid Coverage of Plaintiffs' Treatment

Plaintiffs need not show that their requested relief would eliminate every obstacle to care,

only that it is likely, rather than "merely speculative," to redress their injuries. *Dantzler, Inc. v. Empresas Berríos Inventory & Ops., Inc.*, 958 F.3d 38, 47 (1st Cir. 2020). New Hampshire Medicaid has covered each Plaintiff's treatment throughout 2026, including a change in Logan's course of treatment. Loe Supp. Aff. ¶ 6. Indeed, each adolescent was receiving clinical care for gender dysphoria prior to January 1, 2026. Goe Decl. ¶¶ 8, 11, 13; Koe Decl. ¶¶ 9, 11–15; Loe Decl. ¶ 11; Moe Decl. ¶¶ 9–11. The Rule ends that coverage by withdrawing FFP and requiring the State plan to provide that the agency "will not make payment under the plan" for Plaintiffs' medications. 42 C.F.R. § 441.802(a)–(b). Enjoining the Rule as to Plaintiffs would remove that obstacle, and no evidence in the record suggests New Hampshire Medicaid would discontinue their coverage but for the Rule.[1]

Defendants, who have no authority to interpret or enforce RSA 332-N, argue that New Hampshire law independently prohibits the care for which Plaintiffs seek Medicaid coverage. They read RSA 332-N:2, III to protect only medications prescribed before January 1, 2026. Opp. at 39. The Court need not definitively interpret that provision of New Hampshire law because Defendants' prediction of New Hampshire Medicaid's conduct rests entirely on their interpretation of a statute no New Hampshire court has addressed.

In any event, nothing in RSA 332-N:2, III limits "continued treatment" to continuing a single medication. The text and structure protect a course of treatment begun before January 1, 2026, including its later phases; Defendants' contrary reading produces results the legislature could not have intended. Even under their reading, the dispute concerns only the scope of relief, because Defendants concede that New Hampshire law permits at least Logan and Maya to continue

---

[1]The letter from the New Hampshire Department of Health and Human Services Defendants submitted as an exhibit to their Opposition says nothing to indicate any intent to change its practice of covering the treatments.

medications prescribed before January 1, 2026. Opp. at 38–39.

### A. New Hampshire's Continuing Treatment Clause Protects the Course of Treatment That Began Before January 1, 2026

This Court "must predict how the [New Hampshire Supreme Court] would interpret the statute," *Garran v. SMS Fin. V, LLC (In re Garran)*, 338 F.3d 1, 6 (1st Cir. 2003), and that analysis begins—and, where the language is unambiguous, ends—with the statute's plain and ordinary meaning. *Petition of Carrier*, 165 N.H. 719, 721 (2013); *In re Town of Seabrook*, 163 N.H. 635, 644 (2012).

#### 1. <u>The text of the clause plainly protects continued treatment, not only continued medication</u>

The continuing treatment clause provides: "Nothing in this chapter shall prohibit a health care provider from continuing the direction or administration of medication or treatment that began prior to January 1, 2026, and such continued treatment shall not be considered a violation of this chapter." RSA 332-N:2, III. Defendants read the clause to protect only the specific medications prescribed before January 1, 2026. Opp. at 39. But it protects "medication *or treatment*" and the continued "*direction* or administration" of treatment—not merely "a medication that was prescribed." Defendants thus add a limitation the legislature "did not see fit to include." *Carrier*, 165 N.H. at 721. Four textual features confirm that "treatment" means a course of care, not a particular drug.

*<u>First</u>*, the ordinary meaning of "treatment" is a course of care: the "management and care to prevent, cure, ameliorate, or slow progression of a medical condition."[2] "Management and care" occur and evolve over time, so "treatment," without qualification, denotes the course of care as a whole. The omission of "course of" from Paragraph III therefore implies no narrower meaning.

[2] Treatment, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/treatment (last visited Oct. 20, 2026).

New Hampshire statutes also use the terms interchangeably. *See* RSA 507-E:1, III (referring to "premature abandonment of a patient or of a course of treatment"). The technical meaning is the same: in medicine, "treatment" is a planned course of care that proceeds through clinically indicated phases. Millington Supp. Decl. ¶ 8. Thus, under either meaning, the "treatment that began prior to January 1, 2026" is the patient's course of care, which Paragraph III permits to continue.

*Second*, the clause lists "medication" and "treatment" as alternatives, and different words generally convey different meanings. *City of Concord v. State*, 164 N.H. 130, 141 (2012) (quotation omitted); *see John A. Cookson Co. v. N.H. Ball Bearings, Inc.*, 147 N.H. 352, 357 (2001). "Treatment" therefore means more than a particular medication. Nor does it merely mean a non-pharmaceutical "procedure": the legislature repeatedly used "procedure" in Paragraphs I and II but chose the broader term "treatment" in Paragraph III. Elsewhere, the chapter confirms that breadth by referring to "procedures, therapies, prescriptions, or other treatments." RSA 332-N:3, IV. The safe harbor thus protects continuing treatment generally, not merely a fixed list of interventions.

*Third*, after protecting "medication or treatment," the clause provides that "*such continued treatment* shall not be considered a violation." RSA 332-N:2, III (emphasis added). The legislature thus used "treatment" to encompass everything protected by the first half of the clause, including clinically indicated medication. A particular medication may be one component of the treatment that may continue.

*Finally*, the clause protects "continuing the direction" of treatment, not merely its "administration." Administration means giving medication[3]; direction means managing treatment over time, including monitoring the patient, adjusting dosages or formulations, and advancing to the next clinically indicated phase. Millington Supp. Decl. ¶¶ 8, 9. Limiting a provider to the

[3] Administration, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/administration (last visited Oct. 20, 2026).

medication prescribed before January 1 would reduce the provider's role to administration and render "continuing the direction" superfluous.

Nor does "that began prior to January 1, 2026" limit the clause to particular drugs. The phrase fixes when "medication or treatment" must have begun; it does not restrict later steps within that treatment. Defendants' reading would protect administration of the same drug but not direction of the next step in the same course of care—a distinction the text does not draw.

2. The use of "treatment" throughout the chapter confirms that "treatment" means course of care

Read as a whole, Chapter 332-N regulates care by purpose, not by a fixed list of drugs. Paragraph I prohibits a medical procedure, "including but not limited to" puberty-blocking or cross-sex hormone medication, when provided for specified purposes. RSA 332-N:2, I. Paragraph II likewise defines an exception by treatment purpose, and Paragraph III protects care begun before the cutoff date. *Id.* at II–III. The damages provision further lists "procedures, therapies, prescriptions, or other treatments," confirming that medications are components of broader treatment. *Id.* § 332-N:3, IV. The availability of the safe harbor therefore turns on when the course of care began, not on which medication was prescribed.

## II. Plaintiffs Are Likely to Succeed on the Merits

### A. CMS's General Plan-Administration Provisions Do Not Authorize a New Categorical Federal Exclusion

As they did in the Rule itself, Defendants invoke 42 U.S.C. §§ 1396a(a)(19), 1396a(a)(30)(A), 1397aa(a), 1397bb(a)(7)(A), and 1302(a), but those provisions authorize CMS to *oversee* State plans and enforce conditions; they do not authorize CMS to *create* a nationwide, diagnosis-specific funding condition that Congress did not enact. *See Moore v. Reese*, 637 F.3d 1220, 1238 (11th Cir. 2011). The cited provisions govern State-plan safeguards, administration, quality, CHIP standards, and rules consistent with the Social Security Act. 42 U.S.C. §§

1396a(a)(19), 1396a(a)(30)(A), 1397aa(a), 1397bb(a)(7)(A), 1302(a). These general oversight provisions do not authorize CMS to impose a new condition barring States from covering treatment for a particular condition.

Defendants' principal response is that §§ 1396a(a)(19) and 1396a(a)(30)(A) are "judgment-laden" standards that delegate discretion to the Secretary, so that the Court's only role under *Loper Bright* is to "fix[] the boundaries of the delegated authority" and ensure reasoned decision-making within them. Opp. at 14–17 (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024)). But *Loper Bright* requires courts to "exercise their independent judgment in deciding whether an agency has acted within its statutory authority," 603 U.S. at 412, and to locate the boundaries of any delegation in the statute as a whole, not in the agency's own description of its powers. Here those boundaries are set by provisions Defendants barely mention: § 1396d(r)(5), which requires coverage of "necessary health care . . . to correct or ameliorate" a child's conditions "whether or not such services are covered under the State plan," and § 1396a(a)(10)(B), which requires that services be comparable among beneficiaries. A general instruction that State plans "safeguard against unnecessary utilization" cannot be read to authorize what those specific provisions forbid. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("[T]he specific governs the general.").

Nor do the provisions Defendants cite delegate the power they claim. Sections 1396a(a)(19) and (a)(30)(A) are conditions on State plans. They describe what a State must do, and they authorize the Secretary to determine whether a State's plan does it. They do not say that the Secretary may himself prescribe, by nationwide rule, that a particular treatment for a particular diagnosis is never necessary for any beneficiary. *Armstrong* confirms as much. The Court there called § 1396a(a)(30)(A) a "judgment-laden standard" in explaining why its enforcement—against

a State's *payment rates* for habilitation services—was committed to the Secretary rather than to private suits. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 323, 328–29 (2015). Nothing in *Armstrong* suggests that the provision empowers the Secretary to override the Act's specific coverage mandates. Section 1396c, finally, permits the Secretary to withhold funds when a State substantially fails to comply with the conditions *Congress* enacted; it does not authorize CMS to impose a new condition on an otherwise compliant State plan.

Defendants' fallback—that "necessary care . . . remains covered" because CMS has determined that this care is never necessary, Opp. at 23—is circular. If CMS can circumvent EPSDT by declaring a category of treatment categorically unnecessary, § 1396d(r)(5) imposes no independent limit on the agency. That reading also inverts *Loper Bright*, which assigns to the Court, not the agency, the task of fixing the boundaries of delegated authority. 603 U.S. at 395. Defendants cannot locate the boundary by assuming the conclusion that lies on the other side of it.

Defendants' reliance on Congress's express funding exclusions and the sterilization regulations does not supply the authority missing here. Opp. at 18–21. Congress's express exclusions reinforce that categorical exclusions require congressional direction. ECF No. 7 at 24–25. The sterilization regulations do not show otherwise. They govern a discrete procedure defined by its purpose—permanent infertility—not medications covered when prescribed for other diagnoses. CMS disclaimed those regulations as a "direct legal predicate" for the Rule, citing them only as "precedent illustrating" prior age-based limits. 91 Fed. Reg. 52,451. And any authority to adopt those regulations in 1978 does not establish authority for this Rule. An agency "literally has no power to act . . . unless and until Congress confers power upon it," *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986), and cannot bootstrap authority from its own prior, unchallenged action.

Finally, contrary to Defendants' assertion, Plaintiffs do not claim that States have "ultimate discretion to determine the best interests of recipients." Opp. at 21. Congress sets Medicaid's conditions and authorizes HHS to withhold funds for substantial noncompliance. 42 U.S.C. §§ 1396a(a), 1396c. That *enforcement* authority does not permit CMS to add a new coverage condition by rule. *See Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 364 (2025).

**B. The Rule Conflicts with EPSDT**

Defendants invoke 1396(a)(30)(A) to support their interpretation of the statute. But Section 1396a(a)(30)(A) requires State plans to "provide . . . methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care." States must also amend their plans "whenever necessary to reflect . . . [m]aterial changes in State law, organization, or policy, or in the State's operation of the Medicaid program," 42 C.F.R. § 430.12(c)(1), and CMS must review and "shall approve" a plan that satisfies the conditions Congress specified, 42 U.S.C. § 1396a(b). These provisions govern utilization, payment, and States' obligations to update their plans; none authorize CMS to declare an entire category of treatment medically unnecessary for certain beneficiaries regardless of their clinical circumstances or treating team's clinical judgment. Defendants' reading would convert general provisions governing State plan administration and utilization review into authority to override Congress's specific requirement that sets EPSDT as the coverage floor that both States and CMS must honor. *See Concord Hosp., Inc. v. N.H. Dep't of Health & Hum. Servs.*, 743 F. Supp. 3d 325, 336 (D.N.H. 2024).

Plaintiffs do not contend that a provider's label of a medical treatment as "necessary" automatically compels coverage or that CMS must "review and rebut the determination of treating physicians in each individual case." *See* Opp. at 22. CMS may not replace the medical necessity inquiry Congress granted to the States with a nationwide rule foreclosing any finding of necessity

for every treatment in a defined category when used for a particular diagnosis. By including the phrase "whether or not," Congress deliberately expanded coverage applicable to youth beyond services otherwise included in a State plan. *See* ECF No. 7 at 27. And because gender dysphoria is a recognized medical condition and the medications at issue fall within categories of medical assistance described in Section 1396d(a), coverage turns on whether a requested service is necessary to correct or ameliorate an individual adolescent's condition. The Rule answers that question with a categorical exclusion Congress did not authorize.

The cases Defendants cite do not save the Rule. They cite *Heckler v. Campbell*, 461 U.S. 458 (1983), which permits an agency to resolve by regulation issues that do not require case-by-case consideration, while preserving individualized fact-finding and an opportunity to show that a general guideline does not apply. *Id.* at 467–68; Opp. at 22. The Rule at issue here does the opposite: it declares the covered treatments medically unnecessary for every Medicaid-enrolled adolescent with gender dysphoria without exception based on the child's condition, treatment history, multidisciplinary assessment, or response to care. CMS therefore has not merely established criteria for assessing necessity but has eliminated the statutory inquiry altogether. That result conflicts with § 1396d(r)(5), which asks whether a service is necessary to correct or ameliorate the condition identified through screening.

And the Rule does more than withhold federal dollars. It requires every State plan to provide that the State Medicaid agency "will not make payment under the plan" for this treatment, 42 C.F.R. § 441.802(a), and it conditions approval of the State's plan on that assurance. Defendants emphasize that a State remains free to pay for this care "with State-only funds outside of the Federally-matched Medicaid program." Opp. at 18 (quoting 91 Fed. Reg. 52,407); *see id*. at 9–10, 31. But that is precisely the point: the only path the Rule leaves open is for a State to build and

fund a separate, non-Medicaid program for a single diagnosis. The Rule does not permit a State to continue covering these medications for adolescents through its Medicaid plan, as New Hampshire has done for these Plaintiffs throughout 2026, and nothing in the record suggests that New Hampshire has such a stand-alone program. EPSDT, by contrast, requires that necessary care be furnished *under the plan*, "whether or not such services are covered under the State plan." 42 U.S.C. § 1396d(r)(5).

Nor is *Skrmetti* in tension with Plaintiffs' EPSDT argument. *See United States v. Skrmetti*, 605 U.S. 495 (2025). It addressed whether a state restriction violated the Equal Protection Clause—not the Medicaid Act, the EPSDT requirements of Section 1396d(r)(5), or CMS's rulemaking authority. That the Constitution permits a State to enact a restriction does not mean CMS may impose the same restriction by regulation despite an affirmative statutory coverage mandate. *Skrmetti* did not speak to the operative question here.

*Rush v. Parham* likewise does not support the Rule. *Rush* held that a State may reasonably define medical necessity and limit physician discretion, including by excluding experimental or ineffective treatment. 625 F.2d 1150, 1154–58 (5th Cir. 1980). But *Rush* did not approve an irrebuttable exclusion imposed solely because of the diagnosis or treatment purpose. To the contrary, it preserved the treating physician's primary responsibility and contemplated individualized review of medical judgment. *Id.* at 1156 (noting that allowing states to establish standards for medical necessity "does not remove from the private physician the primary responsibility of determining what treatment should be made available to his patients."). *Flack* applied that very distinction, explaining that whatever *Rush* may have permitted on its 1980 record, a categorical exclusion was unreasonable where current authoritative evidence and professional consensus established that gender-confirming treatments can be safe, effective, and medically

necessary.[4] *Flack v. Wis. Dep't of Health Servs.*, 395 F. Supp. 3d. 1001, 1015–18 (W.D. Wis. 2019); *see also Miller by Miller v. Whitburn*, 10 F.3d 1315, 1320 (7th Cir. 1993) (finding "the best indicator that a procedure is experimental is its rejection by the professional medical community as an unproven treatment") (citations omitted). The Rule here forecloses coverage even when a treating clinician and multidisciplinary team determine that puberty-suppressing medication or hormone therapy is necessary for a particular adolescent, although the same medications remain eligible for FFP when used for other diagnoses. Reasonable utilization standards may shape a lawful definition of medical necessity; they may not predetermine the outcome for an entire class of patients and nullify EPSDT's command to cover necessary corrective or ameliorative services. Section 1302 authorizes only regulations "not inconsistent with" the Act, 42 U.S.C. § 1302(a), and the Rule crosses that line by making CMS's generalized assessment conclusive in every case.

### C. The Rule Conflicts With Medicaid's Comparability Requirement and Prohibition Against Diagnosis-Based Denials

#### 1. <u>The Rule arbitrarily conditions FFP on the beneficiary's diagnosis</u>

Defendants claim that because the Rule applies to every beneficiary under age 18 (or 19 for CHIP), it is treating every beneficiary alike. *See* Opp. at 26. This is nonsensical. The treatments at issue are only "sex-rejecting" when used to treat patients diagnosed with gender dysphoria; the identical medications are not "sex-rejecting" when used to treat other diagnoses. *See* 42 C.F.R. § 441.801. Claiming the Rule applies equally to all beneficiaries is akin to claiming that a ban on chemotherapy to treat abnormal cell growth is diagnosis neutral, when "abnormal cell growth" is a description of cancer. The Rule defines prohibited "sex-rejecting procedures" as those that

---

[4] Yesterday, the Supreme Court denied the government's motion to stay a preliminary injunction prohibiting the Bureau of Prisons from enforcing a policy that would prevent transgender inmates from receiving hormone therapy, among other treatment. The District Court entered the preliminary injunction after finding that "gender affirming care is the only effective treatment for gender dysphoria." *Kingdom v. Trump*, No. 1:25-cv-691-RCL, slip op. at 13 (D.D.C. June 17, 2026); *Kingdom v. Trump*, No. 26-5236, 2026 WL 2997915, at *1 (D.C. Cir. Sept. 18, 2026), *Trump v. Kingdom*, No. 26A416 (U.S. Oct. 21, 2026) (application for stay denied).

"attempt[] to align individual's physical appearance or body with an asserted identity that differs from the individual's sex." *Id.* That intended use is synonymous with use to treat gender dysphoria. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision* (defining "gender dysphoria" in children as "a marked incongruence between one's experienced/expressed gender and their assigned gender").

Section 440.230(d)'s "appropriate limits" cannot erase subsection (c)'s specific bar on denying a required service solely because of diagnosis, illness, or condition. Medical necessity may support individualized limits, not an irrebuttable rule that treatment is never necessary for one diagnosis. *See* 42 C.F.R. § 440.230(c)–(d); *White v. Beal*, 555 F.2d 1146, 1152 (3d Cir. 1977); *Flack*, 395 F. Supp. 3d at 1019.

2. <u>The federal government cannot require a State to violate the comparability requirement</u>

Defendants' contention that the comparability requirement binds only States is a red herring. The Secretary cannot evade Medicaid's comparability and coverage requirements by placing a diagnosis-based restriction in a federal regulation. The Rule does not merely apply to federal expenditures; it commands that each "State Medicaid plan must provide that the Medicaid agency will not make payment under the plan" for the disfavored uses. 91 Fed. Reg. 52,406 (Aug. 13, 2026); 42 C.F.R. § 441.802(a). The Rule thus compels State Medicaid agencies to implement the categorical diagnosis-based denial that § 440.230(c) forbids.

Nor does *Medina v. Planned Parenthood S. Atl.*, 606 U.S. at 379, hold otherwise. *Medina* addressed whether a Medicaid provision conferred an individually enforceable right under 42 U.S.C. § 1983; it did not authorize CMS to compel State plans to disregard § 440.230(c), much less shield that agency action from review under the APA.

Defendants' invocation of *Auer* deference fares no better because the regulations at issue

are not ambiguous. Section 440.230(c) expressly addresses denial or reduction "solely because of the diagnosis, type of illness, or condition," while subsection (d) permits only "appropriate" limits. No ambiguity permits CMS to redefine a diagnosis-specific categorical exclusion as diagnosis-neutral merely by labeling it evidence-based. *See Flack*, 395 F. Supp. 3d. at 1019 ("a state cannot say 'never' when it comes to medically necessary treatments, because there are no such reasons justifying categorical bans on medically necessary treatment.") (quotation omitted). And even if the regulations were ambiguous (they are not), deference to agency interpretation cannot validate an interpretation that conflicts with the regulation's text and structure.

Defendants focus on the word "arbitrarily" while largely reading out the remainder of subsection (c): "solely because of the diagnosis, type of illness, or condition." 42 C.F.R. § 440.230(c); *see also infra* Section II.D. Their reading would permit a State to deny a required service solely by diagnosis whenever the State asserted some nonarbitrary reason for drawing that line. CMS cannot convert the prohibition on diagnosis distinctions into permissible utilization control by invoking generalized uncertainty about the benefit of treatment.

*Flack* held that criticism of the quality of scientific studies does not justify foreclosing individual review where the professional consensus is that the gender dysphoria treatments at issue are safe, effective, and medically necessary. *Id*. at 1013–18 (reviewing cases determining that "the medical consensus is that gender-confirming treatment . . . is accepted, safe, and effective in the treatment of gender dysphoria"); *see also Lankford v. Sherman*, 451 F.3d 496, 511 (8th Cir. 2006) ("[A] state's failure to provide Medicaid coverage for non-experimental, medically-necessary services within a covered Medicaid category is both per se unreasonable and inconsistent with the stated goals of Medicaid."); *Pinneke v. Preisser*, 623 F.2d 546, 548 n.2 (8th Cir. 1980).

*White v. Beal* is instructive because it considered "whether a state regulation that denies

benefits to some and grants them in full to others, based solely on the cause of the disability and not on medical necessity, is in keeping with the statutory plan." 555 F.2d at 1150. The *Beal* court held that it was not, explaining that Medicaid permits distinctions "based upon the degree of medical necessity but *not* upon the medical disorder from which the person suffers." *Id.* at 1152 (emphasis added). *Weaver v. Reagen* likewise held that a Medicaid program could not disregard individual medical need through a categorical drug restriction inconsistent with Medicaid's objectives. 886 F.2d 194, 199–200 (8th Cir. 1989) (finding such categorization constitutes an arbitrary denial based solely on diagnosis, illness, or condition). Even the *Rush* court held that "if defendants simply denied payment for the proposed surgery because it was transsexual surgery, [the state] should now be required to pay for the operation, since a 'state may not arbitrarily deny or reduce the amount, duration, or scope of a required service . . . solely because of the diagnosis, type of illness, or condition.'" 625 F.2d at 1156 n.12 (quoting 42 C.F.R. § 440.230(c)(1)). *Flack* synthesized these authorities and held that an exclusion denying medically necessary treatments for gender dysphoria, while covering the same treatments for other conditions, violated both Medicaid's availability and comparability requirements. 395 F. Supp. 3d 1001, 1018–19. Together, these cases foreclose Defendants' attempt to transform a categorical diagnosis-dependent denial into an "appropriate" limit based on medical necessity. That the command now comes from CMS rather than a State does not cure the violation, because the Rule expressly requires each State plan and Medicaid agency to implement the prohibited denial. The Rule therefore is a categorical, diagnosis-dependent denial that subsection (c) forbids.

**D. The Rule Is Arbitrary and Capricious**

CMS was required to examine the important aspects of the problem, confront significant contrary evidence, and explain its choice. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). It did not.

1. Defendants did not reasonably address reliance interests or obvious alternatives

Defendants' assertion that they "carefully considered" reliance interests does not address the reliance interest Plaintiffs identified: continued access to treatment already prescribed and covered after lengthy periods of individualized assessment. Opp. at 30–31. The Rule does not merely leave past treatment unpaid; it cuts off Medicaid coverage for adolescents mid-treatment, disrupting the care on which they and their families have relied.

The Rule's prospective application does not address that reliance because the injury is the loss of ongoing care. Nor does the six-month hormone taper address Plaintiffs' reliance interests: it imposes a phaseout to zero, applies only to hormone therapy and does not apply to puberty-suppressing medication. The Rule provides no transition for adolescents on these medications, even though stopping treatment will likely cause puberty to resume within months and produce permanent changes. *See* 42 C.F.R. § 441.802(c); 91 Fed. Reg. 52,416, 52,421–22; *see also* Loe Decl. ¶ 12; Koe Decl. ¶ 13; Goe Decl. ¶ 13.

CMS rejected continued coverage for beneficiaries already receiving treatment and dismissed individualized prior authorization and State or provider judgment as mere "administrative safeguards." Opp. at 30–31. *Regents* requires CMS to seriously consider reliance interests and alternatives within the scope of its policy. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30–33 (2020). CMS's treatment of these alternatives does not meet that standard. The Rule names them and dismisses them with the assertion that CMS's concerns "cannot be rendered appropriate for Federal funding through administrative safeguards alone." 91 Fed. Reg. 52,473; Opp. at 31. *Regents* does not permit an agency to satisfy its obligation by naming an alternative and rejecting it; the agency must explain why the alternative would not address the problem it has identified. *See* 591 U.S. at 33. An exemption for adolescents already in treatment would not have

required CMS to fund a single new course of care. Defendants point to nothing in the Rule explaining why the agency's stated rationale—uncertainty about long-term benefit—justifies interrupting the treatment of patients whose clinicians have already assessed them, and who face documented and immediate harm from withdrawal.

The six-month taper period also does not address the medical risks of forced discontinuation of treatment. The record describes serious physical and psychological harms, including the possibility that withdrawal produces the very harms CMS says it seeks to prevent, such as decreased bone density. ECF No. 7 at 38–39, 41; Millington Decl. ¶ 25. CMS's discussion of State-only funding and prospective application does not explain how families unable to afford care can continue it, or how a State could realistically create and fund a separate, non-Medicaid program to pay for care that the Rule forbids its Medicaid agency to cover under the plan. 42 C.F.R. § 441.802(a); 91 Fed. Reg. 52,407, 52,434. Pointing to a hypothetical State-only program is not reasoned consideration of reliance when the Rule identifies no State that has one and offers no explanation of how one could be stood up before Plaintiffs' coverage ends. The agency's reliance analysis cannot be adequate when it treats the loss of treatment as a voluntary choice and leaves the practical consequences unaddressed.

2. <u>CMS did not meaningfully engage with significant comments</u>

Although the APA does not require an agency to answer every comment, it does require a reasoned response to significant objections. *See, e.g.*, *State Farm*, 463 U.S. at 43. The record shows that CMS did not meaningfully or genuinely engage with the significant comments it received. For example, the Endocrine Society explained that the standard methodology for assessing certainty in a body of evidence (called "GRADE") measures certainty, not whether treatment is clinically appropriate, and that guideline panels may make strong recommendations after considering patient

values and clinical judgment. CMS's response was to label the Endocrine Society's guidelines "of very low quality," citing a single systematic review of guideline methodology, and to declare that their recommendations "should not be implemented." 91 Fed. Reg. 52,411–12, 52,427; *see* Opp. at 33. That is not a response to the Society's point. The comment did not dispute that the underlying evidence is rated low-certainty under GRADE; it explained why a low-certainty rating does not mean treatment is clinically inappropriate and why guideline panels may still make strong recommendations. *Dekker v. Weida*, 679 F. Supp. 3d 1271, 1293–94 (N.D. Fla. 2023) *appeal docketed*, No. 23-12155 (11th Cir. June 27, 2023) (finding that "treatment should be banned based on the supporting research's GRADE score is a misuse of the GRADE system.") An agency that answers that argument by repeating the rating has not engaged with it. ECF No. 7 at 37–38. CMS similarly dismissed comments submitted by the American Academy of Pediatrics ("AAP") without addressing the AAP's emphasis on individualized assessment as being the clinical standard of care. 91 Fed. Reg. 52,427, 52,453–54.

3. <u>CMS cherry-picked and misrepresented the evidence and imposed a categorical ban without explaining why contrary evidence and significant comments did not matter</u>

Defendants defend CMS's reliance on the HHS umbrella review and assessments from the United Kingdom, Sweden, Finland, and Denmark while dismissing domestic clinical guidelines and evidence submitted by the Endocrine Society, the AAP, and other commenters. But as Dr. Millington describes, those health authorities did not reach the conclusion CMS attributes to them. Each continues to make puberty-suppressing medication or hormone therapy available to adolescents in specialized or research settings, each continues treatment for patients already receiving it, and none purported to find that this treatment can never be medically necessary for any adolescent. Millington Supp. Decl. ¶¶ 48–54. The HHS Review considered only 17 of the 286 systematic reviews it screened, acknowledged that evidence of harm was "sparse," and cautioned

that low-certainty evidence does not establish ineffectiveness. ECF No. 7 at 30, 37–39; Erchull Decl., Ex. H at 87–88, 230. The term "low-certainty" is a description of the *types* of available studies, not the quality of the evidence. And low-certainty evidence guides the majority of medical decisions. Millington Supp. Decl. ¶¶ 11–35. CMS did not have to accept Plaintiffs' preferred evidence, but it had to explain why its selected studies outweighed substantial contrary evidence and why uncertainty justified a categorical ban rather than individualized review. It did not.

The Rule followed an Executive Order directing HHS to end the treatment for gender dysphoria in children and agency statements announcing that result before rulemaking. ECF No. 7 at 4–9, 41; 90 Fed. Reg. 8,771; Erchull Decl., Ex. L. Plaintiffs do not claim policy motivation alone invalidates the Rule; however, the chronology of the Administration's pronouncements about treatment for adolescents with gender dysphoria underscores CMS's failure to engage contrary evidence and alternatives. *See also Kingdom v. Trump*, No. 1:25-cv-691-RCL, slip op. at 11-12 (D.D.C. June 17, 2026) (finding Bureau of Prisons policy against hormone therapy for transgender inmates "pretextual and reverse engineered to implement EO 14168").

4. <u>The Rule's safety rationale is contradicted by its exceptions</u>

CMS invokes risks such as decreased bone density and other physiological effects while preserving FFP for the same medications when used for other diagnoses. ECF No. 7 at 40; 91 Fed. Reg. 52,409. Defendants do not answer the objection, but instead explain that puberty blockers "have been primarily studied in children affected by precocious puberty" and are used there for a limited period to "temporarily halt an abnormal developmental process." Opp. at 35 (quoting 91 Fed. Reg. 52,416, 52,426, 52,431). The physiological risks CMS identifies, (e.g. suppressed bone-density accrual) are risks of the medication, not of the diagnosis. The drug acts on the body in the same way, no matter the diagnosis. If CMS's concern were the duration of suppression or the risk

to a particular patient, the agency could have adopted duration limits, monitoring requirements, or patient-specific criteria, and it was obligated to explain why it did not. *Regents*, 591 U.S. at 30–33. Defendants' framing confirms the problem. They defend the Rule as "[a] distinction based on the purpose for which a medication is used." Opp. at 35. But the only "purpose" that triggers the exclusion is treatment of gender dysphoria. Defendants chose a diagnosis-specific line and a taper that may produce the very harms the Rule says it seeks to prevent. That unexplained, and unacknowledged, contradiction is arbitrary and capricious.

### E. The Remaining Factors Support Relief

#### 1. <u>The threatened harm is imminent and irreparable</u>

Defendants' characterization of the Rule as affecting "only funding" ignores the critical fact that Plaintiffs cannot pay for the treatment without Medicaid coverage. The Rule therefore threatens the loss of care and is not merely an accounting matter. Logan's family cannot afford roughly $70,000 per year for blockers; Maya's implant costs more than her mother's annual income, in addition to the costs of estrogen and monitoring. Loe Decl. ¶ 16; Moe Decl. ¶ 14. Grace's and Kylie's clinicians identify imminent treatment windows. Goe Decl. ¶¶ 11, 13; Koe Decl. ¶¶ 9–11, 13–15. Maya's mother reports withdrawal, irritability, and depression when Maya's puberty suppressing medication wore off for only a short period. Moe Decl. ¶ 16. A later judgment cannot restore a lost treatment window or reverse permanent physical changes. These injuries fall squarely within the definition of irreparable harm. *See Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005).

#### 2. <u>The balance of hardships and public interest favor a narrow injunction</u>

The requested injunction is limited to the named Plaintiffs, FFP for prescribed puberty-suppressing medication and hormone therapy for gender dysphoria, and the pendency of this case. It applies only to treatment that is otherwise lawful and covered by New Hampshire Medicaid. It

would not require New Hampshire to cover treatment, prevent CMS from enforcing the Rule against others, or reach surgical procedures. Instead, it would preserve the pre-Rule federal-funding status for the adolescents before the Court, in which New Hampshire Medicaid was providing coverage for these specific Plaintiffs. *See Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 41 n.5 (1st Cir. 2010). The limited federal contribution for these named Plaintiffs is outweighed by the risk of permanent harm. The balance of hardships and public interest favor a preliminary injunction.[5]

## CONCLUSION

For the foregoing reasons, as well as those set forth in Plaintiffs' opening brief, the Court should grant the relief requested in the motion and, under Federal Rule of Civil Procedure 65(a), preliminarily enjoin Defendants as described therein.

[5] The opposition also asks for security under Rule 65(c). The Court should set no bond. *See Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc.*, 925 F.2d 6, 9 (1st Cir. 1991) ("[T]here is ample authority . . . that the provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion to dictate the terms of an injunction bond.") (citations omitted).

Dated: October 22, 2026

Respectfully submitted,

*/s/ Chris Erchull*
Chris Erchull

*/s/ Seth B. Orkand*
Seth B. Orkand

**GLBTQ LEGAL ADVOCATES & DEFENDERS (GLAD LAW)**

Joshua D. Rovenger (pro hac vice)
Chris Erchull NH Bar No. 266733
Lisa Rodriguez-Ross (pro hac vice)
18 Tremont Street, Suite 950
Boston, MA 02108
Telephone: (617) 426-1350
jrovenger@gladlaw.org
cerchull@gladlaw.org
erodriguezross@gladlaw.org

**NATIONAL CENTER FOR LGBTQ RIGHTS**

Rachel Berg (pro hac vice)
1401 21st Street #11548
Sacramento, California 95811
Telephone: (415) 365-1338
rberg@nclrights.org

**AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE**

Gilles R. Bissonnette NH Bar No. 265393
Henry R. Klementowicz NH Bar No. 21177
Maria D. Savarese NH Bar No. 273285
Concord, NH 03301
Telephone: (603) 224-5591
gilles@aclu-nh.org
henry@aclu-nh.org
maria@aclu-nh.org

**ROBINSON & COLE LLP**

Seth B. Orkand (pro hac vice)
Kendra L. Berardi (pro hac vice)
53 State Street, 32nd Floor
Boston, MA 02109
Telephone: (617) 557-6900
sorkand@rc.com
kberardi@rc.com

Danielle H. Tangorre (pro hac vice)
111 Washington Avenue, Third Floor
Albany, NY 12210
Telephone: (518) 432-7841
dtangorre@rc.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that, on this date, I electronically filed the foregoing document using the CM/ECF system, which will send notification of such filing to all those registered with the ECF system.

Date: October 22, 2026

*/s/ Seth B. Orkand*

Seth B. Orkand